# 14-605(L)

## 14-2182 (con); 14-2282 (con)

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

UNITED STATES OF AMERICA,

APPELLEE,

v.

BIBI OMAR, AKA ZAMEENA OMAR,

DEFENDANTS,

KIM RAMLOCHAN, AKA KIM CUPELES, AKA KIM YOHAY, SHANE BROWNE,
CASSANDRA CEAN,

DEFENDANTS - APPELLANTS.

_____

On Appeal from the United States District Court
for the Eastern District of New York

_____

BRIEF and ADDENDA FOR DEFENDANT-APPELLANT CEAN

_____

VIVIAN SHEVITZ
Co-Counsel for Defendant-
Appellant **Cassandra Cean**
46 Truesdale Lake Drive
South Salem, New York 10590
914 763 2122
vivian@shevitzlaw.com

LOUIS M. FREEMAN
FREEMAN, NOOTER & GINSBERG
Attorney for Defendant-Appellant
**Cassandra Cean**
75 Maiden Lane., Suite 503
New York, New York 10038
(212) 608-0808

# TABLE OF CONTENTS

Statement of Subject Matter and Appellate Jurisdiction ...........................................1

Statement of Issues Presented For Review ...................................................2

Statement of the Case............................................................................3

   Introduction and Summary of Arguments ............................................3

   Statement of Facts………………………………………………………….9

   A.  The Indictment ……………………………………………………………9

   B. The Evidence at Trial Concerned A Set of Transactions……………………11

     55 Stillwell Place—Shane Browne to Joanne Legair .....................................12

     55 Stillwell Place—Joanne Legair to Tyroon Comacho ................................14

     742 New Jersey Avenue— McCall Brothers to Tyroon Comacho ...............21

     1144 East 82nd Street— Karen Lewis to Clinton Samuel ...........................25

     113 Chauncey Street– Refinance.................................................................27

     113 Chauncey Street - Shirley Kydd to Godfrey Comacho………………...35

   C.  Shane Browne's Credit Card Assault On Tyroon Comacho and the
Uncharged "Cover-Up" Conspiracy .................................................................30

   D.  Ms. Cean's Good Faith InTransactions At Closing ……………………… 35

   E.  Cross Examination Of Ms. Cean ……………………………………………38

   F.  Sentencing  ……………………………………………………………… 38

   G.  The Rule 33 Motion Based on Jurors' Concealment of Material
Information……………………………………………………………………..38

ARGUMENT ....................................................................................38

    POINT I................................................................................38

    THERE WAS A CONSTRUCTIVE AMENDMENT OF THE INDICTMENT
    JUSTIFYING REVERSAL; THE GRAND JURY DID NOT INDICT ON THE
    CHARGES THAT WERE THE SUBJECT OF EVIDENCE, AND MS. CEAN
    DID NOT HAVE AN OPPORTUNITY TO DEFEND ......................................38


    POINT II .............................................................................42

    MS CEAN WAS NOT SHOWN TO BE A MEMBER OF ANY UNCHARGED
    OR SUBSIDIARY CONSPIRACY; STATEMENTS AND ACTS IN
    FURTHERANCE OF A SUBSIDIARY CONSPIRACY TO CONCEAL OR
    EXTORT SHOULD NOT HAVE BEEN ADMITTED AND WERE
    PREJUDICIAL ........................................................................42


    POINT III .............................................................................47

    EVIDENCE REJECTED UNDER RULE 404(B) WAS IMPROPERLY USED
    TO CROSS EXAMINE MS. CEAN.  THE TACTIC OF READING EMAILS
    FROM AN OUT OF COURT DECLARANT AND QUESTIONING
    DEFENDANT AS IF THOSE STATEMENTS MEANT WHAT THE
    PROSECUTOR SAID THEY MEANT AND WERE TRUE, VIOLATED THE
    CONFRONTATION CLAUSE AND THE HEARSAY RULE, AS WELL AS
    FED. R. EVID. 608. IT WAS PREJUDICIAL AND REQUIRES REVERSAL47


    POINT IV.............................................................................51

    THE MOTION FOR A NEW TRIAL BASED ON JURORS' CONCEALMENT
    OF INFORMATION SHOULD HAVE BEEN GRANTED ..............................51

        Denial of the Rule 33 Motion ......................................................61

        The Court Should Have Vacated The Judgment Or Held A Hearing ...........66

        Judge Johnson Erred In Refusing to Set Aside The Verdict .........................68

POINT V ..................................................................................72

THE SENTENCE IS UNREASONABLE; THE COURT SENTENCED MS.
CEAN FOR FAILURES AS AN ATTORNEY FOR WHICH THE
GRIEVANCE COMMITTEE HAD IMPOSED AN ADMONITION; AND  IT
IGNORED ALL MITIGATING 3553 FACTORS............................................72

    The Harsh Sentence Is Unreasonable …………………………………  73

    Ms. Cean Did Not Intend Obstruction of a Criminal Proceeding ……….  76


CONCLUSION ........................................................................79


**ADDENDA**

Addendum A:  Excerpts, Cassandra Cean Cross examination, Tr. 1027-1041

Addendum B: Objection to 404(b) Evidence, DOC 137, 9/23/13

Addendum C: Memorandum in Support of New Trial for Juror Misconduct

Addendum D: Order Denying New Trial, DOC 188, 4/24/14

Addendum E: Memorandum In Support of Reconsideration, DOC 191, 5/5/14

Addendum F: Sentencing Transcript, 5/9/14

**TABLE OF AUTHORITIES**

**CASES**

Bourjaily v. United States, 483 US 171 (1987) ........................................... 7, 37, 42

Crawford v. Washington, 541 U.S. 36 (2004)........................................................49

Grunewald v. United States, 353 U.S. 391 (1957) ................................. 4, 40, 45, 46

Koon v. United States, 518 U.S. 81 (1996) ...........................................................68

Krulewitch v. United States, 336 U.S. 440 (1949) ................................. 6, 40, 45, 46

McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 556 (1984).........61

Stirone v. United States, 361 U.S. 212 (1960)........................................................39

United State v. Banki, 685 F.3d 99 (2d Cir. 2012),....................................................41

United States v. Agrawal, 726 F.3d 235 (2d Cir. 2013) ............................................39

United States v. Brown, 321 F.3d 347 (2d Cir. 2003)................................................78

United States v. Broxmeyer, 699 F.3d 265 (2d Cir. 2012)........................................73

United States v. Cassiliano, 137 F.3d 742 (2d Cir. 1998) .........................................77

United States v. Cavera, 550 F.3d 180 (2d Cir. 2008) (en banc) ............................73

United States v. Check, 582 F.2d 668 (2d Cir. 1978)....................................... 2, 7, 50

United States v. Colombo, 869 F.2d 149 (2d Cir. 1989) ................................... 65, 71

United States v. D'Amelio, 683 F.3d 412 (2d Cir. 2012)...........................................39

United States v. Daugerdas, 867 F. Supp. 2d 445 (S.D.N.Y. 2012).......................67

United States v. Defeo, 36 F.3d 272 (2d Cir. 1994) .................................................77

United States v. Dorvee, 616 F.3d 174 (2d Cir. 2010) .............................................75

United States v. Ferguson, 246 F.3d 129 (2d Cir. 2001) .........................................68

United States v. Garcia, 936 F.2d 648 (2d Cir. 1991) .............................................64

United States v. Gigante, 166 F. 3d 75 (2d Cir. 1999) .......................... 6, 42, 43, 44

United States v. Langford, 990 F.2d 65 (2d Cir. 1993) ...........................................65

United States v. Nelson, 277 F.3d 164 (2d Cir. 2002)..............................................68

iv

United States v. Orena, 32 F.3d 704 (2d Cir. 1994). ...............................................43

United States v. Parse, 2d Cir. 13-1388-cr .........................................................67

United States v. Reed, 49 F.3d 895 (2d Cir. 1995)................................................77

United States v. Rivera, 22 F.3d 430 (2d Cir.1994) ..............................................47

United States v. Sun Myung Moon, 718 F.2d 1210 (2d Cir. 1983) .......................71

United States v. Tellier, 83 F.3d 578 (2d Cir.1996) ..............................................43

United States v. Vilar, 729 F.3d 62  (2d Cir. 2013)...............................................41

United States v. Vitale, 459 F.3d 190 (2d Cir. 2006) ............................................72

United States v. Woodard, 239 F.3d 159 (2d Cir. 2001) ........................................77

United States v. Ziegler, 583 F.2d 77 (2d Cir. 1978) .............................................43

## CONSTITUTIONAL PROVISION

Confrontation Clause……………………………………………………...2, 48, 49, 50

## STATUTES, RULES, and GUIDELINE

<u>Statute</u>:

18 U.S.C. § 3553(a) ........................................................................... passim

Fed. R. Evid. 403 ...............................................................................2

Fed. R. Evid. 404(b).......................................................................... passim

Fed. R. Evid. 801(d)(2)(E)............................................................... 42, 44

Fed.R.Evid. 608 ................................................................................2, 48

Fed. R. Evid. 608, <u>Notes of Advisory Committee on Proposed Rules</u> and
<u>Committee Notes on Rules—2003 Amendment</u>……………………………...    49

USSG § 3C1.1......................................................................................76

   USSG. § 3C1.1 comment. (n.3(d),(f)-(h)…………………………………    76

## OTHER AUTHORITIES

Cohen and Walsman, "Can You Notarize This?  Taking the Notary Job Seriously,
   Volume 240, NYLJ, Friday, July 18, 2008,
   https://www.stroock.com/SiteFiles/Pub630.pdf ...................................................16

Kristin D. Clardy, <u>Judicial Confusion and Inconsistency in Handling Juror</u>
   <u>Misconduct: A New Proposal</u>, 17 Wm. & Mary Bill Rts. J. 895 (2009),
   http://scholarship.law.wm.edu/wmborj/vol17/iss3/8..........................................66

<u>Lexology</u>,  "If you uncover potential juror bias, do you tell the court?  Yes.",
   <u>http://www.lexology.com/library/detail.aspx?g=8e9b3391-ebbc-4866-8a39-</u>
   <u>ed2ee34d123e</u>.......................................................................................................67

### Statement of Subject Matter and Appellate Jurisdiction

Cassandra Cean appeals from a judgment of conviction (DOC 204) entered after a jury trial in the Eastern District of New York (Sterling Johnson, J.) on June 20, 2014, upon her conviction of one count of conspiracy to commit wire fraud against mortgage lenders, 4 substantive wire fraud convictions, and from the sentence of 87 months' imprisonment, restitution of $1,205,355, and forfeiture in the amount of $43,700.57.

She also appeals from denial of her motion for a new trial or in the alternative an evidentiary hearing, based on evidence that two jurors concealed material information during *voir dire*, involving their work or involvement with mortgage frauds "similar" to those charged here (DOC 188, Order 4/24/14 denying Motion for New Trial, Addendum D).

Judge Johnson stayed Cean's surrender date until February 5, 2015. Between the time of trial and now, on October 1, 2014, Ms. Cean gave birth to a baby girl.

This Court has jurisdiction of the appeal pursuant to 28 U.S.C. 1291.

## Statement of Issues Presented For Review

1.     Whether there was a constructive amendment of the indictment expanding the basis on which the jury could find criminal liability to include an uncharged conspiracy, of which Appellant played no part and was unaware, to threaten and conceal, as well as uncharged frauds committed against the straw-buyers recruited to carry out the scheme.

2.     Whether the tactic of cross-examining defendant on the basis of evidence excluded under Fed. R. Evid. 403, offered through the prosecutor's adoption of hearsay accusations as the truth, violated Fed.R.Evid. 608, the hearsay rule (as elucidated in United States v. Check, 582 F.2d 668 (2d Cir. 1978)), and the Confrontation Clause.

3.     Whether the Court erred in denying a new trial based on revelation of concealment by two jurors of their intimate knowledge of mortgage fraud issues "similar" to the subject of the trial.

4.     Whether the sentence is unreasonable as the Court failed to consider mitigating factors under 18 U.S.C. § 3553(a) and committed error guided by (1) distaste for Appellant's then-status as an attorney who failed to follow disciplinary rules and (2) an erroneous conclusion that an obstruction of justice adjustment was warranted.

## Statement of the Case

**Introduction and Summary of Arguments**

In 2010, appellant Cassandra Cean ("Cean"), an inexperienced attorney and former nurse in 2005-2007, was charged with conspiring to commit wire fraud in a scheme involving straw buyers/borrowers for whom a loan broker supplied false information to obtain mortgages from specified victim-lenders. Ms. Cean's charged role was limited to acting as disbursing (settlement) agent.

The evidence and arguments went far beyond a scheme to defraud lenders. There was overwhelming evidence that straw buyers recruited by Shane Browne ("Shane" or "Browne"), an apparent sociopath, were themselves victims of Browne's fraud. He manipulated them into giving up their property and creditworthiness to "help" Browne (or let him "help" them) engage in transactions designed to put proceeds in his pocket, inveigling them to give him power of attorney and promising he would pay mortgages. He charmed, conned and cozied up to them. In reality he duped them, strapping them with debts they could not pay. If they complained or threatened to sue, he committed another fraudulent deal involving another straw buyer, to conceal what he had done and to obtain more money.

There is no evidence that Appellant Cean was involved with recruiting or victimizing straw buyers. "Concealment" offenses were not charged by the grand

3

jury. <u>Grunewald v. United States</u>, 353 U.S. 391 (1957) (after central criminal purpose of a conspiracy is attained – here, obtaining money from mortgage lenders – subsequent conspiracy to conceal may not be implied.)

Cean went to trial in 2013 on limited charges in a superseding indictment(DOC 56). It charged conspiracy to commit wire fraud in 2005-2007 as against three mortgage lenders, and five counts of substantive wire fraud involving loans obtained through those lenders.

Cean was convicted of conspiracy and four of those five substantive counts. The prosecutor took the position that Cean as an attorney could have *prevented* the fraud – by questioning the clients/ mortgage borrowers' ability to make payments and/or their desire to do so.[1] Judge Johnson adopted the government's view of Cean, and imposed a top-of-the-Guideline-range 87-month sentence for this first time offender. He did so in a case where Ms. Cean received at most $41,000 for

---

[1] At sentencing, the prosecutor opposed a minor role adjustment for Cean because, as the government put it: "If the lawyer says, I don't believe that these straw buyers are able to make these payments, this information seems strange to me, I think it's fraudulent, there's no fraud here" (Addendum F, Tr.14).

In summation, the prosecutor ripped Cean for failing to protect the interests <u>not</u> of lenders she was charged with defrauding, but of clients who took on mortgages because Browne inveigled them to do so. Injecting the opinion of the United States Attorney, the prosecutor argued that Cean had not represented Tyroon Comacho (and others) properly: Ms. Cean said she represented Tyroon Comacho but it was "[n]ot true" …because when you represent someone …, you're supposed to protect their interests. She didn't protect Tyroon Comacho's interests, not for a minute. She let her take on two mortgages in six weeks, both as her primary residence. I mean it's just absurd on its face..." (T.1175).

4

fees.  In contrast Browne received $667,000 and was sentenced to 51 months; and Ramlochan, who falsified information and presented it to lenders, was sentenced to 36 months.

The jury issue was whether Cean "knew," and intended, to defraud the mortgage lenders or whether she was negligent in *not* "knowing" and in failing to discern "signs" the government observed only after the fact – *i.e.,* whether she knew, or "should have" known, but did not. Cean's defense was that, like witnesses Legair, Robinson, Comacho and Lewis, she too was an inexperienced dupe of Shane Browne and though she "should have known" had participated at the time unknowingly.

The government argued in summation that Cean was not a "dupe" because "she is an attorney," she "went to law school," and she "knows the rules" and didn't follow the "letter of the law" (T.1160-61).  Further arguments (noted below)[2] were based on what Cean should have known as an attorney and on

---

[2] Browne arranged with recruits McCall and Lewis to execute a power of attorney in his favor.  He did not tell them they would lose title to their homes because of his exercise of the power; each testified s/he had trusted Browne.  Cean had no reason to think otherwise.

Joann Legair was a friend of Browne's and trusted him to the extent she acted as a straw buyer of his property.  She stopped trusting him only after he had saddled her with a mortgage she could not pay.  Even then, Browne induced Legair to sign a power of attorney in favor of Browne's girlfriend, Debra Robinson to transfer the property out of her name.

condemnation for failing to "properly" represent the legal interest of the straw buyers, *i.e.,* to prevent them from entering into the transactions arranged by Browne – though none had expressed concerns to Cean about their intentions or understanding.

Cean argues that she was unfairly tried for failures as an attorney and tarred with offenses with which she was not charged and as to which there was no evidence of her knowing and willful participation. She argues there was a constructive amendment of the indictment, requiring reversal.

She argues that the method of "proof" – using statements and acts of alleged coconspirators to prove these alternate conspiracies – contravened Krulewitch v. United States, 336 U.S. 440 (1949), and United States v. Gigante, 166 F. 3d 75 (2d Cir. 1999). She was not found, by evidence *aliunde*, to have been a knowing

---

The prosecutor argued in rebuttal that these participants did not "appreciate" the fact that they were giving a power of attorney. The prosecutor continued: "You know who did appreciate that? The defendant. She knew what a power of attorney was." (T.1172) "She is an attorney" (*Id.*)

In rebuttal summation the prosecutor condemned Cean's representation even more directly, arguing that Cean said she represented Tyroon Comacho but it was "[n]ot true …because when you represent someone as an attorney, you're supposed to protect their interests. She didn't protect Tyroon Comacho's interests, not for a minute. She let her take on two mortgages in six weeks, both as her primary residence. I mean it's just absurd on its face..." (T.1175).

At sentencing the prosecutor argued for a harsh sentence based on violation of the obligation of a notary that the signer of a document must sign in her presence. Judge Johnson would agree and sentenced Ms. Cean without consideration of any mitigating factor under 18 U.S.C 3553(a).

participant in any uncharged conspiracy; statements "in furtherance" thereof should not have been admitted. Bourjaily v. United States, 483 US 171 (1987).

Moreover, Cean argues that in cross-examination (excerpted in Addendum A), the prosecutor violated her Confrontation rights and injected hearsay, similar to the tactic condemned in United States v. Check, 582 F.2d 668 (2d Cir. 1978) and contravened Fed. R. Evid. 608.

Cean also argues that the denial of her motion for a new trial, or at least an evidentiary hearing, based on non-disclosures by two jurors of their involvement in "similar" matters was error.

Finally Cean argues that the 87-month sentence was procedurally and substantively unreasonable because Judge Johnson failed to consider *any* mitigation or Section 3553 factors; while becoming a super-disciplinary committee, the court did not consider that a Grievance Committee had imposed an admonition based on her inexperience. She also argues that an obstruction enhancement was improper because there was no proper finding of willfulness or materiality.

## Statement of Facts

### A. The Indictment

The superseding indictment (DOC 56) charged that Shane Browne and a woman named Bibi Omar "recruited individuals with good credit scores (...'Straw

7

Buyers') to purchase residential properties in Brooklyn New York" (Paragraph 1). Kim Ramlochan was a loan officer employed by a mortgage broker, and was alleged to have "used her position as a loan officer to secure mortgages for the Straw Buyers." (paragraph 2).

Defendant Cean "was an attorney admitted to practice law in the State of New York", and she "represented the mortgage lenders in connection with the closings for the mortgages." (Paragraph 3).

Specific mortgage lenders were identified as the defrauded victims of the scheme, specifically, American Brokers Conduit (ABC), WMC Mortgage Corp (WMC), and Impac Funding Corp (Impac). (Paragraph 4).

Paragraphs 5-8 defined a "scheme" from September 2005, until approximately April 2011, and alleged that Browne and Omar recruited straw buyers to purchase residential properties, in exchange for which "some" were promised a fee "which was not always paid", and that in "some instances" were promised also that "after a short period of time" their names "would be removed from the title of the properties." Browne and Omar would refer them to Ramlochan "and other co-conspirators" "for the purpose of providing personal and financial information to be used on the mortgage applications. Ramlochan "together with others" "prepared and submitted loan applications to the identified lenders. "Among other things," Ramlochan "misrepresented the financial

8

information of the Straw buyers ... fraudulently induc[ing] banks and mortgage lenders to approve the loans," and "included falsifying income and bank account balances as well as the stated occupations of the Straw Buyers."

Cean's alleged role appears in paragraph 9: "Once mortgages were approved, the defendant CASSANDRA CEAN, together with others, arranged closings to transfer ownership of the properties, which closings were designed to further the fraudulent scheme. At the closings, the defendant CEAN improperly disbursed proceeds of the mortgage loans to herself, as well as to the defendants BROWNE, OMAR, RAMLOCHAN and other co-conspirators, from her attorney escrow account in contravention of the HUD-l Settlement Statement (the 'HUD-l').

Based on these factual allegations Cean was charged with "knowingly and intentionally conspir[ing] to devise a scheme ... to defraud, and to obtain money and property by means of materially false and fraudulent premises .... and using the wires to do so. Counts Two through Six alleged specific instances of wire fraud, involving five closings.

Cean was convicted of all counts except Count 4, the refinance of 113 Chauncey Street.

## B. The Evidence at Trial Concerned a Set of Transactions

The government offered evidence as to mortgage transactions in which Cean, acting as settlement agent for the lender (and also representing a party)

9

disbursed funds in the manner directed by the seller (Browne, acting with power of attorney, or his "nominee"), including payments to broker Ramlochan or persons she claimed had verified employment, payments to Browne, and payments to herself as fees.

The government claimed that the fact that all such disbursements were not listed on the HUD-1 forms issued to the settlement agent by the lender, itself constituted (or evidenced) fraud on the lender. Cean defended on the ground that payments directed by a seller need not be listed specifically on a HUD-1; where payments are directed by and authorized by the seller (or on his authority), the disbursements are legal.

Cean's position was confirmed by both a lender witness (summarized below)[3] and –grudgingly--by case agent Tarasca. Tarasca admitted she had sworn in the criminal complaint (DOC 1) that HUD allows the payment of cash to a seller to be disbursed according to the seller's preference, "which is the only manner in which someone not listed on the HUD may obtain payment" (T.794).[4] Cean testified that payments on these transactions had been authorized

---

[3] Witness Morrison confirmed that sellers could tell closing agents to pay out pursuant to his or her instructions. Lenders were more concerned with the buyer's side than with the seller's (T.406-15).

[4] Agent Tarasca attempted to disclaim her sworn position, in essence questioning herself as if on re-direct during cross in an attempt to bolster the government's case. She wanted to "explain"; some lenders did not operate that way:

Q [to Agent Tarasca] Did you learn in this case that a seller may disburse funds that the seller is entitled to as a result of a closing and that that doesn't have to be listed on the HUD-1? Of the cash amount, say $200,000 due to the seller, the seller can disburse the fund as he or she sees fit?

A I … learned it in prior mortgage fraud cases that I've worked.

\*\*\*

Q Okay. And so we all understand each other, if the seller tells the settlement agent to distribute the 200,000 in my example, the settlement agent can write fund --

[AUSA] GANDY: Objection ….

   \*\*\*

Q If using the $200,000 figure, if the seller says to the settlement agent would you write these checks for me I'd like to spend my $200,000 in the following manner, that is permissible; correct?

MS. GANDY: Objection, Your Honor.

THE COURT: I'll allow it.

A It really depends on the lender. Certain lenders say that they want every disbursement on the HUD-1 and there's other lenders that say if there's a hundred thousand to the seller, they can disburse that to whomever they want as long it's at their direction. But some lenders do require that every item is listed on the HUD-1. I've heard it from different lenders, different things.

Q Did you sign a complaint in this case?

A I did.\*\*\*

Q And you said in that complaint the HUD allows, however, the payment of cash to the seller to be disbursed according to the seller's preference, which is the only manner in which someone not listed on the HUD may obtain payment.

You swore to the truth of that statement, correct?

A I mean, I'd have to review the document again.

Q Okay. I'll show it to you just to see if I read it properly.

 \*\*\*

A It depends. And I will give you an example.

Q I didn't ask for an example. It depends is fine. …

A I would like to explain, if I can.

Q I'll leave it to the Court, there's no question pending.

THE COURT: Not now. You can explain it later.

11

and requested by the sellers (Browne and/or those for whom he spoke with actual or apparent authority).

## 55 Stillwell Place—Shane Browne to Joanne Legair

There were three "sales" of 55 Stillwell Place, Brooklyn, New York -- property owned by Shane Browne.  In 2005, he recruited his friend Joanne Legair to purchase the property to "help" him, Browne, save his home.

She testified Browne came to her one day "sad," "almost to tears;" he was about to lose his home.  A "gentleman" who was supposed to help him had died the previous day and he was "desperate."  He would give Legair $10,000 if she would "bail him out" by purchasing the home.  He would buy it back in a year's time during which she would lease it to him.  He said that "Brian," with a mortgage company, would describe the details and she agreed (T.422-21).

Legair contacted "Brian" who said it was "perfectly legal."  She gave him her birthdate and a confirmation of employment with Morgan Stanley.  She signed a blank document Brian provided.  At trial, when she saw that document, it stated that she earned $9293.18 per month as a Morgan Stanley accountant and paid $1975/month in rent; it was false (T.423-431).

Paperwork identified Cean as attorney for the purchaser; Legair testified that she was not actually represented by Cean's firm (T.434) but understood

THE WITNESS: Yes, Your Honor. [T.792-96.]

Cean to have been Browne's attorney. She did not know Browne's relationship with Brian (who had assured it was "legal"), but at a closing at Cean's office, Brian attended. Brian gave her a lot of paperwork, which she signed without reading it, relying on the advice of her friend Shane. (T.434-40). On September 22, 2005, Long Beach Mortgage Company wired $496,406.58 to Cean's lOLA account and Cean made disbursements at the direction of Browne.

Cean did not know these details: Legair testified Browne told her he would pay the mortgage directly and this induced her to commit to the transaction. He made one payment and then made excuses for not paying her the $10,000 he had promised. Eventually he brought her a check for $5000 but it bounced twice; later he gave her $5000 cash (T.444-45).

The bank began to call Legair "non-stop." She protested that that the property was leased to the prior owner and he was supposed to pay. She learned she still owed the debt. When the loan representative observed that, "based on the money you make," you should be able to pay the mortgage – a "red flag" went off. She could not have afforded the $4000/month mortgage debt and phoned Brian. She learned the application was falsified (T.447-48).

Legair threatened to sue "all of them." Brian didn't want to go to jail, and apologized. Legair demanded the property be taken out of her name.

13

**55 Stillwell Place—Joanne Legair (Via Robinson) to Tyroon Comacho.**

Shane connived to get a power of attorney from Legair. There is no evidence that Cean knew this. Since Legair would not speak with Shane, he used a surrogate, his girlfriend Debra Robinson (who held a bachelor's degree and worked in a health care facility). Robinson testified she had been in an intimate relationship with Shane, whom she knew to be involved in a real estate business. Robinson had met Ramlochan, who "did documentation" for Shane, and several guys who did manual work fixing up properties (T.598-500). Robinson phoned Legair, who did not know Robinson previously (T.449).

Robinson testified that Shane got her involved when Legair threatened to take him to court because he owed her money. He owed Legair money because (as in another deal) Legair had "put a house in her name."[5] Shane wanted Robinson to ward off the threat of being exposed through a lawsuit.

---

[5] Robinson knew about another deal, not involving Cean. Browne had put another property in Jason Brackin's name. Both the Brackin house and Legair's (where Browne was living) were in arrears. Shane asked Robinson to call the mortgage companies and work out payments.

Robinson "spoke to both Joanne and Jason, got their information and permission to call the mortgage company, and ... made a payment arrangement with the mortgage companies and promised to pay." Robinson made mortgage payments out of her own funds, and some from Shane's, because Shane asked her to do so. Shane was supposed to repay her. He repaid some, but not all of it (T.505-07).

Cean had nothing to do with the transaction between Brackin and Shane. A different attorney had been involved.

14

Robinson inveigled a relationship with Legair: both were from St. Vincents/Grenadines (as was Shane). Shane gave Robinson money to give to Legair but not all that he had promised. Legair testified she had told Shane that unless he compensated her for ruining her credit she would not sign a power of attorney.

Robinson identified an agreement that Shane signed; he was to pay Legair the balance of the $5000 he owed her plus an extra $5000 for ruining her credit. She received only $5000 more, totaling $10,000 for her participation in the transactions. Legair took Shane Browne to Small Claims Court and obtained a judgment, which was unsatisfied (T.460-63). Again there is no evidence Cean knew of any of this.

Because Legair wanted the property taken out of her name she readily signed a power of attorney in Robinson's favor. Robinson testified that she was given paperwork by Shane. She took it to Legair's house, where Legair signed it. She returned the paper to Shane. She testified Cean was not present (T.508-12).

Like Robinson, Legair testified that when she signed the power of attorney only Robinson was present, not Cean (T.456, 458). Neither Legair nor Robinson disclaimed that it had been willingly signed, and neither said it had been unauthorized.

15

The prosecutor and Court would condemn Ms. Cean for not being present when the power of attorney was signed and for what they deemed a lie when she testified the power of attorney had been signed in her presence. As discussed below, the Court cited this as a reason for an obstruction of justice adjustment. The prosecutor also seized on this episode as an indication that Cean was not a "legitimate" attorney.[6]

Legair testified that she had never told Cean why she wanted the property taken out of her name; in fact she did not discuss the property at all with Ms. Cean (T.453-55). Legair did not attend the closing of 55 Stillwell. (T.458). Legair received no money when the property was transferred; on the other hand, Legair was not expecting money because the property was not hers (T.463-64). The mortgage proceeds went to Shane. (A fee went to Cean). Either Robinson, who held power of attorney, or Browne, speaking with apparent authority, had directed payouts from the proceeds.

Robinson had had no hesitation about doing Shane a favor; she continued to do what he asked even when Legair told her that Shane was not paying her

---

[6] Numerous articles highlight the unlawful "shortcut" too many notaries take – *i.e.*, notarizing a signature affixed not in the notary's presence. Even where the notary knows the signer, there are grounds for discipline. *See,* Cohen and Walsman, "Can You Notarize This? Taking the Notary Job Seriously, Volume 240, NYLJ, Friday, July 18, 2008, https://www.stroock.com/SiteFiles/Pub630.pdf. While attorneys who violate this rule have been sanctioned, we have seen no previous instance of an 87-month prison term and forfeiture for signing improperly, or even lying about it, *or* for an attorney involved in a mortgage fraud scheme.

back. No "bells" went off. Only when Shane failed to give Robinson the money he owed for a long time, did she break off their relationship (T.519-523). Even as of trial, after she lost $10,000 to Shane, Robinson testified it was "bad judgment" (T.533). Robinson did not realize that Shane was conning Legair (T.529). She did not realize what they were doing was "illegal". She had suspected it was "unethical" but not illegal. She argued with Shane a lot about his taking advantage of people (T.539).

The new buyer of Shane's property was Tyroon Comacho, a tenant of Shane's coconspirator Omar, whose role was to refer buyers to Shane. Comacho was an easy mark. She held a work permit and earned $200-$240/week as a part time baby sitter. She could receive $10,000 to "help" Shane buy a house. Comacho met Shane and found Shane "good, like, very respectful." She came to call him "son" and he called her his mother (T.221-221-23). She agreed to "help" when Shane assured that in 3 months he would take the property out of her name (T.132-141).

Omar brought mortgage broker Ramlochan to see Comacho at her work. Comacho signed papers Ramlochan provided. Ms. Comacho testified she did not know what she was signing and claimed she did not know there was false information. She did not recognize the signature (purportedly hers) on a statement shown her by the prosecutor that the "source of funds" would include a $15,000

17

down payment or that she was supposed to have brought $65,924.07 to the transaction (T.142-149). She had not agreed to bring funds and she had none.

On ACRIS records reviewed by Special Agent Tarasca, Lesley Benjamin was listed as Ms. Comacho's attorney (T.703). Benjamin was one of the attorneys (like Cean) to whom closings were referred by Michael Paul, an unindicted co-conspirator. Comacho said that Shane may have sent her to see attorney Benjamin but did not think of Benjamin as her attorney (T.149-51).

Among Cean's files Agent Tarasca found a cover letter from Cean's office forwarding contracts of sale to Attorney Benjamin. The letter – a form letter filled in by Paulette, Cean's paralegal – noted that Benjamin's client's $15,000 down payment was deposited in Cean's IOLA account. Comacho had testified she did not make a down payment and Agent Tarasca found no evidence that a $15,000 down payment had been made or deposited (T.721-25).

Asked about this letter, Cean testified that Paulette prepared contracts based on information provided by the mortgage broker (here, Ramlochan) as a matter of course (T.888-89);[7] because the contract of sale in the file showed a $15,000

---

[7] As noted in the Sentencing Point below, in 2010 a Grievance Committee found that Ms. Cean's conduct had been violative of conflict rules and that Paulette had been given too much authority over mortgage transaction details. Considering Ms. Cean's inexperience at the time it imposed an admonition. Ms. Cean tried to straighten out her practice. The events that formed the basis of the trial predated the admonition.

payment, Paulette had prepared the usual form letter confirming that the down payment money would be escrowed. The letter was not sent out. The federal agent saw it – unused in the transactions –in the subpoenaed file (T.887). Cean testified that the $15,000 had not appeared on the final HUD-1 that governed the loan disbursement. While the $15,000 had appeared on a draft form letter, it did not appear on the final HUD-1 because Cean's firm had not in fact received the $15,000 (T.890-92).

Agent Tarasca confirmed that on that Legair-Comacho transaction, there were (as was usual)[8] *two* HUD-1 forms, one of which did not emanate fromCean's firm and that the $15,000 did not appear on the final HUD-1 (T.797-99).

Agent Tarasca also found in bank statements a reference to a $65,000 cashier's check issued on the basis of cash withdrawn from the IOLA account on the day of the closing, May 11, 2006. The check stated it was remitted by Comacho and was payable to Legair. The check was not used, however, because all of the funding came through and it was not needed, and Cean testified she was directed by Robinson to disburse the proceeds to Shane (instead of Legair). Ms.

---

[8] Mortgage lender-witness Wesley testified that "standard forms" were provided for a closing, and that Cean was sent closing instructions by way of a HUD-1 statement which could not be varied (T.41-42). However, there were drafts of HUD-1's prepared in every case. Information came from the loan broker, Ramlochan's firm, Imperial Mortgage. Wesley testified that the underwriter took the word of the borrower for its information on stated income loans (T.99-101). Stated income was not verified (T.50, 409).

19

Cean redeposited it to the IOLA account on May 17, 2006. Though the government did not know the circumsatnces of this check, Agent Tarasca entered it on her summary chart anyway (T.715-20).[9]

Though the check was not used, nevertheless, the prosecutor argued the check was a "show", a "lie" to ensure the deal got closed; it constituted "fraud" (T.1092). Cean, the prosecutor argued, was "just as dirty as the rest of them" (T.1089). Because she had written this "show" check, she had "bankrolled" the fraudulent transaction (T.1084). However, given the government's theory that everyone at the closing had been "in" on the fraud, a "show check" was unnecessary.

Cean testified she had obtained the certified check the same day as the closing, May 11, 2006, from Chase. She did not present the check to anyone. Rather, at the closing she was told by Robinson that all of the funds should be made payable to Shane (T.894). She returned the check to the IOLA account and later gave Shane two checks, totaling about $62,000.[10] There were no disguised payments, and every penny paid out was disclosed (T.1143-44).

---

[9]Agent Tarasca said the entry on her summary chart had relied on the bank account statement for the Cean Owens IOLA account. not anything in a mortgage lender's file  (T.716).

[10]Cean testified that she had returned the 65,000 check to her IOLA account after she found out that bank's wiring of funds had been complete. Then she wrote out checks for the closing as instructed.

20

**742 New Jersey Avenue— McCall Brothers to Tyroon Comacho**

After Ms. Comacho bought Shane's house from Legair in May 2006 on the word of Shane,[11] she signed a second set of paperwork for Shane and ended up becoming a debtor on a second property at 742 New Jersey Avenue in Brooklyn. She was being dunned by the lender for the mortgage she "unknowingly" assumed on this property just days before trial. Her credit was "very bad" (T.162, 181, 208).

Ms. Comacho testified that Shane took her to see a house at 742 New Jersey Avenue and told her that if he went to live there he would rent the basement to her and her husband Godfrey Comacho for $1000/month. She told Shane she could not afford it but she purchased it unknowingly (T.161-62). On the other side of the transaction, the seller of 742 New Jersey Avenue, was David McCall, another

---

Cean testified that Legair had told Cean's office to give money from the closing to Shane. Cean also testified that because there were outstanding judgments against Shane and his name showed up in the chain of title, she had withheld money until the judgments were cleared (T.898-900). Among the checks was one for $17,043.57, written to Cean as attorney. The government charged this as a "fee" to Cean, but it was released to Shane.

[11] Ms. Comacho testified that on May 11, 2006, Shane had picked her up (as he picked up Debra Robinson) and brought her to Cean's offices. Cassandra was in the offices but she was not "sitting with us" (T.151, 156-57).

Ms. Comacho signed three or four papers. She didn't read them. She signed because Shane had asked her to do him a favor so that he would get the house (T.157-58). Shane was like her "son" (as Cean knew) and Ms. Comacho did what he wanted. She relied on him to make payments because he said that he would do so (T.180).

dupe. McCall testified that in early 2006, he and his brothers faced losing the inherited family home to foreclosure. Shane convinced them to let him "help" sell the property and take over the mortgage payments. McCall testified he and his brothers did not realize they would lose title to the property. They gave Shane power-of-attorney and were to receive $3,333 each as "thank you gifts" (T.566-83). (Shane later directed Cean to disburse three checks to the McCall brothers for $3,333 each; they were written out of the IOLA account from proceeds of the prior transaction involving Shane—another act the prosecutor pointed to as suggesting she violated duties as an attorney but which, according to sentencing documents, a Grievance Committee had determined did not violate professional rules).[12]

Shane arranged the sale of 742 New Jersey Avenue to Tyroon Comacho again with Ramlochan providing fictitious information (this time using Shernell Prescott, whose testimony is summarized below).[13]Comacho testified she did not

---

[12] At sentencing, the prosecutor presented a letter from a Grievance Committee that had commenced a *sua sponte* review of Ms. Cean's escrow funds in 2007 and concluded that she did not violate the Code of Professional Responsibility. The Committee advised her to assure in the future that checks were deducted from the "appropriate account where the funds are being preserved." (DOC 198-3, October 12, 2007 letter to Ms. Cean from the Grievance Committee for the Tenth Judicial District.) There is no evidence Cean failed to live up to this advice after she received it in 2007.

[13] Shernell Prescott was an office manager for conspirator Michael Paul, who referred cases to lawyers, loan processors, and brokers that he knew (T.263-266). Ramlochan was one of the main referrals. He referred cases to Cean and Lesley Benjamin as attorneys – primarily to Ms. Benjamin. Thereafter, Ramlochan

read the paperwork, which was submitted by Ramlochan to WMC Mortgage. WMC approved the loan and wired $550,331.98 to Cean's IOLA (T.326, 343-47, 362-64, 372.) Cean acted as settlement agent and again disbursed funds to Browne, Omar, and Ramlochan; she obtained fees for representing the lender and Ms. Comacho. The McCalls, the sellers, did not receive any of the funds.

David McCall testified he was at Cean's office for the transaction, but said nothing to Cean. He had believed that Shane was a "private investor" (T.570-73).

---

enlisted the witness, to falsely verify employment. For the favor Prescott received some modest payments out of the closing proceeds (at the direction, so Cean thought, of the seller) (T.266-75). Prescott falsely verified employment "like, three, four" times (T.275). She received payment for a "couple of them," once with a check for $500 from Cean's account that referenced "Comacho" (T.276).

Over objection as to relevance, the prosecutor elicited that Prescott had also had received a check from some other attorney for her efforts in an independent fraudulent transaction ("Bristol") that was "not part of the indictment." On the ground that the checks were directed "by a coconspirator" the court allowed this evidence (T.280-81).

Prescott testified that she first heard the term "straw buyer" from Paul. He wanted people with good credit to purchase houses (T.287). Paul paid straw buyers for their services. Prescott said she heard the term straw buyer once at a closing she attended in Lesley Benjamin's office, where Cean was also present acting as an attorney. Prescott said she was "not sure who said it" (*i.e.,* the words "straw buyer") but she "heard it" (T.290).

Prescott said that Attorney Benjamin, a "very strong-willed person" who seemed to be breaking some rules, had introduced her to Cean on the one occasion. The prosecutor asked Prescott a question assuming that Benjamin had referred to Cean as her 'business partner." Prescott corrected the questioner, or tried to, stating that Benjamin had not used the word "partner." Rather Benjamin had said that Cean was "one of the attorneys that she will be working very closely with" (T.292-95).

23

Shane took him to an office where he met a woman named "Cassandra Brown." (T.573). He did not say he thought Cean was his counsel, and contrary to the government's accusation, she did not purport to act as his counsel. (The government's argument that Cean badly represented McCall was premised on a form letter Paulette had mistakenly filled in, asking for a payout number. Where the form said "client" she erroneously filled in McCall's name without deleting the word "client" (T.503, 1053).)[14] McCall signed papers given to him (and Shane) by Cean. Though he had not "fully understood" the documents he did not ask anyone to explain (T.593-95). He signed a document that turned out to be a power of attorney in favor of Shane (GX 50 p.55) (T.572-75, 600).

McCall testified that after the transaction, he had a "gut feeling" that it "just didn't feel right" (T.579-80). He asked Shane for a letter "[t]o make certain that the property stays in the family" (T.580). Shortly thereafter, his brother Darren received a letter from Cean's office (GX 35, T.581, 584). The letter instructed the McCalls that they could exercise a three-month buy back option by requesting it of the Cean law firm. McCall testified on cross-examination that he had taken no action and did nothing when he received the letter, because he believed he had sufficient time to buy the property back (T.592).

---

[14] The designation of McCall as "our client" was a mistake. Ms. Cean never purported to represent Mc Call, and neither he, nor she, believed she did.

24

McCall was not certain why he had received the check for $3,333 and was not certain about what anyone had said about it at the time (T.587). After the meeting he phoned Shane and inquired what had happened with the property. He was "not certain of the information [Shane] said" at this time (T.589). He never spoke to Cean after that event. McCall repeated that he had understood from Shane that the mortgage would be paid off (T.596).

**1144 East 82nd Street— Karen Lewis to Clinton Samuel**

In April 2006, Karen Lewis, owner of 1144 East 82nd Street, Brooklyn, was at risk of losing the property. She had $60,000 in repairs because of the sewer backing up. She fell behind on the mortgage (T.546-48). Lewis testified that "one day out of the blue" a "gentleman" knocked on her door; he said he could sell the house, and she could pay the bank; nothing would be held against her name. The "gentleman" was Shane Browne. She had never met him before (T.548). Browne "took a liking" to Ms. Lewis' son. He was "friendly" and "charming." He induced her to sign a power of attorney.

Browne took her to what she believed was a realtor's office; paperwork was passed around. She met an Indian man and a "lady named Cassandra." Though a contract of sale said that Ms. Cean was the seller's attorney, Ms. Lewis did not sign it; she believed that Cean was the secretary (T.552-58).

25

She went to this office a second time to sign the power of attorney to Shane, who "explained" it to her. "Cassandra" was passing back and forth between the outer offices and the conference room. Cean notarized the document. On a third visit to Cean's office, Shane gave Lewis $15,000 in cash, but not in front of Cean (who was in the outside office).

Lewis did not tell Cean that Shane gave her cash; she did not tell Cean anything else. When Lewis got home, Shane told her to give him $3000 of the $15,000 he had given her as a "finder's fee" for "helping [her] get rid of the house" and she did so (T.554-56).

The wiring of funds on the two mortgage loans taken out by Clinton Samuel for the purchase of Lewis' home were charged as Count 2 and 3 of the superseding indictment. Payments of loan proceeds were made at the direction of Shane to himself, Omar, and Ramlochan. Cean received legal fees. Lewis testified that she had not authorized Shane to retain the proceeds (T.561-65). Shane had told Ms. Lewis that the mortgage would be paid off. [15] Lewis believed Shane an angel who was helping her sell her property (T.556).

---

[15] According to the presentence report (para.17), mortgage payments were not made by Shane as promised; Samuel made payments for two years, then stopped. The house was sold in a short sale, which resulted in a loss to the mortgage lender.

26

### 113 Chauncey Street– Refinance[16]

Based on ACRIS records, there were three transfers of 113 Chauncey Street in 2006-07.  First the property was transferred from the Jones Brothers to Shirley Kydd, all of whom were supposedly living at that residence.  Records showed that Cean had notarized the deed (T.764-65).

In November 2006, Kydd applied for a refinance loan, seeking $300,000. Witness Wesley testified that Kydd had to have owned the property at the time because there would be cash to the purchaser, not a seller (T.72-74).  Kydd did not testify.  ACRIS files included an affidavit of Kydd stating that she was a niece of the owners who died, and inherited the property (T.780-85).  Kydd was given $300,000 and Shane ended up with $278,844 of it.  The government claimed that the affidavit of heirship was false.  It was notarized outside of Ms. Cean's office (T.941) and there was no evidence Cean was aware of any falsity.   The prosecutor objected when Cean was asked whether Kydd (not a witness) had told Cean she was the niece of the decedent.  The Court allowed an answer:  Yes, she had affirmed that she was the niece (T.941).  The jury acquitted.

### 113 Chauncey Street—Shirley Kydd to Godfrey Comacho

Though Shane had abused Tyroon Comacho, Shane recruited her husband Godfrey, age 81 at trial, to buy Chauncey Street from Kydd.  Ramlochan submitted

---

[16] Ms. Cean was acquitted of Count 4.

a fraudulent mortgage application. A closing took place on January 31, 2007. Impac Funding wired $575,222.19 to Cean's lOLA account.

Cean testified that she received a call from Kydd: Kydd was getting back with her husband and was selling the property to Godfrey Comacho. Cean did not know then that Godfrey was Tyroon's husband (T.945). Cean met Godfrey at the closing and represented him as well as acting as settlement agent. She believed he was moving into the property (T.946) and he testified he had intended to do so. Kydd advised Cean how to distribute the proceeds (T.946-49, GX 121-C); Cean took fees she thought due her, and paid Shane and Ramlochan's employer, and a minimal amount for an attorney representing Kyddt. Mortgage payments were never made by Shane as promised; the property was later sold in a short sale, resulting (according to the Presentence Report) in a loss to the lender.

Godfrey testified that Shane had taken him to see Chauncey Street, then took him to Cean's office. "I didn't have much dealings with her." He knew Cean as Shane's lawyer (T.642-43). There were a lot of people at the table including a "guy named Cotton" whom he understood to be his lawyer. Papers were passed, one after the other and he signed them with confidence in his real estate agent (Shane) and in Cotton. He "was not thinking about anything." He "could have lived at the property because I would have been working in the area a short while,

28

but it was inconvenient for my wife when we went and see the place" and he "told Shane I would not be able to live there." (T.643-48).

He spoke to Shane about the mortgage. Shane said he would pay it from the rents. He found out Shane was not paying the mortgage. Shane stopped answering the phone. Godfrey spoke to Shane's girlfriend. She told Godfrey he should sell the place because Shane was not paying the mortgage (T.651-53). Godfrey was not able to sell it; "they took [him] to another lawyer" -- Lesley Benjamin (T.654). Benjamin told him he had signed for two properties for Shane. He did not know about a second property until then (T.654-55).

On cross examination, Mr. Comacho said it had just been his "dream" to buy a house. He did not want to make money on it. He wanted to buy it and live in it. He had thought that Shane and Bibi Omar were doing "a regular thing" and believed whatever Shane had told him. (T.662-63, 680). Shane had even "suggested" to Godfrey that he could "flood the basement and … get insurance" (T.664-67).

No one told Cean about these conversations. The only thing she was told was that Shane had racked up $8000 credit card debt against Tyroon Comacho, and as to this, Cean *acted*, by inducing Shane to give funds return to him at a subsequent closing, about which Cean knew, to Ms. Comacho (as discussed

below).  Godfrey confirmed that, at Cean's office a third time, Cean gave him two checks for $5000, which he gave his wife Tyroon. (T.655-657).

## C. Shane Browne's Credit Card Assault on Tyroon Comacho and the Uncharged "Cover-Up" Conspiracy

Tyroon Comacho became frustrated and nervous at the constant calls about the mortgage on the property at 742 New Jersey Avenue (T.192-93). She was anxious also because her "son", Shane, had also taken *her* money.  Shane gave her $3000 but "borrowed it back" and never repaid her (T.191).

On cross-examination Tyroon Comacho testified that Shane had also conned her into taking out three credit cards in his name ("Mom, I need credit cards in my own name").  He racked up $8000 in debt and promised but never paid it (T.223-25).

Eventually Tyroon complained to her landlady Omar about the calls from the mortgage company, and found out that they had forged her name.  Accusing them of forgery, Tyroon threatened to expose the scheme.  Omar's mother (Bibi Hakim) told Tyroon they would give her $10,000 to not notify the police (T.195). Hakim invited Tyroon to a meeting, held at Cean's offices but not in Cean's presence.  (Shane told Tyroon to pay Cean for the use of her office that day). Tyroon sat in a room with Shane, Omar, and the mother Hakim; in Hakim's handwriting they "ma[d]e a paper"; Shane and Omar would "put the property in

30

their name" and would give Tyroon $10,000 (T.196-97). Tyroon got $10,000, "so I don't go to the police or anything, you know, they are going to take it out of my name" (T.202). The house was taken out of her name, but not the mortgage debt.

When Tyroon was signing this agreement, she saw Cean "walking around the office going in and out of different rooms." Cean was not in the room when the "settlement" agreement with Hakim was signed (T.237). Cean had not drafted the agreement and did not know about it at the time. Cean testified that she learned that Hakim was a person for whom Tyroon bought property only at trial (T.964). There is no contrary evidence.

Evidence of the Browne/Hakim/Omar "hush-up" scheme was admitted over objection that this evidence was not part of the complaint or indictment (T.199). The prosecutor argued it was "incredibly relevant" and should be admitted because it "involves several of the same conspirators" (T.199). Omar was "the one who orchestrates this, as the testimony has shown." The Court observed that the government had not even "mentioned so far Shane in this" and the prosecutor responded that "Shane drove her there." Without considering Rule 403 factors, the Court agreed with the prosecutor and allowed the evidence "because there are two co-conspirators, that's relevant" (T.200).

Even after Tyroon signed the agreement, she gave Shane money and followed his instructions. After using Cean's office, Shane told Tyroon that she

31

"ha[d] to give Cassandra some money" because they were using her offices. Comacho said she would "give her a little bit, like a hundred, $200." Shane told her that Cean "is a big attorney, and, you know, I have to give her more than that ... 2000 or whatever." Tyroon testified that she gave Cean perhaps $2000 or $3000 (she did not remember, but "more than $1000). Shane also insisted that Tyroon also give *him* money because he drove her there. She handed Shane "roughly $1000" (T.204-05, T.238).

The prosecutor continued to question over objection based on Rule 403 and a motion for a mistrial based on the purposeful injection of prejudice (T.243-45). Before Tyroon agreed to the "settlement" with Hakim, Tyroon had been terrorized when "they" had put a letter under her door.

Counsel objected that this evidence of intimidation of Tyroon Comacho was "very dangerous" and had "nothing to do with my client." The Court sided with the prosecutor: it was "relevant to the conspiracy" and admissible because the acts were committed by a conspirator" (T.245) ("...it does have to do with a coconspirator in this case") (*Id*.).

Counsel asked the Court to allow him instead to re-open cross-examination tto alleviate any supposedly "false" notion (so the prosecutor had argued) that Tyroon and Omar had remained friends. Counsel argued that this would be preferable to admitting evidence of terrorization, and suggesting that Cean was

32

somehow responsible.  The prosecutor responded that because the government was "the one[] that carr[ies] the burden of proof here" the evidence should be allowed, and that "Cean is liable for the conduct of her coconspirators whether she likes it or not" (T.246).   The Court did not stop the prosecutor from "linking" Cean to the intimidation scheme. The prosecutor elicited that Cean was Shane's attorney when Omar was involved in the "scheme to ruin her credit" and "some of the papers were signed at [Cean's] office" (T.249).

## D. Ms. Cean's Good-Faith in the Transactions at Closing

Cean testified that she did about 100 closings in a year "[i]f not more." No more than *eight* of those hundreds of closings over a three year period were with Shane, "if that" (T. 965).

Cean testified that she had participated as a lawyer in these transactions, and had not learned much about the people whom the government claimed she had failed to properly represent because they did not tell her much.  She knew nothing about broker Ramlochan (T.1023-24).)   She did not know what the prosecutor learned by looking at the transactions in retrospect.  The information Cean was given by her clients was what she knew.

Tyroon Comacho's testimony corroborated Cean's good faith, and provided the explanation of how and when Cean began to learn that there was a "problem"

33

with Shane Browne.  Tyroon thus had testified that she had *never* told Cean about the mortgage problems Shane had caused her; she never asked Cean to help with the mortgage debt or "the houses" because she had thought "everything was finished" (T. 207).

But, Tyroon testified, she <u>did</u> tell Cean about Shane's credit card abuse (T.207).  Cean testified it was then she began to learn disturbing facts.  Tyroon had phoned her one day and confided that she had given Shane credit cards and he did not pay them.  She told Cean: "he's my friend, he asked me, he didn't pay them."  She said she was "maxed out" (T.955).  Cean did not abandon Tyroon Comacho.  To the contrary, Cean got Shane to give her $10,000 to pay off the debt.

Cean testified that, through the Kydd-to-Godfrey-Comacho transaction that Shane was involved in, she succeeded in "freeing up" $10,000.  She knew Kydd had written a $10,000 check to a Guardian as to property Shane had bid on; the check was to be canceled when Shane was not the highest bidder.  Cean got Kydd to authorize the payment of $10,000 for the Comachos and she wrote two checks to Godfrey for $5000 each which her retrieved   Evidence of two $5000 checks from Cean's account to Godfrey Comacho corroborated this (GX 80 p, 1793, GX 80 p.1796, T.206).  Tyroon testified that with this money, she paid off the credit cards (T.205-07).

34

Tyroon testified that Cean had treated her with respect and had helped her. On re-direct Tyroon testified that Cean was a "very nice person, I'm not going to say anything about her". She "said, you know what, Ms. Comacho, I'll try to help you" (T.255) and she did.

## E. Cross Examination Of Ms. Cean

Despite evidence of Cean's good faith and that the indictment had not charged her with defrauding clients, on cross-examination Cean was attacked for offenses against Tyroon Comacho, against Joanne Legair, against David McCall, against Godfrey Comacho, and all the others Shane had duped – offenses not charged in the indictment. She was condemned for inefficacy as an attorney who was supposed to protect their rights.

The lengthy cross-examination is excerpted in Addendum A and spans T.1029-1041. The prosecutor read, then paraphrased, from hearsay emails from an absent declarant, interpreted as constituting an accusation that in a 2008 matter not part of this case, Cean had misappropriated escrow funds and participated in a payoff scheme. The prosecutor had initially argued for the introduction of evidence of this "Peters Lane" transaction under 404(b). The court excluded the evidence on argument (Addendum B) that under Rule 403 it was confusing, and the 3500 material indicated that the prosecutor's interpretation was faulty and therefore the presentation would require a minitrial.

35

Though the evidence was excluded on the prosecutor's case, the prosecutor used it when Cean took the stand. Cean was never able to challenge these accusations because the accusers were not brought into court. The prosecutor had adopted the truth of the accusations and forced Ms. Cean to deny them *as if* in a mini-trial, but where only one side could present its case. In expansive rulings seemingly allowing *anything* that the prosecutor said went to credibility, the Court allowed this examination *because* it was "cross examination" (*e.g.,* T.1030).

The questioning regarding this e-mail was lengthy and unjustified. (It is excerpted in Addendum A, T. 1027-1041). The prosecutor first demanded that Ms Cean respond as to whether an attorney (Glassman) tried to hold her responsible for a mortgage being improperly filed in some transaction that took place in 2008 – a charge not previously made in the indictment or in the complaint. Ms. Cean said she did not believe that that was what the email meant (T.1027).

Counsel objected and asked for a *voir dire*. The prosecutor went farther (Addendum A). Counsel protested that this was not just impeachment. The government was getting statements into evidence without calling the individuals as witnesses in this criminal case. This violated Ms. Cean's Sixth Amendment rights. She could not confront these witnesses and cross-examine them.

The prosecutor countered: These were "coconspirator statements." That it was not *this* conspiracy did not matter to the prosecutor; she insisted "it could be

36

any conspiracy." Without finding (consistent with a _Bourjaily_ standard) that Ms. Cean had been part of the particular conspiracy; Judge Johnson let the government: "Go ahead. You can use it for impeachment then" (T.1032).

Counsel suggested the Court would understand if it looked at the email. Judge Johnson responded "I have not read it" (T.1033). The prosecutor said it would not offer the email itself so there was no problem. The Court allowed the prosecutor to cross-examine Cean on "what is in the E-mail without reading it" (T.1034).

Because of word restrictions, we do not quote the lengthy examination, but urge the Court to review the excerpt in Addendum A). It was hearsay, and violated Cean's rights to confront her accuser, starting and ending this way:

> Q Mr. Glassman stated to you, that you were responsible for distributing escrow moneys, that you did indeed distribute those monies?
> A Correct.
> Q And, it was his belief that there were certain mistakes that were made with regard to the transaction, correct?
> A Not as far as my part of the transaction, no.
> Q Isn't it true that the-- there were two loans and one of the mortgages was recorded but one of the mortgages was not recorded?
> A I don't have any recollection of that.
> Q Isn't it also true that the initial owner, Mr. Garcia, his mortgage was not paid off?
> A I don't believe that to be the case. [T. 1035-1036, Addendum A]

***

37

Q …O'Neill stated he was going to report you, …Canino and others to the authorities, because he believed fraud occurred during this transaction?
A That never happened.
MR. FREEMAN: Judge, I object.
A That is not true.
THE COURT: Just a second.
MR. FREEMAN: That is not even part of this case.
THE COURT: This is cross examination. It's an issue of credibility. Go ahead. [T.1040-1041.]

## F. Sentencing

Facts of sentencing are set forth in Point V of this Brief.

## G. The Rule 33 Motion: Jurors' Concealment of Material Information

Facts concerning the denial of a motion for a new trial are set forth in Point IV of this brief.

## ARGUMENT

## POINT I

## THERE WAS A CONSTRUCTIVE AMENDMENT OF THE INDICTMENT JUSTIFYING REVERSAL; THE GRAND JURY DID NOT INDICT ON THE CHARGES THAT WERE THE SUBJECT OF EVIDENCE, AND MS. CEAN DID NOT HAVE AN OPPORTUNITY TO DEFEND

Cean argues that there was a constructive amendment of the indictment. An indictment is constructively amended when "the terms of the indictment are in effect altered by the presentation of evidence [or jury instructions] which so

38

modify essential elements of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment." United States v. D'Amelio, 683 F.3d 412, 416 (2d Cir. 2012). A constructive amendment is viewed as a *per se* violation of the Grand Jury Clause, sufficient to secure relief without any showing of prejudice. This Court has stated it has "proceeded cautiously in identifying such error, consistently permitting significant flexibility in proof" – but there is no error only when defendant has been given notice "of the core of criminality to be proven at trial." United States v. Agrawal, 726 F.3d 235 (2d Cir. 2013).

While narrowing of an indictment does not constitute a constructive amendment, broadening it, or changing it, does. *Cf.* Stirone v. United States*, 361 U.S. 212, 218 (1960) (noting that indictment written in general terms may support conviction on alternative bases).

As noted, the indictment was specific. Ms. Cean was charged in an indictment with participating in a scheme to defraud specific mortgage lenders. Cean's sole alleged role appears in paragraph 9: "9. Once mortgages were approved, the defendant CASSANDRA CEAN, together with others, arranged closings to transfer ownership of the properties, which closings were designed to further the fraudulent scheme. At the closings, the defendant CEAN improperly disbursed proceeds of the mortgage loans to herself, as well as to the defendants

39

BROWNE, OMAR, RAMLOCHAN and other co-conspirators, from her attorney escrow account in contravention of the HUD-l Settlement Statement …."

As is apparent from the Statement of Facts, the prosecutor's argument at trial changed dramatically from the charges in the indictment. The government pressed a much broader "scheme" than that alleged – a separate conspiracy to defraud the underprivileged people who acted as straw buyers who believed they were "helping" – or were to be "helped by" – Shane:  they were victims who lost *their* money and property including their creditworthiness. They were not given money promised by Shane and were left with mortgages they could not pay, even after Shane had the houses transferred out of their names, purportedly to "fix" the problems they faced.

Cean was not charged with defrauding (or aiding a fraud) as against Joanne Legair Dickerson, or Tyroon Comacho, or her husband Godfrey Comacho, or David McCall, or Karen Lewis -- all of whom lost property to the machinations of Shane. The government condemned Cean for *not* knowing of the abuse of these people. In so doing the government constructively amended the indictment and offered evidence that was improper and prejudicial. This tactic resulted in unfair prejudice and requires reversal. See Grunewald v. United States, 353 U.S. 391 (1957) (uncharged "subsidiary conspiracy" to conceal); Krulewitch v. United States, 336 U.S. 440 (1949).

40

That the trial was focused on harm caused to straw buyers is highlighted by the prosecutor's summation. The prosecutor castigated Cean for failing to protect the interests *not* of the mortgage lenders she was charged by the grand jury with defrauding, but of the clients who took on mortgages because Shane inveigled them to do so. Injecting the opinion of the United States Attorney on issues of a real estate attorney's representation of a client in a transaction, the government specifically argued that Cean had not represented Tyroon Comacho properly: Cean had said she represented Tyroon Comacho but it was "[n]ot true." The prosecutor posited: "Not true because when you represent someone as an attorney, you're supposed to protect their interests. She didn't protect Tyroon Comacho's interests, not for a minute. She let her take on two mortgages in six weeks, both as her primary residence. I mean it's just absurd on its face…" (T. 1175).

The indictment was broadened beyond recognition. As noted in <u>United States v. Vilar</u>, 729 F.3d 62 (2d Cir. 2013), *quoting* <u>United State v. Banki</u>, 685 F.3d 99, 118 (2d Cir. 2012), a constructive amendment occurs when the trial evidence or the jury charge operates to *broaden* the possible bases of conviction from that which appeared in the indictment." Under the law, this was *per se* error and reversal is required.

41

## POINT II

**MS CEAN WAS NOT SHOWN TO BE A MEMBER OF ANY UNCHARGED OR SUBSIDIARY CONSPIRACY; STATEMENTS AND ACTS IN FURTHERANCE OF A SUBSIDIARY CONSPIRACY TO CONCEAL OR EXTORT SHOULD NOT HAVE BEEN ADMITTED AND WERE PREJUDICIAL**

As discussed in the Statement of Facts, the prosecutor repeatedly elicited statements and acts of conspirators in a subsidiary conspiracy to conceal their wrongdoing when Legair and then Comacho threatened to go to authorities. The prosecutor's flawed theory for admissibility was that these were acts by coconspirators, and Cean was liable for anything they may have done.

Statements – even of conspirators in a charged conspiracy – made in connection with some *other* conspiracy of which defendant is not shown (by her own acts and statements) to have been a member, are hearsay. They are not admissible under Fed. R. Evid. 801(d)(2)(E).

In <u>Bourjaily v. United States</u>, 483 U.S. 171, 175 (1987), the Supreme Court set the standard for admission of challenged "co-conspirator" statements. To admit a statement under 801(d)(2)(E), a court must find two factors by a preponderance of the evidence:  first, that a conspiracy existed that included the defendant and the declarant; and second, that the statement was made during the course of and in furtherance of that conspiracy. <u>United States v. Gigante</u>, 166 F.3d 75 (2d Cir.

42

1999), citing *Bourjaily* and *inter alia* United States v. Orena, 32 F.3d 704, 711 (2d Cir. 1994). [17]

While the conspiracy between the declarant and the defendant "need not be identical to any conspiracy …specifically charged in the indictment," and "while the hearsay statement itself may be considered in establishing the existence of the conspiracy," the bottom line requirement as to the propriety of admitting an out of court declaration against a criminal defendant is this: "there must be some independent corroborating evidence of the defendant's participation in the conspiracy." Gigante, 166 F.3d at 82, *citing* United States v. Tellier, 83 F.3d 578, 580 (2d Cir.1996).

Here there was not even an attempt to establish the foundation fact that Cean was a member of any conspiracy to "hush up" or "conceal," and there was no evidence to establish such fact. Tyroon stated *she* did not discuss any of her mortgage/property problems with Cean. Discussions between Tyroon and Hakim were private, and the "agreement" by which Tyroon was to be paid off for her

---

[17] United States v. Ziegler, 583 F.2d 77 (2d Cir. 1978) recognized the law of co-conspirator statements as a law of "agency." Before a statement can be admitted against a defendant, it must be shown that the defendant herself made the speaker an "agent." The Court wrote: "the law regarding admissibility of declarations made by co-conspirators is well settled. The existence of a conspiratorial relationship between the declarant and the defendant must be established *aliunde* by independent evidence before the declarant's statements are admissible against the defendant. This rule rests on principles of the law of agency, where the existence of the agency relationship cannot be proved by the alleged agent's own bootstrap assertion."

acquiescence was not prepared by Cean. There is no evidence that Cean knew anything about what happened before, during, or after any of the mortgage loan transactions in which she participated as attorney, other than what went on in connection with the loan funding.

Even in a case where there is some "overarching" conspiracy that "covers" "sub-conspiracies," as in <u>Gigante</u>, which involved an organized crime group of which Gigante was the "head," the Court recognized that a statement in furtherance of some "included" conspiracy was not admissible against the defendant absent evidence of the defendant's knowing, willful participation in that specific conspiracy, in the furtherance of which an out of court statement was made, as shown by independent evidence:

> … [E]ven in the context of organized crime, there is a limit to the proper use of Rule 801(d)(2)(E) to admit coconspirator testimony. The district court in each instance must find the existence of a specific criminal conspiracy …And when a RICO conspiracy is charged, the defendant must be linked to an individual predicate act by more than hearsay alone before a statement related to that act is admissible against the defendant under Rule 801(d)(2)(E).

Of course, unlike <u>Gigante</u>, this is not a case in which there was any "overarching" conspiracy to begin with. The prosecutor's mere argument that statements should be admissible (and were "incredibly relevant") *just because* they were made by "co-conspirators" is plain wrong. Cean was not shown by any independent evidence to have been part of Shane's conspiracy to mistreat the straw

buyers he controlled through threats and intimidation and by pulling their financial strings.

Grunewald v. United States, 353 U.S. 391 (1957), established that a conspiracy to conceal cannot be inferred just on the basis that there was an underlying conspiracy to commit another crime. While Grunewald concerned a statute of limitations argument, the Court relied on Krulewitch v. United States, 336 U.S. 440, in which the Court rejected the notion that an implicit "agreement" to "conceal" constituted a basis to admit alleged co-conspirator statements *not* made in furtherance of the charged conspiracy.

In Grunewald, the government had thus argued that "even if the main object of the conspiracy was to obtain decisions from the Bureau of Internal Revenue not to institute criminal tax prosecutions," the conspiracy "also included as a subsidiary element an agreement to conceal the conspiracy to 'fix' these tax cases, to the end that the conspirators would escape detection and punishment for their crime…. [F]rom the very nature of the conspiracy . . . there had to be, and was, from the outset a conscious, deliberate, agreement to conceal . . . each and every aspect of the conspiracy. . . ." The Court rejected that argument, writing (353 U.S. at 399-400):

> In *Krulewitch,* the question …was whether certain hearsay declarations could be introduced against one of the conspirators. The declarations … were made by one named in the indictment as a co-conspirator after the main object of the conspiracy (transporting a

45

woman to Florida …) had been accomplished. The Government argued that the conspiracy was not ended, however, since it included an implied subsidiary conspiracy to conceal the crime after its commission, and that the declarations were therefore still in furtherance of the conspiracy, and binding on co-conspirators. This Court rejected the Government's argument. It then stated:

'Conspirators about to commit crimes always expressly or implicitly agree to collaborate with each other to conceal facts in order to prevent detection, conviction and punishment. Thus, the [Government's] argument is that, even after the central criminal objectives of a conspiracy have succeeded or failed, an implicit subsidiary phase of the conspiracy always survives, the phase which has concealment as its sole objective.'

'We cannot accept the Government's contention. . . . The rule contended for by the Government could have far-reaching results. For, under this rule, plausible arguments could generally be made in conspiracy cases that most out-of-court statements offered in evidence tended to shield co-conspirators. We are not persuaded to adopt the Government's implicit conspiracy theory, which, in all criminal conspiracy cases, would create automatically a further breach of the general rule against the admission of hearsay evidence.'

In light of <u>Grunewald</u> and <u>Krulewitch</u>, Judge Johnson erred in accepting the government's argument that just because there was conduct, or statements, by individuals named with Cean in the charged offense, that justified admission of statements in furtherance of "subsidiary" misconduct committed after the acts charged in the indictment in this case. Statements in furtherance of efforts to "hush" and "silence" Joanne Legair and Tyroon Comacho, or to obtain money from McCall or Lewis, were not made in furtherance of any conspiracy of which

46

Cean was shown by her own acts and statements to have been a participant. They should not have been admitted.

While the improper admission of such testimony of "co-conspirator statements" is subject to harmless error analysis, *see*, United States v. Rivera, 22 F.3d 430, 436 (2d Cir.1994), the repeated use of out of court conduct and statements by Shane and Omar directed to frauds and wrongs against the straw buyers can hardly be deemed something "harmless." Even if reversal were not required by the error of the constructive amendment, reversal would be required because Cean was unfairly tarred with abusive misconduct that prejudiced the jury (as it prejudiced Judge Johnson, we submit) against her.

**POINT III**

**EVIDENCE REJECTED UNDER RULE 404(B) WAS IMPROPERLY USED TO CROSS EXAMINE MS. CEAN. THE TACTIC OF READING EMAILS FROM AN OUT OF COURT DECLARANT AND QUESTIONING DEFENDANT AS IF THOSE STATEMENTS MEANT WHAT THE PROSECUTOR SAID THEY MEANT AND WERE TRUE, VIOLATED THE CONFRONTATION CLAUSE AND THE HEARSAY RULE, AS WELL AS FED. R. EVID. 608. IT WAS PREJUDICIAL AND REQUIRES REVERSAL**.

As discussed in the Statement of Facts, the Court rejected the prosecutor's motion to use evidence of "other acts" allegedly committed by Cassandra Cean in its case in chief. It did so based on defense arguments reproduced in Addendum B,

47

showing (from 3500 material) that the evidence did not support the prosecutor's theories, was confusing, and would require a mini-trial. There were serious questions as to the prosecutor's interpretation of that "evidence."

Of course, had that evidence been offered under Rule 404(b), Ms. Cean would (at least) have had the right to cross-examine accusers as to those other acts. She was denied that right through reckless and improper cross-examination tactics.

Accusations made through the prosecutor's reading of out-of-court statements interpreted as accusations could neither be cross-examined nor rebutted. This tactic – which produced painful testimony reproduced in Addendum A –was unfair and unconstitutional. The fact of "cross-examination" does not justify jettisoning rules of evidence and the Confrontation Clause.

Fed.R.Evid. 608(b) permits cross-examination of specific acts of misconduct but does not allow extrinsic evidence to prove matters relating solely to credibility. It states: "Except for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness. But the court may, on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness."

The Advisory Committee Notes make clear that there are limits to the "allowance" of an inquiry on cross examination. It notes that "[e]ffective cross-

48

examination demands that some allowance be made for going into matters of this kind, but the possibilities of abuse are substantial." It also notes the "overriding protection of Rule 403" which "requires that probative value not be outweighed by danger of unfair prejudice, confusion of issues, or misleading the jury, and that of Rule 611 bars harassment and undue embarrassment." Further Advisory Notes make clear that Fed. R. Evid. 402 and 403 must be considered before allowing a broad-ranging cross-examination of a witness (and especially a criminal defendant, where the prosecutor vouches for an out-of-court statement by adopting it). See, Fed. R. Evid. 608, Notes of Advisory Committee on Proposed Rules and Committee Notes on Rules—2003 Amendment.

Here, Judge Johnson had rejected the use of the prosecutor's evidence as to the 2008 Peters Lane transaction under Rule 403. This evidence – yet another crime the government did not charge in the indictment – should have been off the table completely. At most, Cean's denials should have ended the matter. The admission of this evidence violated Rule 608(b).

It also ran afoul of the hearsay rule and the Confrontation Clause. The accusers were not in court. They could not be cross examined. Cean was unable to defend.

Under Crawford v. Washington, 541 U.S. 36 (2004), the use of a statement of an "unavailable" witness not subject to cross-examination violates the

49

Constitution. Crawford leaves little room to dispute that the tactic used here was unlawful, concluding that the Confrontation Clause was directed at keeping "ex parte" examinations out of the evidentiary record. He found that it applies to "witnesses" against the accused, meaning "those who 'bear testimony,'" *id*. at 51, and that "the Framers would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Id*. at 53. A prior opportunity for cross-examination is mandatory and dispositive under Crawford: "Dispensing with confrontation because testimony is obviously reliable is akin to dispensing with jury trial because a defendant is obviously guilty." *Id*. at 62.

Here, the declarations in an email chain did not satisfy any rule that exempted them from "hearsay." They were not co-conspirator statements made during the course of, or in furtherance, of a conspiracy of which Cean and the declarant were both parties. "Adopted" by the prosecutor, they were testimonial. The prosecutor's tactic deprived Cean of her right under the Confrontation Clause to confront her accuser.

The tactic also is reversible as a matter of basic hearsay analysis, established long ago under United States v. Check, 582 F.2d 668 (2d Cir. 1978). In Check, the prosecutor used the out of court statements "uttered by" Cali by "audaciously introduc[ing] [them] through the artifice of having Spinelli

50

supposedly restrict his testimony to his half of his conversations with Cali." Id. at 679. The statements "were being offered to prove the truth of the matters asserted in them." *Id*. The government argued in Check that the out-of-court statements were "excluded from the definition of hearsay or qualified for some supposed exception to the hearsay rule," Id., but the Court ruled they were not and held this artifice improper. Here the government did exactly the same when it tried to use the same tactic to side-step the hearsay rule. As in Check, the government should be instructed the tactic is improper.

Cean, in sum, was unfairly cross-examined. She was deprived of her Constitutional right to defend (and to defend only the charges made by a Grand Jury). The conviction should be reversed.

## POINT IV

### THE MOTION FOR A NEW TRIAL BASED ON JURORS' CONCEALMENT OF INFORMATION SHOULD HAVE BEEN GRANTED

Before sentencing Cean moved for a new trial or in the alternative an evidentiary hearing based on newly discovered evidence that two jurors had concealed information upon which bias could be inferred (Addendum C). We quote and/or paraphrase from Facts put before Judge Johnson.

At *voir dire* Magistrate Judge Gold advised prospective jurors that the case they would decide involved mortgage "transactions [that] had certain fraudulent aspects" and that "[i]n most instances, the mortgage payments weren't paid to the lenders, the banks or other entities that were lending the money. And many of the pieces of real estate that were secured by the mortgages ended up in foreclosure." 9/13/13 Transcript of Voir Dire ("VD"), 14.

Early in *voir dire,* three prospective jurors revealed at sidebar conferences that a family member had been accused of or convicted of fraud. One explained her son's admission to the bar was delayed until he demonstrated that he was innocent of mortgage fraud committed by a law firm by which he was employed before he became a lawyer (VD 33-35). Her son's name was "used fraudulently on forms" (VD 34), creditors were calling him at home, and he had to hire lawyers (VD 33-34). Magistrate Gold found these circumstances "too close to the bone" and excused this juror with the consent of both parties. (VD 34-35). Similar disclosures were required of the two jurors here.

Another potential juror confided that her husband had pled guilty to mortgage fraud and cooperated with the government (VD 44-46). A third disclosed that her husband had lost his license to practice medicine after pleading guilty to health care fraud (47-48). Magistrate Gold excused both women (VD 33-35, 52-53).

During *voir dire*, Magistrate Gold asked if any of the prospective jurors had:

(1) "worked as or for a mortgage broker or has an immediate family member in that capacity?" (VD 55);

(2) "ever had a mortgage on a piece of property that the prospective juror owned" (VD 61);

(3)"used a mortgage broker as opposed to a bank or institutionalized lender" (VD 62);

(4)"ever [been] involved in a mortgage transaction that they believe for some reason involved an aspect of fraud or misrepresentation? " (VD 62)(matter in brackets supplied); or

(5) "a negative experience with their mortgage lender or anyone else involved in servicing the mortgage?" (VD 89).

Several prospective jurors revealed that they, or a close relative, were involved in real estate or mortgage lending. Juror Number 31 stated that for eight years he had a business affiliation with a licensed broker who sold mortgages, and in the course of that business he (the juror) had attended closings (VD 56). At a sidebar, that juror was asked a bevy of follow up questions: Were you ever involved in an investigation of mortgage fraud? (VD 57); Was the company that you worked for ever investigated for mortgage fraud? (VD 57); Did you contact employers, for example, to verify income or review tax returns of borrowers yourself? (VD 59); Were you ever involved in a mortgage transaction where you later learned that the person purporting to buy the property was not the actual person who was the borrower?" (VD 60); Were you ever involved in a mortgage

53

transaction where you later learned that the person purporting to buy the property was not the actual person who was the borrower? (VD 60); Or where anybody made any statements about who would be residing in the home and it turned out to be false? (VD 60).

Although Juror Number 31 answered "no" to all of these questions, the government ultimately moved to strike him from the panel (VD 57-61, 92).

Two other prospective jurors disclosed that they had a family member who was involved in real estate. Juror Number 30 acknowledged an "[i]mmediate family member, a real estate agent. And, a broker -- real estate broker" (VD 19, 61). Juror Number 22 stated that her father, now retired, had at one point been involved in real estate. Juror Number 22 was struck by the defense (VD 93).

Unlike these prospective jurors, Juror 6, Kiel James—though having seen that honest answers of the prior jurors led to follow-up questions at the sidebar—did not describe his background and employment, and did not disclose that he has a real estate license and was a "member of the CENTURY 21 Milestone Realty team" in Jamaica, New York. Exhibit B to the Motion for a New Trial, DOC 179-2 was Kiel James's real estate license and Exhibit C to the Motion for a New Trial, DOC 179-3, consisted of Webpages from CENTURY 21 Milestone Realty's website with Mr. James' photograph on it.

To the contrary, Mr. James stated only that he was employed by Jet Blue "in their admin department helping them with payroll" (VD 74). After stating that that was his employment he immediately volunteered that he could be fair and impartial.

Defense counsel learned not only of Mr. James' real estate license and work with CENTURY 21, but also that a property the juror owned was listed by CENTURY 21 Milestone Realty and was sold at a short sale – a circumstance that denotes the type of financial stress suffered by the straw-buyer victims in this case.

Additional documents suggested a family and business relationship between Kiel James and Geoffrey James. Counsel's investigation had uncovered that Kiel A. James and Geoffrey James have been joint owners of at least one property, 718 Pennsylvania Avenue, Brooklyn, New York,[18] and both men, on various legal documents, claimed residence at the same address – either 116-24 140th Street, Jamaica New York 11436, 116-24 140th Street, South Ozone Park, NY 11436 or

---

[18] Exhibit L to the Motion for a New Trial, D.E. 179-12, was a Mortgage and Deeds relating to 718 Pennsylvania Avenue, Brooklyn, New York (indenture dated June 15, 2005 stating that Kiel A. James and Geoffrey James own 718 Pennsylvania Avenue, Brooklyn, New York as joint tenants). Kiel A. James acquired 718 Pennsylvania Avenue in 2003 with one Faith Allen and that acquisition was funded by a $450,000.00 mortgage in both their names. In 2007, a satisfaction of mortgage was issued to Kiel James, and an Indenture dated April 6, 2007, granted Geoffrey James sole ownership of 718 Pennsylvania Avenue.

718 Pennsylvania Avenue, Brooklyn, New York.[19]   In addition, Geoffrey James was named as the primary defendant in at least two foreclosure actions.  <u>Exhibit K</u> to the Motion for a New Trial, D.E. 179-10, Complaints and associated documents in <u>Lasalle Bank, N.A. v. Geoffrey James</u>, Index No. 157961/08, Supreme Court, Kings County (foreclosure action based on $464,000.00 mortgage on 568 Alabama Avenue, Brooklyn, New York) and <u>Wells Fargo v. Geoffrey James</u>, Index No. 11316/08 (foreclosure action based on $260,000 mortgage on 742 Pennsylvania Avenue, Brooklyn, New York).

Regarding Kiel James' purchase and subsequent short sale of 142-18 129th Avenue, Jamaica, New York, documents showed that in February 2007, Kiel James, without spending a penny of his own money, acquired 142-18 129th Avenue, Jamaica, New York from Abdur Z. Mohamed for the sum of $455,000.00.

---

[19] An affidavit of service for one of the foreclosure actions against Geoffrey James was served upon a co-tenant of Geoffrey James at 116-24 140th Street, Jamaica, NY 11436.  <u>See</u>, <u>Exhibit K</u> to the Motion for a New Trial, D.E. 179-11, Affidavit of Service upon Geoffrey James.  Kiel James used exactly the same address as his home address for his Citibank mortgage and First National Bank of Arizona mortgages.   See, <u>Exhibits E and F</u> to the Motion for a New Trial, D.E. 179-5 and 6. Moreover, the description of the co-tenant given on the affidavit of service, <u>see</u>, <u>Exhibit J</u> to the Motion for a New Trial, D.E. 179-10, is a brown skinned forty-year-old male, approximately six feet tall and 190 pounds, a description which fits Kiel James.   <u>See also</u>, <u>Exhibit C</u> to the Motion for a New Trial, D.E. 179-3, webpages for Century 21 Milestone Realty, which include photographs of Kiel James.  Also among the documents in <u>Exhibit L</u> to the Motion for a New Trial, D.E. 179-12 is an Indenture dated April 6, 2007, which indicates on the first page that Kiel A. James and Geoffrey James each reside at 718 Pennsylvania Avenue, Brooklyn, New York and on a subsequent page that they reside at "116-24 140th Street, South Ozone Park, NY 11436."

Exhibit D to the Motion for a New Trial, D.E. 179-4, 2007 Bargain and Sale Deed (Abdur Mohamed to Kiel James) for 142-18 129th Avenue, Jamaica, New York. The purchase price was funded entirely by a $340,000.00 mortgage from First National Bank of Arizona and an $85,000.00 mortgage from Citibank. Exhibit E to the Motion for a New Trial, D.E. 179-5, Citibank Mortgage and Exhibit F to the Motion for a New Trial, D.E. 179-6, First National Bank of Arizona Mortgage.

Although 142-18 129th Avenue was a residential property, it seemed unlikely that Kiel James purchased that property to live there, especially since on documents regarding this transaction he gave another address as his residence. The false statements that the mortgagors intended to live in the residence were a centerpiece of the trial in this case against Cean.

On May 21, 2010, Kiel James listed 142-18 129th Avenue for sale with CENTURY 21 Milestone Realty, the agency where he works as a real estate agent. Exhibit G to the Motion for a New Trial, D.E. 179-7, Report from mlsirealtor.com. The listing indicated that it was a short sale subject to bank approval. *Id.*

On January 21, 2011, 142-18 129th Avenue was sold for $255,000.00 -- *i.e.,* $170,000.00 less than the amount he, or more precisely First National Bank of Arizona and Citibank, paid for the property. Exhibit H to the Motion for a New Trial, D.E. 179-8, 2011 Bargain and Sale Deed (Kiel James to Niel C. Collins) for 142-18 129th Avenue, Jamaica, New York.

57

The transaction was a short sale, meaning that the banks took the entire $170,000.00 loss. Exhibit I to the Motion for a New Trial, D.E. 179-9, Satisfaction of Mortgage for Citibank Mortgage for 142-18 129th Avenue, Jamaica, New York; Exhibit J to the Motion for a New Trial, D.E. 179-12, Satisfaction of Mortgage for First National Bank of Arizona Mortgage for 142-18 129th Avenue, Jamaica, New York.

This evidence called out for a new trial or at least an evidentiary hearing. These were shady real estate/mortgage transactions that were concealed during *voir dire*.

Like Kiel James, Wanda Alston-Stallings was less than candid regarding her employment. In response to Magistrate Gold's question about whether any of the prospective jurors worked for a law enforcement agency, Alston-Stallings stated she was an "employee of the New York City Sheriff's Department"... Administrative" (VD 40). Asked if the Sheriff investigated mortgage fraud, Alston-Stallings answered: "Not, generally, no sir"(VD 40). Later, individual jurors were asked to provide further employment information. Alston-Stallings stated: "I'm currently working for the City of New York ... it will be 30 years in February. I don't supervise" (VD 79).

Magistrate Gold then asked Alston-Stallings, "You said you worked for the City of New York, but I'm not sure you told us what you do." Alston-Stallings replied, "I work with the sheriff in New York (VD 79-80).

This terse description of non-supervisory, non-real estate duties was belied by Alston-Stallings' LinkedIn webpage, which suggested far more expansive supervisory duties as a law enforcer. *See,* Exhibit M to the Motion for a New Trial, D.E. 179-13. On her LinkedIn page, the following appeared: "**Review real estate instruments ensuring adherence to the law for recording**; qualify taxpayers for payment plans for violation towed vehicles; Administrative Liaison between respondents, NYPD and City Marshals, ensure proper fees, violations and taxes are paid; supervise and evaluate staff." Id. (emphasis added).

Based on these facts, showing omission of material information, Cean argued (Addendum C) that she was deprived of her Sixth Amendment rights to an impartial jury. Just as Magistrate Judge Gold had excused other potential jurors when they disclosed facts that "besp[o]k[e] a risk of partiality," a honest and full disclosure of facts by James and Stallings would have given rise to an exercise of discretion on the part of Judge Gold to excuse James and Stallings for cause as well.

Addendum C shows additional specific arguments which warrant a conclusion that Kiel James borrowed money with no intent to repay it and that

Alston–Stallings had an intimate knowledge of the workings of real estate/mortgage transactions -- and ACRIS documents (discussed by case agent Tarasca, T.692[20]) -- which warranted a new trial or at least an evidentiary hearing (Addendum C, 18-21).

As discussed in the new trial memorandum, the first note from the jury–through foreperson Stallings – had asked for those very ACRIS documents Stallings worked with,[21] and no doubt accorded them evidentiary deference based on experiences outside the courtroom.

Counsel pointed to the observation in Sampson v. United States, 724 F.3d 150, 167 (1st Cir. 2013):

---

[20] Special Agent Tarasca testified that ACRIS stands for "Automated City Register Information System, and is "an online database which contains property records such as recorded mortgages, deeds, and powers of attorney, maintained by NY City. It contains property records for the five boroughs. The Agent reviewed the documents pertinent to four properties involved in the case (T.692) and testified on the basis of those documents.

[21] Stallings was the foreperson when the jury asked for the documents and "laughed" at the Court:

> THE COURT: All deed and what's POAs?
> THE JURY: Powers of attorney.
> THE COURT: Oh, sorry. She's laughing at me. Power of attorney and what?
> THE JURY: Mortgages.
> THE COURT: And mortgages, okay.
> THE JURY: Everything through ACRIS that you have.
> THE COURT: We have that. [T.1249:21-1250:3]

60

When a juror has life experiences that correspond with evidence presented during the trial, that congruence raises obvious concerns about the juror's possible bias. [citations omitted]. In such a situation, the juror may have enormous difficulty separating her own life experiences from evidence in the case.

Cean argued that she had shown these "life experiences" of Jurors 6 and 10, and that disclosure would have prompted an opportunity for a challenge for cause.

### Denial of the Rule 33 Motion

Judge Johnson denied the motion for a new trial (Addendum D, DOC 188 4/24/14). Quoting Juror 6's and Juror 10's self-evaluations that they could be fair and impartial (*id*. at 2, quoting VD 10,12), the district court started with the observation that Rule 33 vacaturs are "not favored." (Addendum D, 5, citations omitted).

He then ruled that Cean failed both prongs of the two-part "test" purportedly established in <u>McDonough Power Equip., Inc. v. Greenwood</u>, 464 U.S. 548, 556 (1984), which required a finding of "falsity" and a showing of partiality.

Judge Johnson found that both jurors' responses were "not false" -- that Cean had only "establishe[d] that an individual with the same name" as Juror 6's name (Kiel James) "has a real estate license, acquired property which was later sold in a short sale, or had a close family member in multiple foreclosure proceedings" -- and that Cean's "attempts at connecting such information to Juror

61

Number 6" was "nothing more than conjecture" (Addendum D, 7). Therefore, the court ruled, "[b]ased on the record," Juror 6's response was "not false."

In a motion for reconsideration (Addendum E, DOC 191), Cean showed that the government had not disputed the legitimacy of *documents* which depicted juror James' photograph: the juror and the holder of the real estate license were one and the same. Nor had the government denied the allegations concerning James' activities.

Judge Johnson invoked arguments Cean had not made, commenting that Cean "failed to establish, for example, that Juror Number 6 did not work at Jet Blue..." Cean had not claimed that James' statement about Jet Blue was false. He may have worked at Jet Blue in addition to his real estate work. But, based on Judge Johnson's recharacterization, he ruled that there was "no reasonable basis to conclude that [Juror 6's] responses under oath were not truthful." Rather, [a]ny omission by Juror Number 6 would be reasonably construed as a mistake." *Id*.

The Court ruled that "[e]ven if" the Court had found Juror 6's response "false" – as to which the Court did not grant a hearing – it would not have found "such information" to have affected the juror's impartiality. "The fact" that Juror 6 held a real estate license, "for example, does not imply bias." (Addendum D, 8). Again, on the motion for reconsideration (Addendum E), counsel made clear that the fact of the real estate license itself was not argued as the basis for bias. His

62

nondisclosure of that license constituted evidence of purposeful concealment of questionable real estate dealings (too "close to the bone" to the accusations in this case against Cean) that would have warranted exercise of a challenge for cause and should have led to further inquiry (as it did with other prospective jurors).

As to the foreperson, Judge Johnson ruled that Cean again had not established that the juror gave false information. He observed that Juror Number 10 had indicated that the Sheriff's Office did "not generally" investigate mortgage fraud (VD at 40). He stated that defense counsel had not sought further inquiry into Juror Number 10's work experience and background though the Magistrate Judge had made "repeated inquiries as to whether counsel had further questions for any jurors." However, in support of this statement the court footnoted only one transcript reference (VD at 89, cited at Addendum D 9-10 & n.2), as an "example," indicating that defense counsel had answered "no" when asked whether there were "[a]ny other questions you'd like me to ask."

In the motion for reconsideration (Addendum E), counsel challenged the court's "misapprehension" that he had not asked for follow up questioning. Counsel quoted at a number of instances (other than one page) where he *had* asked for further questioning of jurors when they had disclosed information that should be followed up. (Addendum E, 5-6, n.3).

Furthermore, Judge Johnson ruled, "information obtained from a social networking website cannot be verified. As a result, he ruled, none of the information provided by Defendant with respect to a social networking website establishes that Juror 10 was "dishonest in her reply to the Magistrate."

In the motion for reconsideration, defendant expressed understanding that third-party postings on the Internet may in fact contain false or misleading information. However, counsel argued, here it was plain that Stallings was the source of the information on her Linked In page, which was obvious by comparing her answers during *voir dire* to the Linked In webpage. (Addendum E, 10, n.5).

Nonetheless, based on the findings that evidentiary facts had not been established, or that they connoted different conclusions than those argued in support of a new trial or at least a hearing, Judge Johnson continued: "Even if Defendant could satisfy <u>McDonough</u>'s first prong, she would fail the second prong. Juror Number 10 did not provide any information during *voir dire* that would establish that her employment responsibilities resulted in bias. See <u>Langford</u>, 990 F.2d at 70. Such information does not reflect a "manifest injustice" which would warrant a new trial. <u>Ferguson</u>, 246 F.3d at 134. As a result, the Court finds that Juror Number 10's affirmation of impartiality, together with Magistrate Judge Gold's evaluation of her, was sufficient to establish that she was not biased. <u>United States v. Garcia</u>, 936 F.2d 648, 653 (2d Cir. 1991)."

64

The Court should have set aside the verdict because the lies and concealment were material. At the very least, it should have granted an evidentiary hearing.

The Court rejected such a hearing *citing* United States v. Langford, 990 F.2d 65, 69 (2d Cir. 1993), because, it stated, this Court had not, in United States v. Colombo, 869 F.2d 149, 151-52 (2d Cir. 1989), created a "per se rule" even where a juror conceals. But Langford does not hold (nor should be read to hold) that a juror's lie is not probative evidence sufficient to require at least an evidentiary hearing. (Indeed, in Langford there was an evidentiary hearing. There, the juror's credible explanation for her lie (embarrassment over her prior welfare-related larceny and misdemeanor prostitution convictions, and concern for how it would affect her six-year old daughter), was the basis for denying a new trial; it rebutted the inference of bias and partiality in the decision-making process.

Colombo observed that a prospective juror who lies during *voir dire* about a material issue exhibits a personal interest in the case. It is "quite inconsistent with an expectation that a prospective juror will give truthful answers concerning her or his ability to weigh the evidence fairly and obey the instructions of the court." Consequently, the jurors' assurances that they could be fair and impartial would be entitled to little (if any) weight, if it is also determined that they lied about or concealed information that should have been disclosed so that the parties could inquire about the effect of that information on the ability to be fair.

65

Judge Johnson ignored these factors. He commented in a footnote that "[i]n fact" this Court has only once remanded for an evidentiary hearing on the basis of juror nondisclosure under <u>McDonough</u>" (Addendum D, 8 &n.1). The absence of cases in which a new trial or evidentiary hearing were ordered after <u>McDonough</u> should not, and does not, require ignoring a juror's lies when (as here) they are apparent. <u>McDonough</u> itself was a plurality decision in a civil case, not governed by the Sixth Amendment, and in which only three justices had signed onto the main opinion. Further, the Court did not determine whether in fact there had been material concealment or how to evaluate it. It had remanded for those determinations. (For a discussion of <u>McDonough</u> and the confusion it has created, *see* Kristin D. Clardy, <u>Judicial Confusion and Inconsistency in Handling Juror Misconduct: A New Proposal</u>, 17 Wm. & Mary Bill Rts. J. 895 (2009), http://scholarship.law.wm.edu/wmborj/vol17/iss3/8.)[22]

**The Court Should Have Vacated The Judgment Or Held A Hearing**

Though courts hesitate to grant new trials, there have been increasing instances where courts have considered new trial remedies. In the age of the

---

[22] The author writes that <u>McDonough</u> "sets out an ex-ante view of juror misconduct; however, the application of this rule is less than clear cut. The rule is exceedingly difficult to interpret because the Court did not actually engage in the analysis presented by the McDonough test. The Court stated the rule, then a few short sentences later stated that the case was remanded to the Court of Appeals to deal with other issues on appeal. The Court never concluded that the information concealed by the juror in McDonough would be considered honest, but they implied that it would be." [footnotes omitted].

66

Internet, counsel has an obligation to bring instances of concealment to the attention of the Court.   Fair trials should not be compromised.

On October 16, 2014, United States v. Parse, 2d Cir. 13-1388-cr, was argued before the Second Circuit.  Parse is an appeal from the denial of a new trial motion based on juror misconduct in *voir dire* by the one defendant as to whom Judge Pauley denied a new trial because his trial counsel had known some of the information about the concealing juror but failed to bring it to the attention of the Court.  Judge Pauley had *granted* a new trial as to three defendants after a hearing. The juror's lies were shown to have been toxic, and grounded in a desire to "market" herself to sit on the case.  United States v. Daugerdas, 867 F. Supp. 2d 445, 449 (S.D.N.Y. 2012).

A report of the October 16, 2014 oral argument before the Second Circuit (Lexology,  "If you uncover potential juror bias, do you tell the court?  Yes." at http://www.lexology.com/library/detail.aspx?g=8e9b3391-ebbc-4866-8a39-ed2ee34d123e), suggests that the Court is likely to grant a new trial as to defendant Parse as well.  In his appellate briefs (13-1388), he argued that there should be no finding of waiver of bias on the part of a jury.

Where a jury is contaminated by partiality, there should be a new trial.  A fair and impartial jury is the very basis of our system of justice.  Trying a criminal defendant before a biased jury thus "offend[s] the Sixth Amendment" and "violates

even the most minimal standards of due process." <u>United States v. Nelson</u>, 277 F.3d 164, 206 (2d Cir. 2002). The right to an impartial jury is one of the very few "basic fair trial rights that can never be treated as harmless." <u>Gomez v. United States</u>, 490 U.S. 858, 876 (1989).

### Judge Johnson Erred In Refusing to Set Aside The Verdict

This Court reviews a district court's decision on a motion for a new trial for an abuse of discretion. *See* <u>United States v. Ferguson</u>, 246 F.3d 129 (2d Cir. 2001) (upholding new trial based on insufficient showing of an element of the offense in drug-murder case). A district judge abuses its discretion not only where the court has exceeded the bounds of allowable discretion generally, but also where, in exercising discretion, the judge has made an error of law, *see* <u>Koon v. United States</u>, 518 U.S. 81, 100 (1996) or a clearly erroneous finding of fact. <u>Cooter & Gell v. Hartmarx Corp</u>., 496 U.S. 384, 401, 405 (1990).

In denying a new trial, Judge Johnson made clear errors in evaluating facts that supported the motion. He ruled that Cean had not linked Juror James' Century 21 real estate activities to the juror, by finding that she had shown only that there was someone with the same name that may have been involved in those activities, and not the juror. As noted (Addendum E), there was photographic evidence supporting the showing that the juror and the object of the information were the same. And the government had not denied it.

68

Second, the moving papers were not based on an argument that the juror had lied in stating he worked for Jet Blue, *or* that the mere fact of having a real estate license established that the juror lacked impartiality. Judge Johnson's conclusions were recharacterizations and were clearly erroneous.

Third, Judge Johnson was mistaken when he ruled that defense counsel had not sought follow up questions when jurors made terse statements. In the motion for reconsideration, counsel highlighted the passages where additional questioning was sought. The failure of the jurors to have *disclosed* the information that would have prompted additional questioning, is what led to counsel not requesting additional information as to these particular jurors at the time.

Fourth, the court erred in rejecting the Internet research (Linked In, as to Stallings) as a sound basis for at least an evidentiary hearing. Information for Linked In is provided by the subscriber, not the public. As pointed out, the information on Stallings' LinkedIn page conformed to that given the court during jury selection.

In the end, there is substantial, if not compelling proof, supporting the motion for a new trial, showing that Jurors James and Stallings withheld material information bearing on the very facts underlying this case. Kiel James and Geoffrey James owned property that neither could afford and sold it in a short sale, with the bank taking the loss, and James did not disclose it. There is every reason

69

to believe it was intentional.  Even if not, it deprived the defendant of a chance to elicit more information and uncover the basis for dismissing the juror for cause.

Wanda Stallings stated she did not supervise and that her job did not involve real estate or mortgage investigations.  In fact, it did.  As she stated on her LinkedIn page, she was a supervisor and for thirty years enforced compliance based on her review of ACRIS records – the very records upon which the government's case agent relied in her testimony as the basis to convict Cean.  And, as noted in the Motion for Reconsideration (Addendum E), during deliberations, the jury (through foreperson Stallings) requested those ACRIS documents by name.[23]  Indeed, part of the evidence that Stallings was called upon to fairly and impartially evaluate were records from her own employer.  Documents like GX 16 – a bargain and sale deed for 1184 East 82nd Street Brooklyn, New York and GX 17 – a durable power of attorney – were recorded by and have cover sheets with the seal of the New York City Department of Finance.  The notion that Stallings could fairly and impartially assess the reliability and significance of records

_____

[23] The jury's first note requested several exhibits.  When the Court asked the jury to clarify its requests, the following exchange took place:

> THE COURT: All deed and what's POAs?
> THE JURY: Powers of attorney.
> THE COURT: Oh, sorry. She's laughing at me. Power of attorney and what?
> THE JURY: Mortgages.
> THE COURT: And mortgages, okay.
> THE JURY: Everything through ACRIS that you have.[T.1249:21-1250:3.]

70

maintained by her own office is implausible and unseemly. It creates an appearance of partisanship or favoritism by Stallings toward her colleagues at the Department of Finance.

As this Court put it in United States v. Colombo, 869 F.2d 149, 151- 152 (2d Cir. 1989), a prospective juror who lies during *voir dire* can be prosecuted for perjury under 18 U.S.C. § 1621 or subjected to criminal contempt pursuant to 18 U.S.C. § 401 (1982) and possible substantial restitution claims by the government. Consequently, one who lies to stay on a jury exhibits a powerful personal interest in a case. "Such an interest not only suggests a view on the merits and/or knowledge of evidentiary facts but is also quite inconsistent with an expectation that a prospective juror will give truthful answers concerning her or his ability to weigh the evidence fairly and obey the instructions of the court." *Colombo*, 869 F.2d at 151-152. *See also* United States v. Daguerdas, *supra*, 867 F. Supp. 2d at 473 (dishonest answers to voir dire questions indicate that a juror is unwilling or unable "to apply the law as instructed by the court to the evidence presented by the parties" and, therefore, suggests partiality).

This case calls out for a new trial. At the very least an evidentiary hearing should be ordered. United States v. Sun Myung Moon, 718 F.2d 1210, 1234 (2d Cir. 1983) (hearing must be granted "when there is clear, strong, substantial and incontrovertible evidence, that a specific, nonspeculative impropriety has occurred

71

which could have prejudiced the trial of a defendant"). *Accord,* <u>United States v.</u> <u>Vitale</u>, 459 F.3d 190, 196 (2d Cir. 2006).

## POINT V

**THE SENTENCE IS UNREASONABLE; THE COURT SENTENCED MS. CEAN FOR FAILURES AS AN ATTORNEY FOR WHICH THE GRIEVANCE COMMITTEE HAD IMPOSED AN ADMONITION; AND IT IGNORED ALL MITIGATING 3553 FACTORS**

On May 9, 2014, the Court sentenced 39 year-old Cassandra Cean, a first-time offender, to a jail term of 87 months' imprisonment, the top of the Guideline range. Judge Johnson was persuaded Cean had lied about notarizing a power of attorney (that Legair and Robinson said had been signed outside her presence). Nothing else mattered, and he "threw the book" at her. As a closing attorney, Judge Johnson stated, "she knew or should have known that what she was doing was wrong." (Addendum F, 24). She was a "Horatio Alger story" – a woman who had it all then "threw it all away just for the sake of a quick dollar" (Addendum F, 24). That Cean would be disbarred and would not be able to earn a living was her fault. That she was about to give birth to a baby did not matter. Judge Johnson sentenced her to 87 months of imprisonment, forfeiture in the sum of $43,700.57, and restitution in the sum of $1,205,355 (Addendum F, 24).

Judge Johnson did not consider the disparity between the sentences imposed on the masterminds of the scheme, and Cean. Cean had received some $41,000 (though some was received "as attorney" and was held for uncollected judgments against Shane). Shane –sentenced to 51 months – had received $667,480 (not to mention additional monies from the people he recruited), and Ramlochan (who had put together the fraudulent loans) received a 36-month sentence. Appellant contends that her 87-month top-of-the-Guideline sentence is unreasonable.

**The Harsh Sentence Is Unreasonable**

In reviewing a sentence this Court's standard is "reasonableness," "a particularly deferential form of abuse-of-discretion review" applicable both to the procedures used to arrive at the sentence (procedural reasonableness) and to the length of the sentence (substantive reasonableness). United States v. Broxmeyer, 699 F.3d 265, 278 (2d Cir. 2012), *quoting* United States v. Cavera, 550 F.3d 180, 188 & n.5 (2d Cir. 2008) (en banc). Courts "have discretion to select an appropriate sentence, and in doing so are statutorily bound to consider the factors listed in [18 U.S.C.] § 3553(a), including the advisory Guidelines range." Cavera, 550 F.3d at 188.

Here, though counsel submitted facts and argued at length about Cean's good works, her positive life, her inability to work in her professions (*see* Addendum F), the only factors considered were "loss" and enhancements, and the

73

notion that Cean failed to properly represent her clients – an uncharged crime. In failing to consider mitigation (citing *no* 3553 factor) the court imposed a sentence much greater than necessary.

As it did at trial, at sentencing the government condemned Cean's "character" for her derelictions as an attorney, and her role in failing to protect the "vulnerable" people Shane was abusing. In a section of the government's sentencing response labeled "The Defendant's Character" (DOC 198, 11), the government wrote that if Cean "lost" her means to earn a living, it was her own fault, and should not be considered in mitigation.

The government supported its request for a severe term of incarceration with evidence that the Grievance Committee had considered with leniency discussed in the footnote.[24] Dismissing the significance of the fact that Cean's offense conduct had pre-dated findings and guidance of the Grievance Committee, the prosecutor

---

[24] In a February 16, 2010 letter (DOC 198-2) imposing discipline by way of an admonition for conduct evincing an apparent conflict of interest in a mortgage transaction in 2008, the Committee faulted Cean for allowing her paralegal Paulette to handle details of the closings. This was the same type of misconduct as was at issue in this case. Notably (but lost on the government), Cean's subject misconduct in this case *pre*-dated the Committee's guidance.

The Grievance Committee deemed this sufficient punishment as an attorney, even though in a 2007 ruling, the Committee had faulted Cean for another incident of her handling of mortgage escrow funds, which she then corrected (DOC 198-3). The Committee advised Cean to pay closer attention to the "appropriate accounts" from which transfers were taken in mortgage closings. However, the Committee ruled that Cean had not violated any Rules of Professional Responsibility.

nonetheless argued against a finding of aberrant conduct (and in favor of the
Guideline sentence) arguing that because of these findings Cean's conduct was not
aberrational (DOC 198, 12):

> Though the defendant insists that her conduct is aberrational, …[her]
> conduct with regard to other mortgage transactions was reviewed on
> more than one occasion by the Grievance Committee. …
> Significantly, the defendant's offense conduct of conviction also
> involved, in part, illegal and improper issuance of checks and misuse
> of the IOLA and escrow accounts.
>
> Given the defendant's clear abuse of her position as an attorney to
> facilitate the fraudulent scheme and the fact that the defendant used
> the vulnerability of individuals from her community throughout the
> course of the scheme – to her advantage and their serious detriment –
> the government respectfully asserts that the defendant's work as an
> attorney and her community service activities do not warrant a
> significant downward departure.

We suggest it is unreasonable that, for conduct that a Grievance Committee
found aberrational and based on inexperience, the sentencing court would impose a
sentence at the top of an already harsh Guideline range and would dismiss *anything*
in mitigation.   It is also unreasonable because it is based on a breach of trust to her
vulnerable clients, conduct not charged in this case and for which the Grievance
Committee had imposed an admonition – and conduct not found by a jury.

The failure to consider *any* mitigation – and no consideration of section
3553 can be found in the sentencing transcript (*see* Addendum F) – renders this
sentence procedurally and substantively unreasonable.   *See* United States v.
Dorvee, 616 F.3d 174 (2d Cir. 2010) (sentence deemed unreasonable because it

75

was motivated by the need to protect the public from further crimes by defendant, though there was record evidence that he did not pose such a threat and the district court's explanation of its deterrence rational ignored the parsimony clause of 18 U.S.C. § 3553(a)). Here, there was no discussion of the rationale for sentencing – not even a statement as to deterrence – and the court ignored all Section 3553 factors which underscore parsimony.

The sentence should be vacated and the case remanded to a different judge.

**Ms. Cean Did Not Intend Obstruction of A Criminal Proceeding**

Cean also specifically objects to the 2-point enhancement for obstructing the criminal proceeding. The Court enhanced primarily on Cean's denial of having notarized the Legair power of attorney after the fact. While the government argued it was "material" in that, had Cean's testimony that she had been present was believed, it would have changed the verdict, it is unreasonable to conclude that if a lie, Cean's statement about the circumstances of notarizing the power of attorney that Legair did not disclaim, if believed, would have changed the verdict.

In order to properly conclude that a defendant's testimony warrants imposition of a USSG § 3C1.1 obstruction enhancement, the court is required to make findings of willfulness and materiality. *See* U.S.S.G. § 3C1.1 comment. (n.3(d),(f)-(h)). The willfulness requirement means that the enhancement "is appropriate only upon a finding that the defendant had the 'specific intent to

76

obstruct justice, *i.e.,* that the defendant consciously acted with the purpose of obstructing justice.'"   United States v. Defeo, 36 F.3d 272, 276 (2d Cir. 1994) (citation omitted).   *See also*, United States v. Reed, 49 F.3d 895, 900 (2d Cir. 1995) ("'willfully' implies a *mens rea* requirement"), *aff'd after remand*, 88 F.3d 174 (2d Cir. 1996).   An enhancement for obstruction may therefore be granted only if the court finds that the defendant willfully and materially impeded the search for justice in the instant offense.

The imposition of an obstruction-of-justice enhancement is subject to a mixed standard of review. *See,* United States v. Cassiliano, 137 F.3d 742, 745 (2d Cir. 1998).  This Court must "accept the findings of fact of the district court unless they are clearly erroneous." United States v. Woodard, 239 F.3d 159, 161 (2d Cir. 2001) (internal quotation marks omitted). However, a ruling that those facts "constitute obstruction or attempted obstruction under the Guidelines  ... is a matter of legal interpretation and is to be reviewed *de novo*." Cassiliano, 137 F.3d at 745.

Defense counsel requested a hearing before determining that Cean's testimony had been materially false and/or was intended to obstruct the proceeding.  While the district court found that defendant had lied about the notarization (Addendum F), it merely accepted the prosecutor's argument that the lie was material (Id.).

77

When materiality or willfulness is disputed, this Court has required specific findings, which were not made here, and when necessary, a hearing, before imposing the enhancement. United States v. Brown, 321 F.3d 347 (2d Cir. 2003). It is not evident from the record that Cean intended to obstruct this proceeding (as opposed to a theoretical disciplinary inquiry premised on failure to notarize properly) in any material way. The enhancement is not properly founded; at the least there should have been a hearing.

Judge Johnson concluded sentencing with remarks that best sum up the uni-focused ground for this sentence. Adopting the prosecutor's view that Cean could have and should have asked more questions and had she done so, could have prevented the fraud from taking place (Addendum F, 14),[25] Judge Johnson closed with the observation: Cean was a closing attorney and "she knew or should have known that what she was doing was wrong" (Addendum F, 24).

The sentence is greater than necessary, is flawed by the Court's failure to consider a wealth of mitigating circumstances (summarized by defense counsel at sentencing, Addendum F, 15-19), is unreasonable, and should be vacated entirely.

---

[25] "But for her conduct, this fraud may not have been able to take place. If the lawyer says, I don't believe that these straw buyers are able to make these payments, this information seems strange to me, I think it's fraudulent, there's no fraud here" (Addendum F, 14).

## CONCLUSION

Because there was a constructive amendment of the indictment, and Constitutional and evidentiary errors, the convictions should be reversed.  Because the jury was tainted through the misconduct of two jurors who failed to reveal facts evidencing their biases, the Court should order a new trial or at least an evidentiary hearing.  Because of sentencing errors, the Court should vacate the sentence and order *de novo* resentencing.   The Court should remand to a different judge.

Respectfully Submitted,
/s/ Louis M. Freeman
_____

LOUIS M. FREEMAN
FREEMAN, NOOTER & GINSBERG
Attorney for **Defendant-Appellant Cassandra Cean**
75 Maiden Lane, Suite 503
New York, New York 10038
(212) 608-0808

/s/ Vivian Shevitz
_____

VIVIAN SHEVITZ
Appointed Co-Counsel for Defendant-**Appellant Cassandra Cean**

79

**Rule 32(a) Statement**

**Certificate of Type-Volume Limitation, Typeface Requirements and Type Style Requirements**

A Motion for Permission to File an Oversized Brief was filed on January 6, 2015, seeking permission to file a brief of no more than 26,100 words.

By Order dated January 14, 2015 (DOC 80) the Court denied permission for a brief of 25,247 words. However it granted permission to file a revised brief of no more than 20,000 words.

This brief contains 19,405 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief therefore complies with the Court order.

This brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman.

ADDENDA

Addendum A
 Excerpts, Cassandra Cean Cross examination, Tr. 1027-1041

Addendum B
Objection to 404(b) Evidence, DOC 137, 9/23/13

Addendum C
Memorandum in Support of New Trial for Juror Misconduct

Addendum D
Order Denying New Trial, DOC 188, 4/24/14

Addendum E
Memorandum In Support of Reconsideration, DOC 191, 5/5/14

Addendum F
Sentencing Transcript, 5/9/14

Cean - cross - Cruz Melendez                    1027

1    A    Yes, I do.

2    Q    Do you recognize it?

3    A    Yes, I do.

4    Q    Is that copy a fair and accurate representation of the

5    check that you received from Edward Savran?

6    A    Yes, it is.

7         MS. CRUZ MELENDEZ:  Your Honor, the government moves

8    Government Exhibit 165 into evidence.

9         MR. FREEMAN:  No objection.

10        THE COURT:  Received.

11        (So marked.)

12   Q    So this is the check that you received from Edward

13   Savran, correct?

14   A    Correct.

15   Q    In the amount of $305,095.  Isn't it true that after

16   receiving this check, you received an e-mail from an attorney

17   named Adam Glassman?

18   A    Yes, I did.

19   Q    In connection with this property?

20   A    Yes, I did.

21   Q    And in that e-mail, isn't it true that Adam Glassman

22   stated that the mortgages were improperly filed in connection

23   with this transaction?

24   A    Well, I don't believe -- I don't believe it was with this

25   transaction, but I, I did receive an e-mail from him.

Case 1:13-cr-00232 Document 83, 01/15/2015, 1417003, Page90 of 192

Cean - cross - Cruz Melendez                    1028

1    Q    You received that e-mail on November 26, 2008?

2    A    I don't know the exact date.

3    Q    Would seeing the e-mail refresh your recollection?

4    A    Yes, it would.  Thank you.

5         (Exhibit published.)

6    Q    Did you receive that e-mail on November 26, 2008?

7    A    Yes, I did.

8    Q    Do you recognize the substance of that e-mail?

9    A    Yes, I do.

10        MS. CRUZ MELENDEZ:  Your Honor, the government moves

11   Government's Exhibit 166 for identification purposes into

12   evidence.

13        THE COURT:  Have you shown it to Mr. Freeman?

14            (Pause.  )

15        MR. FREEMAN:  Your Honor, I'm going to object.

16        THE COURT:  I haven't seen it.  What do you object

17   for.

18        MR. FREEMAN:  You have to see it.

19        THE COURT:  That's why I want to see it.

20        (Continued on next page.)

21

22

23

24

25

CMH      OCR      RMR      CRR      FCRR

Side Bar                                    1029

1          (The following occurred at side bar.)

2          MR. FREEMAN:  Your Honor, it's hard to, but there

3    are a number of e-mails here.  Which one are we talking about

4    here?

5          MS. CRUZ MELENDEZ:  Your Honor, it's in a number of

6    e-mails.

7          THE COURT:  Three sheets of paper.  Is there a

8    number of e-mails?

9          MS. CRUZ MELENDEZ:  It's a chain, your Honor and I'm

10   more than happy to, which is not on the chain.

11         MR. FREEMAN:  This is, this is not, this is -- she's

12   cc'd on an e-mail.  She's not either the sender or the

13   receiver.

14         THE COURT:  She said she received the e-mail.

15         MR. FREEMAN:  Well, your Honor, I could voir dire

16   but she wasn't, she wasn't the sender or the recipient.  There

17   was lots of hearsay upon hearsay upon hearsay within the

18   e-mail.

19         THE COURT:  Just a second.  If there are a number of

20   e-mails there she said she received, will you be specific what

21   she received?

22         MS. CRUZ MELENDEZ:  Yes, your Honor.  And as a

23   person who's been copied on an e-mail, she is a recipient of

24   the e-mail.  The mere fact that she's not in the spender line,

25   but I will absolutely make sure that she is not on the line.

CMH      OCR      RMR      CRR      FCRR

Side Bar                                                    1030

1        THE COURT:  Now, the other thing is that, which one

2   of these e-mails do you want to get in?

3        MS. CRUZ MELENDEZ:  Your Honor, the chain, although

4   the --

5        THE COURT:  You want them all in?

6        MS. CRUZ MELENDEZ:  Yes, your Honor, the chain from

7   here and what I would state is that we would redact the top if

8   he objects to that.

9        MR. FREEMAN:  No, I object to everything just to be

10  clear.

11       THE COURT:  I understand that.

12       MS. CRUZ MELENDEZ:  He's listed in the two --

13       THE COURT:  What's the relevance?

14       MS. CRUZ MELENDEZ:  Your Honor, as we discussed

15  earlier, we believe that this particular property, that

16  transaction being the 70 Peters Lane, her involvement with the

17  transaction and events that occurred afterwards where she

18  agreed with others to pay extortion money for the purposes of

19  not being exposed to the authorities, both the parities on

20  credibility.  This is what your Honor ruled on earlier today.

21       MR. FREEMAN:  Your Honor, this is a flagrant

22  violation of Sixth Amendment.  She can't -- she called these

23  people here, call them in and we'll cross-examine them it's

24  /R*.

25       MS. CRUZ MELENDEZ:  It's for impeachment purposes.

Case 1:13-cr-... Document 83, 01/15/2015 1417093 Page 93 of 192

Side Bar                                    1031

1        THE COURT:  Just a second.

2        MR. FREEMAN:  It's not for impeachment.  She asked

3   her, just the way she did with the other property, did you do

4   this or did you do that or did you do this.  That's

5   impeachment.  This is getting other people's statements in the

6   e-mail instead of calling them as witnesses.

7        MS. CRUZ MELENDEZ:  They're co-conspirator

8   statements, your Honor.  As we stated, this is a conspiracy.

9        THE COURT:  Just a second.  Who are the e-mails

10  from?

11       MS. CRUZ MELENDEZ:  The e-mail is from an attorney

12  who is representing an individual who is in a conspiracy with

13  the defendant.

14       MR. FREEMAN:  Not this conspiracy.

15       MS. CRUZ MELENDEZ:  It could be any conspiracy.

16       MR. FREEMAN:  No, it can't be any conspiracy.

17       THE COURT:  Just a second.  Don't argue.  You're

18  talking to me.  Number one.

19       MS. CRUZ MELENDEZ:  I'm sorry.  I'm sorry, Your

20  Honor.

21       THE COURT:  What is it, in particular, you want in?

22       MS. CRUZ MELENDEZ:  Your Honor -- I'm sorry, your

23  Honor.

24       Your Honor, to expedite things, I would introduce

25  the document but I will be using it for the purposes of

Case 1:13-cr-00231 Document 83, 07/15/2015 1417003 Page94 of 192

Side Bar                                              1032

1    impeachment.

2          MR. FREEMAN:  But what she can't do is what she did

3    before.

4          THE COURT:  I know what she can't do.

5          MR. FREEMAN:  Judge, what she can't do is to read

6    each sentence and say did this happen, did this happen, did

7    this happen.  It comes in, it comes in the same way only the

8    document doesn't come in.

9          THE COURT:  I'm aware.

10         MR. FREEMAN:  That would be inappropriate, not to

11   mention inadmissible.

12         THE COURT:  Go ahead.  You can use it for

13   impeachment then.

14         MS. CRUZ MELENDEZ:  Thank you.

15         (Side bar conference ends.)

16         (In open court.)

17         THE COURT:  Rizzy reminded me you wanted a 3:45

18   nature break and I don't want eyeballs floating.

19         (Recess taken.)

20         (Continued on next page.)

21

22

23

24

25

CMH        OCR        RMR        CRR        FCRR

Case 1:07-cr-00231 Document 83 Filed 01/15/2015 1417003 Page 95 of 192

1       MR. FREEMAN:  Before you get the jury, I don't know

2  that you have actually read the E-mail.  I think once you read

3  it, you will understand my objection better than if I just

4  tried to articulate it.

5       THE COURT:  I have not read it.

6       MR. NOWAK:  The government is not offering the

7  E-mail.

8       THE COURT:  So there is no problem then.

9       MR. FREEMAN:  Well, yesterday when I was trying to

10  ask questions, the government objected because I was in the

11  question, revealing what was in the document that I was

12  looking at.  What is good for the goose is good for the gander

13  and I want to anticipate the government doing that, with this

14  E-mail.

15       If the government looks at the document and reads

16  it, looks up and then incorporates the essence or the--

17       THE COURT:  So you are going to cross examine with

18  other material you have without looking at that document?

19       MS. CRUZ MELENDEZ:  The distinction was, defense

20  counsel was reading from the Complaint, that is not my

21  intention.  Now that I'm not offering it into evidence, I'm

22  not going to read from the document, but I do think it's a

23  fair point of cross, to ask her about events that are outlined

24  in the-- the mere fact that there is information in the E-mail

25  doesn't mean that the-- I can't cross her on the existence of

Case 1:12-cr-... Document 83 ... 02/15/2015 ... Page 96 of 192

Cean - Cross - Cruz Melendez                    1034

1  the items discussed in the E-mail.

2          THE COURT:  She already admitted she received the

3  E-mail, you can ask her about what is in the E-mail without

4  reading it.

5          MR. FREEMAN:  Okay.

6          When I say, okay, I mean I understand what you are

7  saying.  I still maintain my objection.

8          THE COURT:  Okay.

9          (Jury entering.)

10          THE COURT:  Be seated ladies and gentlemen.

11          MS. CRUZ MELENDEZ:  May I inquire, Your Honor?

12          THE COURT:  You may.

13  BY MS. CRUZ MELENDEZ:

14  Q    Ms. Cean prior to the break we were talking about a

15  transaction regarding a property located at 70 Peters Lane in

16  West Hampton, New York, do you recall that?

17  A    Yes, I do.

18  Q    And, you testified that your title company was involved

19  with that transaction?

20  A    I did not testify as such.

21  Q    Your title company was involved in that transaction?

22  A    No, they were not.

23          I'm sorry.  They were involved in the transaction,

24  correct.

25  Q    That title company is called Sunrise Land Services,

                        RB        OCR

Cean - Cross - Cruz Melendez                    1035

1   correct?

2   A    Correct.

3   Q    And you are the owner of that company, correct?

4   A    Correct.

5   Q    And, the purchaser in that transaction was Zoila Najarro,

6   correct?

7   A    Correct.

8   Q    Do you represent Zoila Najarro in that transaction?

9   A    Not to my recollection, no.

10  Q    Now, Zoila Najarro was purchasing that property from an

11  individual named Garcia, correct?

12  A    Correct.

13  Q    And Garcia was the relative or the brother of a loan

14  officer at a mortgage brokerage called First Class Equities,

15  isn't that true?

16  A    I'm not sure.

17  Q    Now, before the break we were talking about an E-mail you

18  received from Mr. Adam Glassman?

19  A    Correct.

20  Q    Isn't it true that Mr. Glassman accused you and others

21  involved in the transaction of misappropriating funds?

22          MR. FREEMAN:  Objection.

23          THE COURT:  I will allow it, yes or no.

24  A    I don't recall-- I don't believe that to be so.

25  Q    Mr. Glassman stated to you, that you were responsible for

Case 1:13-cr-00101 Document 83  02/15/2015  1417003  Page 98 of 192

1  distributing escrow monies, that you did indeed distribute

2  those monies?

3  A    Correct.

4  Q    And, it was his belief that there were certain mistakes

5  that were made with regard to the transaction, correct?

6  A    Not as far as my part of the transaction, no.

7  Q    Isn't it true that the-- there were two loans and one of

8  the mortgages was recorded but one of the mortgages was not

9  recorded?

10  A    I don't have any recollection of that.

11  Q    Isn't it also true that the initial owner, Mr. Garcia,

12  his mortgage was not paid off?

13  A    I don't believe that to be the case.

14  Q    As the title company, would you-- you would be

15  responsible for paying off the initial mortgage on the

16  property?

17  A    Correct.

18  Q    Mr. Glassman didn't believe that that occurred though,

19  correct?

20          MR. FREEMAN:  How can she know.

21  Q    He sent her an E-mail to the effect he did not believe

22  you had paid off the mortgage for the initial property?

23  A    But it was paid off.

24  Q    It wasn't paid off though at the time of the closing,

25  correct?

Case 1:13-cr-00123-NLH Document 83-1 Filed 01/15/2015 Page 99 of 192

Cean - Cross - Cruz Melendez                    1037

1   A     It was.

2   Q     Now, as part of this E-mail, Mr. Glassman also mentioned

3   other individuals who were a party to the transaction,

4   correct?

5   A     To my recollection, I was cc'd, yes.

6         MR. FREEMAN:  Your Honor, I renew my objection, this

7   is all hearsay, Glassman is not here.  He is not going to

8   testify.

9         THE COURT:  Overruled.  Go ahead.  Ask.

10  Q     You are familiar with an individual named Jerry Canino?

11  A     Yes, I am.

12  Q     And Mr. Canino worked at First Class Equities?

13  A     Yes, he did.

14  Q     In fact, he owned First Class Equities, correct?

15  A     I don't know if he owned it.

16  Q     Mr.-- the attorney, Mr. Glassman, he represented an

17  individual named David O'Neill, correct?

18  A     Correct.

19  Q     So you are familiar with David O'Neill, right?

20  A     Yes, I am.

21  Q     And, Mr. Glassman contacted you multiple times on behalf

22  of his client, David O'Neill, correct?

23  A     Correct.

24  Q     Contacted you with regard to this transaction, 70 Peters

25  Lane, correct?

RB        OCR

Case 1:13-cr-00838 Document 83-0 Filed 05/15/2015 1417003 Page 100 of 192

Cean - Cross - Cruz Melendez                    1038

1   A    Yes, he did.

2   Q    Because he believed as far as he told you, that-- Mr.

3   Glassman told you, that he had problems with the way this

4   transaction had been handled, correct?

5            MR. FREEMAN:  Your Honor, this continues to be

6   hearsay and it is also-- the attorney for the government

7   testifying as to what happened.

8            THE COURT:  What is the question again?

9   Q    That Mr. Glassman told her, informed her that he had

10  issues with the way that this transaction had been handled.

11           THE COURT:  Yes or no?

12           THE WITNESS:  Yes.

13  Q    Now, after receiving this E-mail that you received in

14  November, a meeting was held in your office, correct?

15  A    I know it was held in my office, I can't recall the date.

16  Q    And at that meeting, Jerry Canino was there; is that

17  correct?

18  A    Yes, he was.

19  Q    A woman named Jacqueline Tadario(phonetic) was there,

20  isn't that correct?

21  A    I can't recall.

22  Q    A woman named Debra Lazario(phonetic) was there?

23  A    I can't recall.

24  Q    Debra Lazario worked at First Class Equities, correct?

25  A    I can't recall.

1  Q    She-- Debra Lazario also worked at a company called TAT

2  Mutual, isn't that correct?

3  A    Possibly, I can't recall.

4  Q    You have done dealings before with First Class Equities,

5  correct?

6  A    Yes, I have.

7  Q    You engaged in transactions with TAT Mutual, correct?

8  A    Possibly.

9  Q    So, going back to the meeting that was held in your

10 office, Adam Glassman the attorney who sent you the E-mail, he

11 was there, correct?

12 A    I can't recall.

13 Q    And, David O'Neill, his client, was there?

14 A    At my office?

15 Q    At your office.

16 A    I don't recall Adam Glassman or David O'Neill ever coming

17 to my office.

18 Q    Isn't it true that at this meeting, you, Jerry Canino,

19 David O'Neill, Debra Lazario and others discussed 70 Peters

20 Lane?

21 A    I can't recall.

22 Q    Isn't it true that the purpose of the meeting was to

23 discuss 70 Peters Lane?

24       MR. FREEMAN:  Objection, Judge, this is the--

25       THE COURT:  It is cross examination.

Case 14-3635, Document 83, 06/15/2015, 1417903, Page102 of 192

Cean - Cross - Cruz Melendez                    1040

1    MR. FREEMAN:  Judge, this is a problem we discussed

2    at the bench.

3    THE COURT:  What is the question?

4    Q   Isn't it true that the purpose of the meeting and then I

5    was interrupted.

6    But the question is, isn't it true that the purpose

7    of the meeting was to discuss the transaction at 70 Peters

8    Lane?

9    THE COURT:  I will allow it and then we will move on

10   to something else.

11   THE WITNESS:  I can't recall.

12   Q   David O'Neill, at some point, whether it be at this

13   meeting or another meeting, told-- stated that he was going to

14   tell the authorities, he believed fraud happened in this

15   transaction?

16   MR. FREEMAN:  Move to strike, objection.

17   THE COURT:  Lawyers' words are not evidence.

18   A   I'm sorry.

19   THE COURT:  Go ahead.

20   Q   David O'Neill stated he was going to report you, Jerry

21   Canino and others to the authorities, because he believed

22   fraud occurred during this transaction?

23   A   That never happened.

24   MR. FREEMAN:  Judge, I object.

25   A   That is not true.

RB        OCR

Cean - Cross - Cruz Melendez                    1041

1          THE COURT:  Just a second.

2          MR. FREEMAN:  That is not even part of this case.

3          THE COURT:  This is cross examination.  It's an

4   issue of credibility.

5          Go ahead.

6   Q    Isn't it true that you agreed with Jerry Canino, that

7   $50,000--

8          THE COURT:  That is enough, you asked the last

9   question.

10  Q    Fine, Your Honor.

11         Showing you what is in evidence as Government

12  Exhibit 80, page 329.  I will zoom in.  That is a $65,000

13  check, that was a cashier's check related to the purchase, by

14  Tyroon Comacho of 55 Stillwell, correct?

15  A    Yes, it is.

16  Q    That cashier's check was deposited by you, indicated by

17  the "CC" here?

18  A    Yes, it was.

19  Q    And you testified on direct examination that this check

20  was requested by Debra Robinson?

21  A    Yes, it was.

22  Q    This cashier's check was done with a withdrawal of cash

23  from your IOLA account, correct?

24  A    I don't know if it was a withdrawal of cash, but it was

25  taken from my IOLA account.

Case 1:11-cr-00449-SJ Document 167 Filed 09/20/13 Page 1 of 13 PageID #: 954

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

UNITED STATES OF AMERICA,


             v.                        No Cr. 11- 449(S-1)(SJ)

SHANE BROWNE,
CASSANDRA CEAN,
and
KIM RAMLOCHAN,
    also known as "Kim Yohay,"
    and "Kim Cupeles,"

        Defendants.
-----------------------------------------------------------------x

Cassandra Cean submits this memorandum of law in opposition to the government's September 12, 2013 motion *in limine* seeking a ruling permitting it to introduce at trial:

1)   testimonial evidence that "Cean provided false letters to loan officers on various occasions confirming that down payments had been placed in escrow prior to closings on transactions involving "straw buyers" where no such down payment had been received or placed in escrow;"[1] and

2)   evidence that purportedly relates to "a fraudulent real estate transaction involving a property located at 70 Peters Lane, Westhampton Beach, New York" (hereinafter "70 Peters Lane").

The Court should preclude this evidence because:

1.   The government's failure to comply with the notice requirement of Fed. R. Evid. 404(b) makes it impossible for the Court to assess whether (i) such evidence meets the requirements for admission under Rule 404(b); and (ii) whether, despite its admissibility under Rule 404(b), such evidence should be precluded on any of the grounds set

---

[1] D.E. 127 at p. 2.

Case 1:13-cr-00428-BB Document 67867f5c667e5f9920132019 Page 1 of 157 PageID #: 1234

forth in Fed. R. Evid. 403.

2.    The government has failed to demonstrate that its proffered evidence is logically relevant to prove a material fact issue with respect to which it is ostensibly offered.

3.    Whatever the probative value such evidence possesses is substantially outweighed by the danger that such evidence will cause unfair prejudice, confuse the issues, mislead the jury, or unnecessarily prolong the trial for a mini-trial on collateral issues of no, or minimal, relevance to the charges in the indictment.

As the Court may be aware, since its September 12th motion the Government has filed yet another eleventh-hour motion *in limine* (D.E. 133) regarding testimonial and documentary evidence that it seeks to introduce regarding another transaction for a residence known as 2307 Pacific Street, Brooklyn, New York.   Defense counsel will respond to that motion in a separate memorandum of law.

A.    *Insufficient notice or disclosure of what the government actually proposes to introduce at trial and the purpose for which such evidence is offered*

In a letter to the Court dated September 12, 2013 (D.E. 127), the government -- after consistently refusing the defense's earlier requests for a bill of particulars and disclosure of evidence it would seek to offer under Fed. R. Evid. 404(b) -- announced for the first time its intention to introduce testimonial and/or documentary evidence regarding an allegedly fraudulent real estate transaction "involving a property located at 70 Peters Lane, Westhampton Beach, New York, New York."[2]   The government also made the belated disclosure that it seeks to present _testimonial_ evidence with respect to an unspecified number of "false letters" allegedly provided by Ms. Cean to unidentified loan officers in connection with unspecified and unidentified loan transactions.   Because these tardy and terse revelations fail to satisfy the notice

---

[2] D.E. 127 at p. 1.

2

Case 1:13-cr-00482-JEI Document 26-7 Filed 09/30/13 Page 48 of 54 PageID 1052

requirement of Fed. R. Evid. 404(b), the Court should preclude the government's proffered evidence.

The notice requirement of Rule 404(b) "is intended to reduce surprise and promote early resolution on the issue of admissibility." <u>Notes of Advisory Committee on Rules—1991 Amendment</u>.  Moreover, a court:

> in its discretion may, under the facts, decide that the particular request or notice was not reasonable, either because of the lack of timeliness or completeness. <u>Because the notice requirement serves as condition precedent to admissibility of 404(b) evidence, the offered evidence is inadmissible if the court decides that the notice requirement has not been met</u>.

<u>Notes of Advisory Committee on Rules—1991 Amendment</u> (emphasis supplied).

Obviously, because the government has not provided the Court and defense counsel with the false escrow confirmation letters that Ms. Cean allegedly provided loan officers -- nor has the government even identified the loan officers who allegedly received such false letters or the transactions or properties with respect to which such "false loan letters" were submitted[3] -- it is impossible for the Court to assess whether the letters that the government suddenly wants to interject into this case qualify for admission under Fed. Evid. 404(b).  Thus, the government has failed to comply with the notice requirement of Fed. R. Evid. 404(b), and consequently, the Court should preclude any testimonial or documentary evidence regarding allegedly false escrow confirmation letters provided by Ms. Cean to unnamed loan officers in connection with unidentified real estate loans.

---

[3] The government's proffer might be characterized as the equivalent of trying to sell the Court a pig in the poke, except that there is no "pig" here, i.e. there are no letters, only an unidentified witness' assertion that such letters were provided "on various" occasions to unnamed loan officers.  Without such letters, it is impossible for the Court to assess whether such letters or even testimony regarding them is relevant to a material issue in this case and admissible under Fed. R. Evid. 404(b).

Regarding the 70 Peters Lane transaction, the government has also failed to comply with the notice requirement of Fed. R. Evid. 404(b).  The September 12th letter not only fails to provide the names of those with whom Ms. Cean allegedly participated in an allegedly fraudulent real estate transaction involving a residence at 70 Peters Lane, it also – for reasons outlined in Section C of this memorandum --misrepresents the nature of and potential scope of what the government mislabels as its 70 Peters Lane evidence.

Indeed, the 3500 material provided with respect to government witness Deborah Lazarou suggests that the government's 70 Peters Lane evidence is not really about a real estate closing but a scheme by one member of a group of unsavory characters to blackmail one of his confederates in a large and far flung conspiracy that is the subject of another prosecution. See, Indictment, United States v. Canino, et al., 11 CR 655, D.E. 1.  Apparently, the government hopes to interject this wholly unrelated matter into Ms. Cean's trial by dressing it up as real estate transaction, which the government can then introduce into evidence under the government's overbroad conception of a "similar act."

In summary, by keeping the defense and the Court in the dark about its Rule 404(b) evidence, the government makes it impossible for the Court to rule on its motion *in limine*.  Accordingly, as the Advisory Committee Note quoted above suggests, the Court has the authority to deny the government's *in limine* motion because it has failed to comply with the notice requirement of Fed. Rule Evidence 404(b).  The Court should exercise that authority and preclude the government's proffered evidence regarding escrow confirmation letters and the deceptively labeled 70 Peters Lane evidence.

> B. The government's September 12th and 18th letters fail to establish the admissibility of its proffered evidence under Fed. R. Evid. 404(b)

# ADDENDUM B – OBJECTION TO 404(b) EVIDENCE

Case 1:13-cr-00482-SJ Document 67-1 Filed 09/20/13 Page 1 of 3 PageID #: 1

Trial judges need to exercise particular care in admitting Rule 404(b) "other crimes" evidence for at least two reasons:

> First, the line between what is permitted and what is prohibited under Rule 404(b) is sometimes quite subtle. Second, Rule 404(b) evidence sometimes carries a substantial danger of unfair prejudice and thus raises serious questions under Fed. R. Evid. 403. Therefore, it is advisable for a trial judge to insist that a party offering Rule 404(b) evidence place on the record <u>a clear explanation of the chain of inferences leading from the evidence in question to a fact "that is of consequence to the determination of the action."</u> Fed. R. Evid 401.

<u>United States v. Murray</u>, 103 F.3d 310, 316 (3d Cir. 1997)(emphasis supplied).

Requiring the government to explain the logical relevance of the particular evidence that it offers in a particular case is not a "hypertechnicality." <u>United States v. Merriweather</u>, 78 F.3d 1070, 1076-1077 (6th Cir. 1996). Unless the government shows the specific purpose for which Rule 404(b) evidence is offered, a trial court cannot determine whether the proffered evidence is in fact relevant to accomplish the purpose for which it is offered – or in other words whether the proffered evidence is actually relevant to prove the issue with respect to which it is offered. Nor can the trial court assess whether whatever probative value the proffered evidence has with respect to a particular material fact or issue is outweighed by the danger of unfair prejudice or any of the other grounds for exclusion listed in Fed. R. Evid. 403. <u>Id</u>.

Neither the government's September 12th letter nor its September 18th letter places on the record a clear explanation of the chain of inferences leading from the evidence in question to a fact "that is of consequence to the determination of the action." It is not sufficient for the government merely to assert that "[e]vidence of Cean engaging in other acts of almost identical conduct during the same period as the charged conspiracy is admissible for the proper purpose of

Case 1:13-cr-00424-JB   Document 267-2   Entered on FLSD Docket 05/28/2015   Page 1 of 1

proving both her knowledge and intent to engage in the criminal conduct alleged in the superseding indictment" (D.E. 127). The government must set forth the chain of inferences that lead to this assertion. The government has not done so because it cannot establish a logical chain of inferences sufficient to justify the admission of its proffered evidence.

The first insurmountable hurdle the government faces is that its similar crimes or bad acts evidence is not similar to the conduct for which the government is prosecuting Ms. Cean. Simply put, the prosecution of Ms. Cean is not about Ms. Cean having provided false information to loan officers and lending companies in order to induce them to make a loan. To the contrary, in an April 1, 2013 letter (D.E. 82), the government asserted adamantly[4] that Ms. Cean's "specific role in the conspiracy" was set forth in the indictment, and quoted the following language from that document,

> Once mortgages were approved, the defendant CASSANDRA CEAN, together with others, arranged closings to transfer ownership of the properties, which closings were designed to further the fraudulent scheme. At the closings, the defendant CEAN improperly disbursed proceeds of the mortgage loans to herself, as well as to the defendants BROWNE, OMAR, RAMLOCHAN and other co-conspirators, from her attorney escrow account in contravention of the HUD-1 Settlement Statement.

D.E. 82 at p. 4.

In other words, the government has never – or at least not until last week – alleged that Ms. Cean was involved in the loan application process. Indeed, the phrase "Once mortgages were approved," means that she was not involved in any allegedly criminal activity

---

[4] Defense counsel has previously requested that the government clarify what Ms. Cean did that, according to the government, made her a culpable member of the conspiracy. The April 1, 2013 letter that we quote was written by the government in opposition to defendant's motion for a bill of particulars and for an order by the Court directing the government to disclose whatever other crimes or bad acts evidence it intended to introduce at trial.

that occurred prior to the approval of a mortgage. Her role in the crimes charged in the indictment was, according to both the indictment and the government's April 1, 2013 letter (D.E. 82 at p. 4) limited to disbursing proceeds of loans that others had obtained by allegedly submitting materially false information to lenders.

There is yet another barrier to admission of the government's evidence. The so-called 70 Peters Lane evidence involves events that occurred, assuming they occurred at all, in 2008, <u>after</u> the transactions that are the basis for the instant prosecution occurred. Although the fact that the Peters Lane evidence relates to events subsequent to the charges in the indictment does not automatically bar its introduction as Rule 404(b) evidence, the sequence of events does minimize the probative value of the 70 Peters Lane evidence to show Ms. Cean's knowledge or intent with respect to transactions that were completed nearly two years before the 70 Peters Lane transaction, and more importantly the feud between Canino and O'Neill allegedly, occurred. <u>See</u>, <u>United States v. Rutkoske</u>, 506 F.3d 170, 177 (2d Cir. N.Y. 2007) (acknowledging that "other acts" occurring after the charged offense may have less probative value than "other acts" committed before the charged offense).

As for the claim that Ms. Cean submitted false escrow confirmation letters, since the government has not even provided a date as to when these letters were submitted, there is no way to assess what probative value, if any, such letters might have with respect to Ms. Cean's knowledge or intent or lack of mistake with respect to the transactions upon which the indictment is based.

  C. *Admission of the government's proffered evidence would*
    *necessitate a trial within a trial*

Rule 403 provides that even relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or

misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." United States v. Malpeso, 115 F.3d 155, 163 (2d Cir. 1997). "Courts are reluctant to admit evidence that appears at first to be plausible, persuasive, conclusive, or significant if detailed rebuttal evidence or complicated judicial instructions would be required to demonstrate that the evidence actually has little probative value." 2 JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S FEDERAL EVIDENCE § 403.05 [b][3] (Matthew Bender 2d ed. 1997).

At first glance, the government's assertions, that Ms. Cean was involved in a "fraudulent" transaction involving 70 Peters Lane and that this transaction might be admissible as another bad act similar to the transactions that underlie Counts Two through Six, sound plausible. However, if one examines all of the 3500 material the government recently provided for Deborah Lazarou, then it becomes apparent that the government's September 12, 2013 letter misrepresents the nature of Ms. Cean's interaction with some of Ms. Lazarou's employers and coworkers and that the government's argument for admissibility is premised upon dubious factual assumptions.

In her initial interview sessions with prosecutors, Ms. Lazarou never claimed that Ms. Cean was involved in a fraudulent transaction involving 70 Peters' Lane. For example, reports of an interview session conducted on January 27, 2011 (GX 3500-DL-6) and May 5, 2011 (GX 3500-DL-7) annexed to this memorandum as Exhibits A and B respectively) do not even mention 70 Peters Lane. And since 70 Peters Lane was not even mentioned in these reports, also conspicuously absent from the reports of Ms. Lazarou's interviews on January 27, 2011 and May 5, 2011 is any assertion that Mr. Cean failed to pay off the seller's mortgage.

# ADDENDUM B – OBJECTION TO 404(b) EVIDENCE

Both reports do, however, indicate that Ms. Lazarou told prosecutors that one David O'Neill[5] a "shady character" who "ran ALL METRO," attempted to blackmail an individual named Gerard Canino, in order to force Canino to pay him (O'Neill) money from fraudulent transactions in which O'Neill was presumably involved. However, there is no indication in the reports that 70 Peters Lane was one of these transactions or a reason for the dispute between Messrs. O'Neill and Canino. See, Exhibit A, at p. 7-8.

However, Ms. Cean's role in connection with the dispute as described in Ms. Lazarou's first two proffer sessions, indicates that she might have served as Mr. Canino's attorney or perhaps as a mediator. She is described as encouraging Canino to pay O'Neill the money in dispute but neither the January 27, 2011 nor May 5, 2011 interviews suggest that any effort she made to encourage Canino to settle his dispute with O'Neill was prompted by Cean's desire to avoid having O'Neill expose alleged wrongdoing by her in connection with the sale of 70 Peters Lane.

However, in the report of her most recent interview on August 15, 2013, (GX 3500-DL-1, annexed hereto as Exhibit C) Ms. Lazarou has changed her story in order to portray O'Neill's demand for payment as something arising from the 70 Peters Lane transaction. Granted, the report of the August 15, 2013 interview is confused and confusing. According to one sentence in the report, Lazarou told prosecutors that "O'Neill "was trying to 'bribe' CANINO for $50,000 because O'NEILL's 'head was on the table' since he was the mortgage broker on the deal." Exhibit C, at p. 2 (emphasis supplied). At another point, there is language that suggests that O'Neill was seeking payment from Canino instead of trying to bribe him.

In any event, it is indisputable that the 3500 material for Ms. Lazarou shows that any testimony she or any other witness gives regarding the O'Neill, Canino and 70 Peters Lane

---

[5] The spelling of this surname varies. In some reports, it is given as O'Neil.

will be complicated and confusing.  Moreover, because much of what Lazarou says in her interview recounts out-of-court statements purportedly made by persons who in all likelihood will not appear at trial and subject themselves to cross-examination –- the Sixth Amendment's Confrontation Clause makes much of her testimony inadmissible.

Furthermore, whatever testimony does come in will not go unchallenged by Ms. Cean.  The admission of Ms. Lazarou's testimony and any related documentary evidence will result in a mini-trial on the issue of exactly what Ms. Cean did with respect to 70 Peters Lane and why she did it.  Consequently, the unnecessary prolongation of what already promises to be a complicated trial so that the government can submit evidence regarding Mr. O'Neill's feud with Gerard Canino and its purported implications for Ms. Cean is reason enough to preclude the government from offering this evidence.  See, United States v. Schatzle, 901 F.2d 252, 256 (2d Cir. 1990) (court properly excluded evidence proffered under Fed. R. Evid. 404 (a) because the potential delay resulting from a mini-trial on such evidence outweighed any potential probative value of such evidence).

### D.  The inefficacy of limiting instructions

A trial court cannot , "clearly, simply, and correctly" instruct the jury as to the specific purpose for which they may consider the evidence admitted under Rule 404 (b ) unless and until the proponent of that evidence identifies the specific purpose for which such evidence is offered.  Merriweather, 78 F.3d at 1076-1077.  Boilerplate proffers that simply list all of the purposes outlined in Fed. R. 404(b) often indicate that the proffered evidence is not relevant to prove any of the material issues or material questions of fact listed in Fed. R. Evid. 404(b).

Indeed, this is precisely what led the Sixth Circuit to reverse the defendant's conviction in Merriweather:

> Manifestly, the proffered "other acts" evidence was not admissible for all the purposes identified by the trial judge in the two jury instructions and, equally manifestly, the jurors could not have had the vaguest notion of the limited proper purpose for which they might have considered the evidence.
>
> The trial court's recitation of seven of the nine purposes named in Rule 404(b) in the precise order as they appear in the text of that rule as its grounds for admitting the Jones conspiracy as "other acts evidence," suggests strongly that the court did not have a clear idea what theory may have justified receiving the evidence.

Merriweather, 78 F.3d at 1076.

Furthermore, to the extent that the government's newly proffered 404(b) evidence involves the introduction of inadmissible hearsay evidence, limiting instructions cannot prevent or cure a violation of Ms. Cean's Sixth Amendment right to confront her accusers.

Finally, there comes a point where a jury receives so many limiting instructions regarding so many different issues that limiting instructions become utterly meaningless. Worse yet, a jury confronted with many limiting instructions is likely to decide that the legal rules which they are told to abide are too onerous, and therefore, the jury is entirely within its right to use whatever evidence as it sees fit. In short, in this case, limiting instructions are not likely to prevent the substantial unfair prejudice that would result from the introduction of the government's proffered evidence.

### E. The potential for unfair prejudice

The government suggests that introduction of its proffered evidence will result in no additional prejudice because this evidence is "not more offensive or egregious than the conduct charged in the superseding indictment."[6] This representation is at best disingenuous.

As noted previously, the evidence proffered in the government's September 12, 2013 letter is not even remotely similar to the charges against Ms. Cean. The indictment alleges

---

[6] D.E. 127 at p. 5.

that her role in the conspiracy occurred during closings.  There is no charge that Ms. Cean was involved in any fraudulent activity prior to closings – e.g., submission of false documents to loan processors and lenders – aimed at inducing a lender to fund a residential mortgage.

Indeed, the indictment plainly states that Ms. Cean failed to disburse funds in accordance with HUD-1 statements.  An allegation that a lawyer failed to strictly adhere to the terms of a HUD form is vastly different from a claim that a lawyer brazenly submitted false escrow confirmation letters to loan processors or was somehow involved in the payment of "hush money" to a blackmailer who purportedly threatened to expose her alleged involvement in lending fraud.  The potential of the latter evidence to suggest that Ms. Cean had a propensity to engage in criminal activity is readily apparent, even if the government chooses to deny this reality.

In addition, it is abundantly clear that the government is attempting to import into the instant prosecution a substantial part of its evidence from the U.S. v. Canino, et al. indictment, 11 CR 655, D.E. 1. Indeed, any explanation of the monetary dispute between Messrs. O'Neill and Canino will inevitably result in the introduction of various instances of wrongdoing by them regardless of the lack any real connection between those acts and the transactions which form the basis for the instant indictment.

*F.  Conclusion*

For the reasons stated above, the Court should deny the government's September 12, 2013 motion *in limine*.

# ADDENDUM B - OBJECTION TO 404(b) EVIDENCE

Case 1:10-cr-00443-PGG Document 137 Filed 09/23/13 Page 116 of 192

Dated:  September 23, 2013
       New York, New York

By: /S/ Louis Freeman
FREEMAN NOOTER & GINSBERG
75 Maiden Lane, Ste. 503
New York, New York
10038 Tel: (212) 608-0808
Fax: (212) 962-9696
*Counsel for Defendant Cean*

Case 14-3281, Document 23, 09/15/2015, 1417003, Page117 of 192

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x

UNITED STATES OF AMERICA,


       v.                               11 CR 449(S-1)(SJ)

CASSANDRA CEAN,

         Defendant.
--------------------------------------------------------x




**DEFENDANT CASSANDRA CEAN'S
MEMORANDUM OF LAW IN SUPPORT OF HER MOTION FOR A NEW
TRIAL PURSUANT TO FED. R. CRIM. PRO. 33;
IN THE ALTERNATIVE, THE COURT SHOULD HOLD AN
EVIDENTIARY HEARING**.

# ADDENDUM C - MEMORANDUM - NEW TRIAL

TABLE OF CONTENTS

|  | PAGE NUMBER |
|---|---|
| INTRODUCTION | 1-2 |
| SUMMARY OF FACTS SUPPORTING THE MOTION FOR A NEW TRIAL | 2-9 |
| ARGUMENT: KIEL JAMES AND WANDA ALSTON-STALLINGS DEPRIVED MS. CEAN OF HER SIXTH AMENDMENT RIGHT TO A TRIAL BY AN IMPARTIAL JURY BY INTENTIONALLY AND KNOWINGLY GIVING FALSE INFORMATION AND OR CONCEALING AND WITHHOLDING INFORMATION IN RESPONSE TO THE MAGISTRATE'S QUESTIONS ON VOIR DIRE | 10-22 |
| A. The Legal Standard Governing this Motion | 10-12 |
| B. Kiel James' Failure to Disclose His Real Estate License and Employment as a Real Estate Agent, the Short Sale of His Property, and Foreclosure Proceedings against Geoffrey James Deprived Ms. Cean of a Valid Challenge for Cause | 12-19 |
| C. Wanda Alston-Stallings' Failure to Disclose the True Nature and Scope of her Employment with The Sheriff for the City of New York Deprived Ms. Cean of a Valid Challenge for Cause | 19-22 |
| CONCLUSION | 22 |

# ADDENDUM C - MEMORANDUM - NEW TRIAL

## TABLE OF AUTHORITIES

| CASE LAW | PAGE NUMBER |
|---|---|
| Clark v. United States, 289 U.S. 1 (1933) | 11 |
| McDonough Power Equipment Inc. v. Greenwood, 464 U.S. 548 (1984) | 10, 11 |
| Sampson v. United States, 724 F.3d 150 (1st Cir. Mass. 2013) | 14 |
| United States v. Colombo, 869 F.2d 149 (2d Cir. 1989) | 17-18 |
| United States v. Daugerdas, 867 F. Supp. 2d 445 (S.D.N.Y. 2012) | 10, 11, 18, 22 |
| United States v. Greer, 285 F.3d 158  (2d Cir. 2002) | 11, 12 |
| United States v. Shaoul, 41 F.3d 811 (2d Cir. 1994) | 11 |
| United States v. Stewart, 433 F.3d 272 (2d Cir. 2006) | 10, 11 |
| United States v. Sun Myung Moon, 718 F.2d 1210 (2d Cir. 1983) | 23 |
| United States v. Thomas, 116 F.3d 606 (2d Cir. 1997) | 18 |
| United States v. Torres, 128 F.3d 38 (2d. Cir. 1997) | 17 |
| United States v. Vitale, 459 F.3d 190 (2d Cir. 2006) | 23 |
| Wainwright v. Witt, 469 U.S. 412 (1985) | 11 |
|  |  |
| **OTHER AUTHORITIES** | **PAGE NUMBER** |
| David Grise, United States Exhibit #3: How to Commit Mortgage Fraud, 58 UNITED STATES ATTORNEYS' BULLETIN (May 2010) | 15 |

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x

UNITED STATES OF AMERICA,


    v.           11 CR 449(S-1)(SJ)

CASSANDRA CEAN,

    Defendant.

--------------------------------------------------------x

**DEFENDANT CASSANDRA CEAN'S
MEMORANDUM OF LAW IN SUPPORT OF HER
MOTION FOR A NEW TRIAL PURSUANT
TO FED. R. CRIM. PRO. 33;
IN THE ALTERNATIVE, THE COURT SHOULD HOLD AN EVIDENTIARY
HEARING.**

**INTRODUCTION**

    Pursuant to Fed. Crim. Pro. 33, Cassandra Cean, moves for a new trial on

the grounds that two jurors purposefully concealed their biases by providing false and

misleading answers during voir dire thereby depriving her of her Sixth Amendment [U.S.

Const, amend. VI] right to a fair trial by an impartial jury.

    Newly discovered evidence shows that, unlike other prospective jurors who

disclosed their own involvement, or the involvement of close family members with real

estate and mortgage broker businesses, Juror Number 6, Kiel A. James failed to disclose

during voir dire (1) that he has a real estate salesperson license and works for a Century

21 real estate office in Queens (when questioned, Mr. James stated only that he currently

works for JetBlue); (2) that he did have a negative experience with his mortgage lender or

anyone else involved in the servicing of his mortgage, which is evidenced by the fact that

he sold a property he acquired in a short sale (the jury venire was specifically asked to raise their hands if they had a negative experience with their mortgage lender or anyone else involved in servicing the mortgage); (3) that this property was acquired with 100 percent financing and then sold within the last two years in a short sale, and (4) that a close family member – with whom Kiel James has owned  real estate  -- has been a defendant in multiple foreclosure proceedings and involved in at least one short sale.

Similarly, Ms. Wanda Alston-Stallings, Juror Number 10 and jury foreperson, failed to disclose that in the course of her employment with the Sheriff's office, a division of the New York City Department of Finance, she reviews real estate instruments in order to ensure that such documents meet legal requirements for recording (when questioned, Ms. Alston-Stallings only stated that she held an administrative position with the New York City Sheriff Department).  Thus, (1) she likely reviews the real estate instruments that New York City Department of Finance, Office of the City Register, records, and (2) this means that she reviews the same type of documents offered by the Government as evidence against Ms. Cean, including the ACRIS documents that the jury through Ms. Alston-Stallings requested during deliberations.  Had Kiel James and Wanda Alston-Stallings not withheld this information, defense counsel would have made and been granted challenges for cause on the grounds that neither Kiel James nor Wanda Alston-Stallings could render a fair and impartial verdict.

### SUMMARY OF FACTS SUPPORTING THE MOTION FOR A NEW TRIAL

On September 30, 2013, voir dire was conducted by United States District Court Magistrate Judge (hereinafter "Magistrate") Steven M. Gold.  The voir dire was

2

concluded in a single day, and the jury was sworn and trial commenced on October 1, 2013.

At the outset of the voir dire, Magistrate Gold advised the prospective jurors that the case they would decide involved mortgage "transactions [that] had certain fraudulent aspects" and that:

> In most instances, the mortgage payments weren't paid to the lenders, the banks or other entities that were lending the money. And many of the pieces of real estate that were secured by the mortgages ended up in foreclosure: (VD 14).[1]

Early in the voir dire, three prospective jurors revealed at sidebar conferences that a family member had been accused of or convicted of fraud. One juror explained that her son's admission to the bar had been delayed until he was able to demonstrate that he was innocent of mortgage fraud committed by a law firm by which he was employed before he became a lawyer (VD 33-35). She stated that her son's name was "used fraudulently on forms" (VD 34) and creditors were calling him at home and he had to hire lawyers in order gain admission to the bar (VD 33-34). Magistrate Gold found these circumstances "too close to the bone" and excused this juror with the consent of both the government and defense counsel (VD 34-35).

Another prospective juror confided that her husband had pled guilty to mortgage fraud and cooperated with the government (VD 44-46). A third woman

---

[1] Numbers preceded by "VD" refer to pages in the transcript of the voir dire conducted by Magistrate Gold on September 30, 2013. A copy of this transcript is being submitted with this motion as *Exhibit A*.

disclosed that her husband had lost his license to practice medicine after pleading guilty to health care fraud (47-48). Magistrate Gold excused both women (VD 33-35, 52-53).

During the course of his voir dire, Magistrate Gold asked if any of the prospective jurors had:

> (1) "worked as or for a mortgage broker or has an immediate family member in that capacity?" (VD 55);
>
> (2) "ever had a mortgage on a piece of property that the prospective juror owned" (VD 61);
>
> (3)"used a mortgage broker as opposed to a bank or institutionalized lender" (VD 62);
>
> (4)"ever [been] involved in a mortgage transaction that they believe for some reason involved an aspect of fraud or misrepresentation? " (VD 62)(matter in brackets supplied); or
>
> (5) "a negative experience with their mortgage lender or anyone else involved in servicing the mortgage?" (VD 89).[2]

Several prospective jurors revealed that they, or a close relative, were involved in real estate or mortgage lending. Prospective Juror Number 31 (Mr. Palazzo) stated that for eight years he had a business affiliation with a licensed broker who sold mortgages, and in the course of that business he (Mr. Palazzo) had attended closings (VD 56). At a sidebar, Mr. Palazzo was asked:

> "Were you ever involved in an investigation of mortgage fraud?" (VD 57);

---

[2] Defense counsel also suggested that Magistrate Gold ask if any of the prospective jurors were having trouble making mortgage payments. Despite defense counsel's urging, Magistrate Gold declined to ask about payment delinquencies on the grounds that it was not appropriate to "probe into people's financial challenges and stresses" (VD 88-89).

4

"Was the company that you worked for ever investigated for mortgage fraud?" (VD 57);

"Did you contact employers, for example, to verify income or review tax returns of borrowers yourself?" (VD 59);

"Were you ever involved in a mortgage transaction where you later learned that the person purporting to buy the property was not the actual person who was the borrower?" (VD 60);

"Were you ever involved in a mortgage transaction where you later learned that the person purporting to buy the property was not the actual person who was the borrower?" (VD 60);

"Or where anybody made any statements about who would be residing in the home and it turned out to be false?" (VD 60).

Although Juror Number 31 answered "no" to all of these questions, the government ultimately moved to strike him from the panel (VD 57-61, 92).

Two other prospective jurors disclosed that they had a family member who was involved in real estate. Juror Number 30 (Ms. Mahoney) acknowledged an "[i]mmediate family member, a real estate agent. And, a broker -- real estate broker" (VD 19, 61).[3] Juror Number 22, Ms. Liao, stated that her father, who was now retired, had at one point been involved in real estate. Ms. Liao, however, was struck by the defense (VD 93).

---

[3] Juror number 30 (Ms. Mahoney) was not challenged by defense counsel because based on her juror number it seemed unlikely that she would make the jury. Indeed, the final alternate chosen was juror number 26, Jared Bisogni.

5

# ADDENDUM C - MEMORANDUM - NEW TRIAL

Unlike Ms. Mahoney and Ms. Liao and Mr. Palazzo, Kiel James did not, when it came his turn to describe his background and employment,[4] disclose that he has a real estate salesperson license and is a "member of the CENTURY 21 Milestone Realty team" in Jamaica, New York. *See*, *Exhibit B*, <u>Kiel James' Real Estate Salesperson License, NYS Department of State</u> and *Exhibit C*, <u>Webpages from CENTURY 21 Milestone Realty, Jamaica, New York</u>. To the contrary, Mr. James stated only that he was employed by Jet Blue "in their admin department helping them with payroll" (VD 74).[5]

Mr. James -- who raised his hand when Magistrate Gold asked (1) if any of the prospective jurors had ever had a mortgage and (2) had ever used a mortgage broker (VD 61-62) -- did not respond when Magistrate Gold asked, "Has anybody here who has a mortgage had a negative experience with their mortgage lender or anyone else involved in servicing the mortgage?" (VD 89). However, defense counsel recently learned that a property owned by Mr. James was listed by CENTURY 21 Milestone Realty and was eventually sold at a short sale. *See*, *Exhibit J*, <u>Report from mlsirealtor.com</u>.

---

[4] The questioning of Kiel James occurred <u>after</u> Ms. Mahoney and Ms. Liao had disclosed that they had close family members in the real estate business, and Mr. Palazzo had revealed his personal involvement in a mortgage brokerage business. Thus, Kiel James knew from their answers and the follow-up questions posed to them, and the fact that Palazzo was also subjected to questioning at sidebar, that Mr. James' real estate salesperson license, his role as a salesman at CENTURY 21 Milestone Realty, his short sales and involvement with Geoffrey James should have been disclosed to Magistrate Gold, the government, and defense counsel. Mr. James also knew that he could have requested a sidebar to discuss his involvement in real estate and his mortgage difficulties and short sale since he had already disclosed at a sidebar the fact that his younger brother had been arrested for driving without a license (VD 42-43).

[5] After the verdict, defense counsel performed research on the internet of each juror.

# ADDENDUM C - MEMORANDUM - NEW TRIAL

In addition, various documents suggest a family and business relationship between Kiel James and Geoffrey James. Counsel's investigation so far has uncovered that Kiel A. James and one Geoffrey James have been joint owners of at least one property, 718 Pennsylvania Avenue, Brooklyn, New York,[6] and both men have, on various legal documents claimed residence at the same address -- either 116-24 140th Street, Jamaica New York 11436 or 116-24 140th Street, South Ozone Park, NY 11436 or 718 Pennsylvania Avenue, Brooklyn, New York.[7]   In addition, Geoffrey James is named as the primary defendant in at least two foreclosure actions. *See*, *Exhibit F*, Complaint and Summons from Lasalle Bank, N.A. v. Geoffrey James, Index No. 157961/08, Supreme Court, Kings County (foreclosure action based on $464,000.00 mortgage on 568 Alabama Avenue, Brooklyn, New York) and Complaint and Summons

---

[6] *See, Exhibit D,* Mortgage and Deeds relating to 718 Pennsylvania Avenue, Brooklyn, New York (indenture dated June 15, 2005 stating that Kiel A. James and Geoffrey James own 718 Pennsylvania Avenue, Brooklyn, New York as joint tenants). Kiel A. James acquired 718 Pennsylvania Avenue on July 10, 2003 with one Faith Allen and that acquisition was funded by a $451,500.00 mortgage in both their names. On April 30, 2007, a satisfaction of mortgage was issued to Kiel James and an Indenture, dated April 6, 2007, granted Geoffrey James sole ownership of 718 Pennsylvania Avenue.

[7] An affidavit of service for one of the foreclosure actions against Geoffrey James was served upon a co-tenant of Geoffrey James at 116-24 140th Street, Jamaica, NY 11436. *See*, *Exhibit E*, Affidavit of Service upon Geoffrey James. Kiel James used exactly the same address as his home address for his Citibank mortgage and First National Bank of Arizona mortgages. *See*, *Exhibits H* and *I*. Moreover, the description of the co-tenant given on the affidavit of service [*Exhibit E*] is a brown skinned forty-year-old male, approximately six feet tall and 190 pounds, a description which fits Kiel James. *See also*, *Exhibit C*, Webpages for Century 21 Milestone Realty, which include photographs of Kiel James. Also among the documents in *Exhibit D*, Mortgage and Deeds relating to 718 Pennsylvania Avenue, Brooklyn, New York, is an indenture dated April 6, 2007, which indicates on the first page that Kiel A. James and Geoffrey James each reside at 718 Pennsylvania Avenue, Brooklyn, New York and on subsequent pages that they reside at 116-24 140th Street, South Ozone Park, NY 11436.

Case 1:13-cr-00345-... Document 129... 04/13/2015... 04/13/2015 - Page 127 of 192

from Wells Fargo v. Geoffrey James, Index No. 11316/08 (foreclosure action based on $260,000 mortgage on 742 Pennsylvania Avenue, Brooklyn, New York).

Regarding Kiel James' purchase and subsequent short sale of 142-18 129th Avenue, Jamaica, New York, documents show that in February 2007, Kiel James, without spending a penny of his own money, acquired 142-18 129th Avenue, Jamaica, New York from Abdur Z. Mohamed for the sum of $455,000.00. *See*, *Exhibit G*, 2007 Bargain and Sale Deed (Abdur Mohamed to Kiel James) for 142-18 129th Avenue Jamaica, New York. The purchase price was funded entirely by a $340,000.00 mortgage from First National Bank of Arizona and an $85,000.00 mortgage from Citibank. *See*, *Exhibit H,* Citibank Mortgage and *Exhibit I*, First National Bank of Arizona Mortgage. Although 142-18 129th Avenue is a residential property, it seems unlikely that Kiel James purchased that property to live there, especially since on documents regarding this transaction he gives another address as his residence.

On May 21, 2010, Kiel James listed 142-18 129th Avenue for sale with CENTURY 21 Milestone Realty, the agency where he now works as a real estate agent. *See*, *Exhibit J*, Report from mlsirealtor.com. The listing indicated that it was a short sale subject to bank approval. *Id.*

On January 21, 2011, 142-18 129th Avenue was sold for $255,000.00 -- i.e., $170,000.00 less than the amount he, or more precisely First National Bank of Arizona and Citibank, paid for the property. *See*, *Exhibit K*, 2011 Bargain and Sale Deed (Kiel James to Niel C. Collins) for 142-18 129th Avenue, Jamaica, New York. The transaction was a short sale, meaning that the banks took the entire $170,000.00 loss. *See*, *Exhibit L*,

8

# ADDENDUM C - MEMORANDUM - NEW TRIAL

Satisfaction of Mortgage for Citibank Mortgage for 142-18 129th Avenue, Jamaica, New York; *See*, *Exhibit M,* Satisfaction of Mortgage for First National Bank of Arizona Mortgage for 142-18 129th Avenue  Jamaica, New York.

Like Kiel James, Wanda Alston-Stallings was less than candid regarding her employment.  In response to Magistrate Gold's question about whether any of the prospective jurors worked for a law enforcement agency, Ms. Alston-Stallings stated:  "I am an employee of the New York City Sheriff's Department . . . Administrative." (VD 40).  Asked if the New York City Sheriff investigated mortgage fraud, Alston-Stallings answered: "Not, generally, no sir." (VD 40).

Later in the voir dire, individual jurors were asked to provide information regarding employment.  At that point, Ms. Alston-Stallings stated:

> "I'm currently working for the City of New York. I've been there, it will be 30 years in February. I don't supervise." (VD 79).

Magistrate Gold then asked Alston-Stallings, "You said you worked for the City of New York, but I'm not sure you told us what you do."  Ms. Alston-Stallings replied, "I work with the sheriff in New York." (VD 79-80).

Ms. Alston-Stallings' LinkedIn profile [Exhibit N], however casts doubt about the veracity of her answers on voir dire.  On her LinkedIn page, she provides a much more expansive and detailed description of what she her job entails:

> **Review real estate instruments ensuring adherence to the law for recording**; qualify taxpayers for payment plans for violation towed vehicles; Administrative Liaison between respondents, NYPD and City Marshals, ensure proper fees, violations and taxes are paid; supervise and evaluate staff.

*Exhibit N*, Wanda Alston-Stallings LinkedIn profile (emphasis supplied).


### ARGUMENT

**KIEL JAMES AND WANDA ALSTON-STALLINGS
DEPRIVED MS. CEAN OF HER SIXTH AMENDMENT
RIGHT TO A TRIAL BY AN IMPARTIAL JURY BY
INTENTIONALLY AND KNOWINGLY GIVING
FALSE INFORMATION AND OR CONCEALING
AND WITHHOLDING INFORMATION IN RESPONSE
TO THE MAGISTRATE'S QUESTIONS ON VOIR DIRE**

The Sixth Amendment guarantees a criminal defendant the right to a trial by an impartial jury. U.S. Const, amend. VI; *United States v. Daguerdas*, 867 F. Supp. 2d 445, (S.D.N.Y. 2012). "One touchstone of a fair trial is an impartial trier of fact—'a jury capable and willing to decide the case solely on the evidence before it.'" *McDonough Power Equipment. Inc. v. Greenwood*, 464 U.S. 548, 554 (1984)(quoting *Smith v. Phillips*, 455 U.S. 209, 217(1982)). *Accord, United States v. Stewart*, 433 F.3d 273, 303 (2d Cir. 2006). Voir dire serves to protect that right:

> by exposing possible biases, both known and unknown, on the part of potential jurors. Demonstrated bias in the responses to questions on voir dire may result in a juror's being excused for cause; hints of bias not sufficient to warrant challenge for cause may assist parties in exercising their peremptory challenges. The necessity of truthful answers by prospective jurors if this process is to serve its purpose is obvious.

*McDonough*, 464 U.S. at 554 (emphasis supplied)

# ADDENDUM C - MEMORANDUM - NEW TRIAL

A juror's dishonesty during voir dire undermines a defendant's right to a fair trial. *United States v. Daguerdas*, 867 F. Supp. 2d at 468. "If the answers to the questions [during voir dire] are willfully evasive or knowingly untrue, the talesman, when accepted, is a juror in name only. His relation to the court and to the parties is tainted in its origin; it is a mere pretense and sham." *Clark v. United States*, 289 U.S. 1, 11 (1933). "[A] juror who lies her way onto a jury is not really a juror at all; she is an interloper akin 'to a stranger who sneaks into the jury room.'" *United States v. Daguerdas*, 867 F. Supp. 2d at 468 (quoting *Dyer v. Calderon*, 151 F.3d 970, 983 (9th Cir. 1998) (en banc)).

### A. The Legal Standard Governing this Motion

To obtain a new trial, Ms. Cean must demonstrate that Kiel James or Wanda Alston-Stallings (1) failed to answer honestly a material question on voir dire, and (2) a correct response "would have provided a valid basis for a challenge for cause." *United States v. Daguerdas*, 867 F. Supp. 2d at 469-470 (quoting *McDonough,* 464 U.S. at 556). "[T]he test is not whether the true facts would compel the Court to remove a juror for cause, but rather whether a truthful response "would have provided a valid basis for a challenge for cause." *Id.* "This means that "the district court must determine if it would have granted the hypothetical challenge" if it had known the true facts. *Daguerdas,* 867 F. Supp. 2d at 470(citing *United States v. Stewart*, 433 F.3d 273, 304 (2d Cir. 2006) and *United States v. Greer*, 285 F.3d 158, 171 (2d Cir. 2002). *See also United States v. Shaoul*, 41 F.3d 811, 816 (2d Cir. 1994) (noting that under the second prong of *McDonough*, a defendant must have a basis for arguing that the district court is required to sustain his challenge for cause).

11

A juror is biased--i.e., not impartial--if her experiences "would 'prevent or substantially impair the performance of [her] duties as a juror in accordance with [her] instructions and [her] oath.'" *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (*quoting Adams v. Texas*, 448 U.S. 38, 45 (1980); *Daguerdas,* 867 F. Supp. 2d at 470. "Bias may be inferred when a juror discloses a fact that bespeaks a risk of partiality sufficiently significant to warrant granting the trial judge discretion to excuse the juror for cause, but not so great as to make mandatory a presumption of bias." *United States v. Greer*, 285 F.3d 158, 171 (2d Cir. 2000) (quoting *United States v. Torres*, 128 F.3d 38, 47 (2d Cir. 1997). As the following paragraphs will show, the life experiences of Kiel James and Wanda Alston-Stallings effectively rendered them incapable of deliberating fairly and impartially in this case.

> B. *Kiel James' Failure to Disclose His Real Estate Salesperson License and Employment as a Real Estate Agent, the Short Sale of His Property, and Foreclosure Proceedings against Geoffrey James Deprived Ms. Cean of a Valid Challenge for Cause.*

Kiel James raised his hand when Magistrate Gold asked (1) if any of the prospective jurors had ever had a mortgage and (2) had ever used a mortgage broker (VD 61-62). However, Kiel James did not respond when Magistrate Gold asked, "Has anybody here who has a mortgage had a negative experience with their mortgage lender or anyone else involved in servicing the mortgage?" (VD 89). Given the information defense counsel has uncovered since the verdict, it is indisputable that Kiel James knowingly and deliberately concealed information that he knew (1) he was obligated to

disclose and (2) was likely to cause either defense counsel or the government or both to object to him serving as a juror.

At the outset, it cannot be emphasized too strongly that Kiel James' false and misleading conduct was not the result of mistake or ignorance or his failure to recognize the significance of the information he withheld. At the very outset of the voir dire proceedings, Magistrate Gold alerted the jury venire to the fact that in most of the transactions covered by the indictment "the mortgage payments weren't paid to the lenders, the banks or other entities that were lending the money. And many of the pieces of real estate that were secured by the mortgages ended up in foreclosure" (VD 14). Because foreclosure proceedings was a fate that might have befallen Kiel James himself if the banks had not permitted a short sale, Magistrate Gold's opening remarks must have had an impact on Mr. James.

In addition, the questioning of Kiel James occurred <u>after</u> prospective jurors, Ms. Mahoney and Ms. Liao, had disclosed that they had close family members in the real estate business, and Mr. Palazzo had revealed his personal involvement in a mortgage brokerage business. Having heard that questioning, Kiel James knew from their answers and the follow-up questions posed to them that Mr. James' real estate salesperson license, his sales position at CENTURY 21 Milestone Realty, the short sale of 142-18 129th Avenue as well as Geoffrey James' foreclosures and short sales should have been disclosed to Magistrate Gold, the government, and defense counsel. Kiel James would also have known -- both from Mr. Palazzo's sidebar and the fact that James himself had requested a sidebar to disclose to Magistrate Gold the arrest of James' younger brother --

13

that he [James] could also have requested a sidebar for the purpose of discussing his real estate salesperson license and sales position and his own short sale and Geoffrey James' short sale and foreclosure problems.

Nor can the crippling impact of Kiel James' personal experience upon his ability to serve as a fair and impartial juror in this matter be minimized. The similarities between the scenario that Magistrate Gold described at the beginning of the voir dire and Kiel James' own short sale of 142-18 129th Avenue were – to borrow a phrase Magistrate Gold used with respect to another juror being excused because her son had to fend off allegations of his involvement in mortgage fraud -- "too close to the bone" for Kiel James not to have noticed them.

To the extent that Kiel James saw himself and/or Geoffrey James as victims of the lenders who provided them with the mortgages that led to their financial woes, Kiel James would naturally have empathized with those government witnesses, e.g., the straw buyers and others, who, according to the government, participated in a mortgage fraud scheme because they were "down on their luck" (VD 1029), "in desperate financial situations" (VD 1182), had barely any money and were "about to lose their home" (VD 1029). Indeed as the court observed in *Sampson v. United States*, 724 F.3d 150, 167 (1st Cir. Mass. 2013):

> When a juror has life experiences that correspond with evidence presented during the trial, that congruence raises obvious concerns about the juror's possible bias. *See Torres*, 128 F.3d at 47-48; *Burton*, 948 F.2d at 1158-59. In such a situation, the juror may have enormous difficulty separating her own life experiences from evidence in the case.

14

# ADDENDUM C - MEMORANDUM - NEW TRIAL

Assuming that Kiel James and Geoffrey James considered themselves in the same boat as some of the government's witnesses who, according to the government, became involved in mortgage fraud because they were down on their luck and desperate, Kiel James was in no position to impartially and dispassionately assess the credibility of such witnesses and the rest of the government's evidence at trial.

As one of the government's own authorities on mortgage fraud has suggested, if someone wants to commit mortgage fraud it is best to use a broker who can introduce him to a lender who "asks few questions and checks up on nothing." David Grise, *United States Exhibit #3: How To Commit Mortgage Fraud*, 58 UNITED STATE ATTORNEYS' BULLETIN (May 2010) at p. 4. The First National Bank of Arizona – the bank that provided the $340,000.00 mortgage for Kiel James' 142-18 129th Avenue property – was precisely that kind of lender. The Federal Deposit Insurance Corporation closed First National Bank of Arizona and sued high ranking bank officers for promoting the risky nontraditional mortgage loans that ultimately caused the bank's failure. *See*, *Exhibit O*, FDIC: Press Releases - PR-63-2008 7/25/2008 and *Exhibit P*, *FDIC Sues Ex-First National Bank of Arizona CEO Over Losses*, Bloomberg News, August 24, 2011, *available at* www.businessweek.com/news/2011-08-24/fdic-sues-ex-first-national-bank-of-arizona-ceo-over-losses.html.[8]

---

[8] Geoffrey James obtained the mortgages upon which he defaulted from People's Choice Home Loan, a subprime lender that filed for bankruptcy in 2007. *See*, People's Choice Home Loan Files for Bankruptcy (Update2) By Tiffany Kary - March 20, 2007, *available at* http://www.bloomberg.com/apps/news?pid=newsarchive&sid=atkiRNcdlZ8M.

Case 1:14-cr-00... Document 83... Filed... Page 135 of 192

Indeed, the uncanny ability of Kiel James -- who does not seem to have been earning money hand over fist -- to obtain mortgages to cover the entire purchase price, $425,000.00 for 142-18 129th Avenue and the fact that he was able unload the property at a short sale, which stuck the banks with a $170,000 loss, all raise red flags suggesting that Kiel James himself was not above taking out loans which he had no intention of ever paying back -- the very same allegation that the government is making against Ms. Cean and her alleged coconspirators.

The suspicion that the short sale of 142-18 129th Avenue was not just the result of bad business judgment or hard luck is further fueled by the curious series of transactions by which Kiel James managed to purchase 718 Pacific Avenue in Brooklyn, New York. This was another transaction made possible by a substantial mortgage, $451,000.00, to a man of limited means. Also, through a series of odd transactions, the property was transferred from Kiel James and his co-buyer Faith Allen to Geoffrey James. At the end of these transactions, Ms. Allen's one-percent interest in the property disappeared, the mortgage was satisfied and Geoffrey James somehow acquired exclusive ownership of the property.

Kiel James and Geoffrey James seem to have had the almost magical ability to obtain substantial mortgages and then avert foreclosure by arranging a short sale just in the nick of time. Counsel has found two foreclosure proceedings against Geoffrey James in Supreme Court, Kings County. *See*, *Exhibit F*, Complaints and associated documents in LaSalle Bank, N.A. v. Geoffrey James, Index No. 157961/08, Supreme Court, Kings County (foreclosure action based on $464,000.00 mortgage on 568 Alabama Avenue,

Case 1:13-cr-00121 Document 123 Filed 10/31/2013 Page 136 of 192

Brooklyn, New York) and Wells Fargo v. Geoffrey James, Index No. 11316/08 (foreclosure action based on $260,000 mortgage on 742 Pennsylvania Avenue, Brooklyn, New York). It appears that Geoffrey James avoided foreclosure of his 742 Pennsylvania property by accomplishing a short sale. The mortgage transactions and short sales in which Kiel James and Geoffrey James have engaged are – to borrow once again Magistrate Gold's phrase – too "close to the bone" for Kiel James to be a fair and impartial juror in this case.

Indeed, in cases where a juror "has engaged in activities that closely approximate those of the defendant on trial" the exercise of "the trial judge's discretion to grant challenges for cause on the basis of inferred bias is especially appropriate." *United States v. Torres*, 128 F.3d at 42, 47 (upholding the dismissal of a potential juror for cause in a structuring case because she had conducted her company bank transaction in a manner intended to spare the company from having to prepare currency transaction reports). In such circumstances, the mental gymnastics required for a juror to separate his own experience from the evidence at trial may be too strenuous or difficult for the average juror. *See*, *United States v. Torres*, 128 F.3d at 47.

Furthermore, the nature, scope and extent of the lies a juror tells – and Kiel James was dishonest on a grand scale -- may, in and of themselves, demonstrate an undue partiality or bias. As the Second Circuit explained in *United States v. Colombo*, 869 F.2d 149, 151- 152 (2d Cir. 1989), a prospective juror who lies during voir dire can be prosecuted for perjury under 18 U.S.C. § 1621 or subjected to criminal contempt pursuant to 18 U.S.C. § 401 (1982) and possible substantial restitution claims by the

government.  Consequently, one who lies to stay on a jury exhibits a powerful personal interest in a case. "Such an interest not only suggests a view on the merits and/or knowledge of evidentiary facts but is also quite inconsistent with an expectation that a prospective juror will give truthful answers concerning her or his ability to weigh the evidence fairly and obey the instructions of the court." *Colombo*, 869 F.2d at 151-152.

Kiel James was obviously sophisticated enough to realize that if he had disclosed the short sale of his property, his real estate license, and the foreclosure actions against Geoffrey James, it was highly unlikely that he would be chosen as a juror. Moreover, as we have noted previously, the questioning of other jurors who had indicated a relationship with a close family member in the real estate business, and in the case of Mr. Palazzo participation in a mortgage brokerage business, patently demonstrated to Kiel James the need to disclose his involvement with the real estate business and his short sale.

The fact that Kiel James chose to remain silent rather than give truthful answers on voir dire strongly suggests the existence of some personal interest in this matter which rendered him incapable of being a fair, unbiased and impartial juror.

Moreover, even when a prospective juror is dishonest for reasons other than a desire to serve on the jury, dishonest answers to voir dire questions indicate that a juror is unwilling or unable "to apply the law as instructed by the court to the evidence presented by the parties" and, therefore, suggests partiality.  *See*, *Daguerdas*, 867 F. Supp. 2d at 473.  Indeed, "one of the principal purposes of voir dire is to ensure that the jurors ultimately selected for service are unbiased and willing and able to apply the law as

18

instructed by the court to the evidence presented by the parties." *See*, *United States v. Thomas*, 116 F.3d 606, 617 & n.10 (2d Cir. 1997). Thus, "every day in courtrooms across the length and breadth of this country," jurors are dismissed from the venire "for cause" precisely because they are unwilling or unable to follow the applicable law. *Id.*

The cavalier and disingenuous manner in which Kiel James responded to Magistrate Gold's questions on voir dire, suggests that he would be equally unlikely to follow the Court's instructions at trial. Indeed, he probably paid as little heed to the Court's jury instructions and the actual evidence at trial, as he did to Magistrate Gold's instructions and questions during voir dire.

> *C. Wanda Alston-Stallings' Failure to Disclose the True*
> *Nature and Scope of her Employment with*
> *The Sheriff for the City of New York Deprived*
> *Ms. Cean of a Valid Challenge for Cause*

Again like Kiel James, Wanda Alston-Stallings withheld critical information that would have established grounds for a valid challenge for cause. The terseness with which she described her employment with the New York City Department of Finance indicates that she tailored her answers to avoid being excluded from the jury. Moreover, she either failed to realize or chose to ignore the inappropriateness of her sitting as a jury in a mortgage case where documents of the very sort that she reviews in the course of her employment would be important evidence.

Initially, Ms. Alston-Stallings described herself as an "administrative" employee of the New York City Sheriff:

> THE PROSPECTIVE JUROR: I'm an employee of the New York City Sheriff's Department.
>
> THE COURT: Okay.
>
> THE PROSPECTIVE JUROR: Administrative.

VD 40.

Later in the voir dire, she acknowledged only that she worked for the City

of New York:

> I'm currently working for the City of New York. I've been there, it will be 30 years in February. I don't supervise.  I am married. My husband does work. He does maintenance mechanic for housing development in the Bronx. I have no children. He has children. He has grown children. I have none. And I can be fair and impartial.

VD 79.

Magistrate Gold had to press her to be more specific

regarding her employment:

> THE COURT: You said you worked for the City of New York, but I'm not sure you told us what you do.
>
> THE PROSPECTIVE JUROR: I work with the sheriff in New York.
>
> THE COURT: You said so. I'm sorry. I forgot about that.

VD 79-80.

Alston-Stallings also hedged when Magistrate Gold asked her if the Sheriff

investigated mortgage fraud, answering "Not generally, no, sir" (VD 40).

Alston-Stalling's LinkedIn profile shows that her answers on voir dire were

not just terse but dishonest.  During the voir dire, she portrayed herself as a mere

20

administrative employee who supervised no one. However, her LinkedIn profile indicates that she has supervised and evaluated her fellow employees. Furthermore, she "reviewed" and "qualified" taxpayers for payment plans for violation towed vehicles, a function which implies that she had some sort of discretionary authority. The LinkedIn profile also indicates that she served as a liaison with the NYPD, a duty that Alston-Stallings neglected to disclose during voir dire.

More importantly, her LinkedIn profile asserts that Alston-Stallings "review[s] Real Estate instruments ensuring adherence to the law for recording." In other words she is responsible, at least in part, for creating the records upon which mortgage lenders rely to secure their interest in mortgage property and to avoid making loans on properties that might be subject to liens by other mortgage lenders. Thus, while her employment duties did not actively involve her in the investigation of mortgage fraud, her work -- reviewing instruments for adherence to the law for filing -- was an important measure for discouraging or preventing mortgage fraud and securing the collateral of mortgage lenders.

Moreover, as a thirty-year veteran of the New York City Department of Finance Alston-Stallings knew that the types of documents that she reviews for "adherence to the law" would likely be offered by the government to prove a mortgage fraud case. Indeed, part of the evidence that Ms. Alston was called upon to fairly and impartially evaluate were records from her own employer.[9] Documents like Government

---

[9]In their first note to the Court, the jury requested several exhibits be brought into the jury room. When the Court asked the jury to clarify its requests, the following exchange took place between

# ADDENDUM C - MEMORANDUM - NEW TRIAL

Exhibit 16 – a bargain and sale deed for 1184 East 82nd Street Brooklyn, New York [a copy of which is provided as *Exhibit Q* -- and Government Exhibit 17 – a durable power of attorney -- were recorded by and have a cover sheet with the seal of the New York City Department of Finance [a copy of which is provided as *Exhibit R*].  The notion that Alston-Stallings could fairly and impartially assess the reliability and significance of records maintained by her own office is both implausible and unseemly because it creates an appearance of partisanship or favoritism by Ms. Alston-Stallings toward her colleagues at the New York City Department of Finance.

Finally, even if Alston-Stallings's reluctance to provide all but the most minimal information about the nature and scope of her employment was not prompted by a desire to be on the jury, her reticence suggests she was unwilling, unable, or just plain disinclined "to apply the law as instructed by the court to the evidence presented by the parties" and, therefore, suggests partiality.  *Daguerdas*, 867 F. Supp. 2d at 473.  Indeed, given the length of her service with the New York City Department of Finance, Alston-Stallings more likely than not assumed that she knew more about mortgages than the

---

the Court and, according to defense counsel's recollection, Ms. Alston-Stallings, who served as the jury foreperson:

> THE COURT: All deed and what's POAs?
> THE JURY: Powers of attorney.
> THE COURT: Oh, sorry.  She's laughing at me.  Power of attorney and what?
> THE JURY: Mortgages.
> THE COURT: And mortgages, okay.
> THE JURY: Everything through ACRIS that you have.
> THE COURT: We have that.

Trial Transcript, October 9, 2013, 1249:21-1250:3.

Case 1:13-cr-... Document ... Filed ... Page 142 of 192

Court, the prosecutor and defense lawyers, and she could decide the case without any instructions or guidance from any of them.

### CONCLUSION

For the above stated reasons, the Court should set aside the verdict and order a new trial. In the alternative, the Court should hold an evidentiary hearing. *United States v. Sun Myung Moon*, 718 F.2d 1210, 1234 (2d Cir. 1983) (evidentiary hearing must be granted "when there is clear, strong, substantial and incontrovertible evidence, that a specific, nonspeculative impropriety has occurred which could have prejudiced the trial of a defendant"). A*ccord, United States v. Vitale*, 459 F.3d 190, 196 (2d Cir. 2006).

Dated: December 17, 2013

New York, New York

Respectfully submitted,

/s/ Louis M. Freeman

Louis M. Freeman
Attorney for Defendant Cean

Freeman, Nooter & Ginsberg
75 Maiden Lane
New York, New York 10038
212-608-0808(p)
212-962-9696(f)

Case 1:15-cr-00638 Document 128-1 Filed 06/24/17 Page 143 of 192 PageID #: 1377

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
UNITED STATES OF AMERICA,

                                              11 CR 449 (SJ)

        - against -
                                              <u>MEMORANDUM &amp;</u>
                                              <u>ORDER</u>

CASSANDRA CEAN,

                              Defendant.
-----------------------------------------------------------X
A P P E A R A N C E S :

LORETTA E. LYNCH
United States Attorney, EDNY
271 Cadman Plaza East
Brooklyn, New York 11201
By:    Maria Cruz Melendez
        Margaret E. Gandy
Attorneys for the United States

FREEMAN, NOOTER & GINSBERG
75 Maiden Lane
Suite 503
New York, NY 10038
By:    Louis M. Freeman
Attorney for Cassandra Cean

JOHNSON, Senior District Judge:

        On June 16, 2010, Cassandra Cean ("Defendant" or "Cean") was charged

with conspiring to engage in wire fraud in connection to an alleged mortgage fraud

scheme.  The matter proceeded to trial at which, on October 9, 2013, Cean was

1

Case 1:15-cr-00637-KAM Document 815 Filed 01/24/17 Page 144 of 192 PageID #: 1378

convicted of conspiracy to commit wire fraud and four counts of wire fraud. She was acquitted of one count of wire fraud. Cean now moves the Court for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure or, in the alternative, an evidentiary hearing. Based on the submissions of the parties, and for the reasons stated below, Defendant's Rule 33 motion is DENIED.

BACKGROUND

Defendant moves the Court for a new trial, claiming that two jurors purposefully concealed their biases by providing false and misleading answers during voir dire thereby depriving her of her Sixth Amendment right to a fair trial by an impartial jury. Given the discrete nature of the Defendant's Motion, only the relevant portions of the record will be repeated here.

Chief Magistrate Judge Steven M. Gold conducted the jury voir dire on September 30, 2013. At that proceeding, the Magistrate informed the prospective jurors that the case involved a mortgage fraud scheme. (Tr. of Voir Dire, Sept. 30, 2013 ("Voir Dire"), at 15.) The Magistrate explained that the prospective jurors were under oath and should answer questions honestly and conscientiously. He stressed the importance of their obligation to "render a verdict fairly and impartially." (Voir Dire at 10, 12.)

Chief Magistrate Judge Gold informed the prospective jurors that he would ask them questions and that they should raise their hands if their answer was yes.

2

Case 1:13-cr-00409-PKC Document 218 Filed 01/17/24 Page 145 of 192 PageID #: 1379

(Voir Dire at 19.)  Among other mortgage-related questions, the Magistrate Judge asked whether any of the prospective jurors had ever obtained a mortgage; whether any were involved in a mortgage transaction that they believed involved fraud; and whether any had a negative experience with a mortgage broker or mortgage service (Voir Dire at 61–62.)   The Magistrate provided the prospective jurors with questionnaires, and questioned each prospective juror individually.

Juror Number 6

Magistrate Judge Gold questioned Mr. Kiel A. James ("Juror Number 6") about his background.  Juror Number 6 replied:

> THE PROSPECTIVE JUROR: I live in Jamaica Queens. I've been living there for 28 years. I rent. I have my bachelor's in accounting. I currently work for JetBlue.
>
> THE COURT: What do you do for JetBlue?
>
> THE PROSPECTIVE JUROR: I'm in their admin department helping them with payroll. I've been there for four years. I don't supervise anyone. I'm married. My wife's an RN. We have one child. Yeah, and I can be fair and impartial.

(Voir Dire at 74.)  Juror Number 6 raised his hand when Magistrate Judge Gold asked if any of the prospective jurors: (1) had ever had a mortgage, and (2) had ever used a mortgage broker.  (Voir Dire at 61–62.)

Juror Number 10

After a Court inquiry into her background, Wanda Alston-Stallings ("Juror Number 10") stated: "I'm an employee of the New York City Sheriff's Department." (Voir Dire at 40.)  The Court then specifically inquired as to whether the Sheriff's Department investigated mortgage fraud.  Juror Number 10 responded in the negative: "Not generally, no, sir."  (Voir Dire at 40.)  Later, the Court again inquired about her employment.  She explained, "I'm currently working for the City of New York. I've been there, it will be 30 years in February. I don't supervise." (Voir Dire at 79.)   She then stated that she could be fair and impartial (Voir Dire at 40, 79.)

The jury was sworn in on October 1, 2013.  On October 9, 2013, Cean was convicted of conspiracy to commit wire fraud and four counts of wire fraud. She was acquitted of one count of wire fraud.

DISCUSSION

I.      Rule 33 Standard

4

Rule 33 permits a court to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Rule 33 places a heavy burden on the defendant, as motions for a new trial are "not favored and should be granted only with great caution." United States v. Stofsky, 527 F.2d 237, 243 (2d Cir. 1975) (internal quotation marks and citation omitted). Indeed, "[a] district court must find that there is a real concern that an innocent person may have been convicted." United States v. McCourty, 562 F.3d 458, 475 (2d Cir. 2009) (internal quotation marks omitted). "It is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment." United States v. Sanchez, 969 F.2d 1409, 1413 (2d Cir. 1992).

"[A] party alleging unfairness based on undisclosed juror bias must demonstrate first that the juror's voir dire response was false and second that the correct response would have provided a valid basis for a challenge for cause." United States v. Stewart, 433 F.3d 273, 303 (2d Cir. 2006), citing McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 556 (1984). This two-part test applies to inadvertent as well as deliberate nondisclosures or misstatements. See United States v. Langford, 990 F.2d 65, 68 (2d Cir. 1993). While "[t]he motives for concealing information may vary, only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial." McDonough, 464 U.S. at 555. A good faith failure to respond correctly to a question does not alone warrant a new trial. See United States v. Shaoul, 41 F.3d 811, 815–16 (2d Cir.

5

Case 1:15-cr-00637-KAM Document 728-1 Filed 04/27/18 Page 148 of 192 PageID #: 1382

1994).    As the Second Circuit has explained, "[t]he ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." United States v. Ferguson, 246 F.3d 129, 134 (2d Cir. 2001) (citation omitted).

II.    Analysis

a.    Juror Number 6

Cean claims that Juror Number 6 failed to disclose: (1) that he has a real estate salesperson license and works for a Century 21 real estate office in Queens; (2) that he had a negative experience with a mortgage lender; (3) that he purchased property with 100 percent financing and then sold it in a short sale, and (4) that a close family member had been a defendant in multiple foreclosure proceedings and involved in at least one short sale.  (Def.'s Rule 33 Mot. at 2.)

In support of such claims, Defendant attaches, among other things, a Real Estate Salesperson License from New York State for "Kiel A. James" who allegedly works at Century 21 Milestone Realty.   (Def.'s Rule 33 Mot. at Ex. B.) Defendant also attaches a profile of Mr. Kiel A. James from the website of Century 21 Milestone Realty.   (Def.'s Rule 33 Mot. at Ex. C.)   Defendant claims that Mr. James listed a property through Century 21 Milestone Realty, which was eventually sold at a short sale.  (Def.'s Rule 33 Mot. at 6, Ex. J.)   Finally, Defendant also includes records from the New York City Department of Finance, Office of the

City Register relating to alleged mortgages and deeds in the name of Mr. Kiel A. James.  (Def.'s Rule 33 Mot. at Ex. D–I.)

Based on the record, the Court finds that Juror Number 6's responses were not false, and Defendant therefore fails the first prong of the <u>McDonough</u> test. Juror Number 6 indicated that he worked for JetBlue.  He raised his hand when Magistrate Judge Gold asked if any of the prospective jurors: (1) had ever had a mortgage, and (2) had ever used a mortgage broker.   (Voir Dire at 61–62.) Defendant Cean has failed to provide any new information or knowledge that indicates that Juror Number 6 provided false information.  The information that the Defendant provided only establishes that an individual with the same name as Juror Number 6 has a real estate license, acquired property which was later sold in a short sale, or had a close family member in multiple foreclosure proceedings. Defendant's attempts at connecting such information to Juror Number 6 can be deemed nothing more than conjecture.  Furthermore, Defendant failed to establish, for example, that Juror Number 6 did not work at JetBlue at the time of voir dire questioning.  Thus, there is "no reasonable basis to conclude that [Juror Number 6's] responses under oath were not truthful."   <u>United States v. Sattar</u>, 395 F.Supp.2d 66, 74 (S.D.N.Y. 2005), <u>aff'd sub nom</u>. <u>United States v. Stewart</u>, 590 F.3d 93 (2d Cir. 2009).   Any omission by Juror Number 6 would be more reasonably construed as a mistake.  <u>See, e.g.</u>, <u>Sattar</u>, 395 F. Supp. 2d at 73.

Case 1:08-cr-00823-JG Document 126 Filed 06/24/07 Page 150 of 192 PageID #: 1384

Even if the Court found that Juror Number 6's voir dire responses were false, there is no reason for the Court to find that such information would affect the juror's impartiality.  <u>McDonough</u> 464 U.S. at 555.  The very fact that Juror Number 6 might hold a real estate license, for example, does not imply bias.  "It is well settled that a juror not shown to have actual bias is not excludable merely because he or she is a member of a particular occupation or even of law enforcement." <u>United States v. Marji</u>, 158 F.3d 60, 62 (2d Cir. 1998).   In fact, Juror Number 6 specifically indicated that he could be "fair and impartial." (Voir Dire at 74.)

In his arguments relating to Juror Number 6, Defendant primarily relies on <u>United States v. Colombo</u>, 869 F.2d 149, 150 (2d Cir. 1989).  There, the defendant produced an affidavit of a juror who stated that another juror confided that she had deliberately refrained from disclosing information because she wanted to remain on the panel.   However, the Second Circuit has limited <u>Colombo</u> to its facts, explaining  that it "did not suggest a <u>per se</u> rule based simply on whether a prospective juror had lied, without respect to whether the dishonesty had a bearing on her impartiality."  <u>United States v. Langford</u>, 990 F.2d 65, 69 (2d Cir. 1993).[1]  Thus, in <u>Langford</u>, notwithstanding a juror's intentional nondisclosure of her criminal history, the Second Circuit affirmed the district court's denial of the

---

[1] In fact, as this Court has pointed out, the Second Circuit "has never found reason to overturn a verdict on the basis of juror nondisclosure under <u>McDonough</u> and only once, <u>see</u> <u>United States v. Colombo</u>, 869 F.2d 149 (2d Cir.1989), has it remanded for an evidentiary hearing on the matter." <u>United States v. Bangiyev</u>, 2008 WL 4240005 (E.D.N.Y. Sept. 12, 2008) (citing <u>United States v. Stewart</u>, 433 F.3d 273, 303 (2d Cir.2006)).

defendant's motion for a new trial because "there was no suggestion . . . that [the juror] had any evidentiary knowledge relating to Langford's case," and the district court's finding that there was "'absolutely no evidence' that [the juror] was in any way biased or prejudiced against Langford" was not clearly erroneous. Id.

No evidence, either in the record or produced by Defendant in connection with this Motion, indicates that Juror Number 6 harbored any bias against the Defendant.

b. Juror Number 10

Defendant also claims that Juror Number 10 failed to discuss that, in the course of her employment, she reviews real estate instruments. (Def.'s Rule 33 Mot. at 2.) As evidence of such a claim, Defendant argues that an internet search on the social networking site LinkedIn revealed that Juror Number 10 "review[s] Real Estate instruments ensuring adherence to the law for recording." Defendant specifically alleges that "[Juror Number 10] either failed to realize or chose to ignore the inappropriateness of her sitting [on] a jury." (Def.'s Rule 33 Mot. at 19.)

The Court finds that Juror Number 10's responses were also not false. During voir dire, Juror Number 10 indicated that the Sheriff's Office did "not generally" investigate mortgage fraud. (Voir Dire at 40.) Defense counsel did not seek further inquiry into Juror Number 10's work experience and background, notwithstanding the Court's repeated inquiries as to whether counsel had further

9

questions for any jurors.[2] Furthermore, information obtained from a social networking website cannot be verified. As a result, none of the information provided by Defendant with respect to a social networking website establishes that she was somehow dishonest in her reply to the Magistrate.

Even if Defendant could satisfy McDonough's first prong, she would fail the second prong. Juror Number 10 did not provide any information during voir dire that would establish that her employment responsibilities resulted in bias. See Langford, 990 F.2d at 70. Such information does not reflect a "manifest injustice" which would warrant a new trial. Ferguson, 246 F.3d at 134.

As a result, the Court finds that Juror Number 10's affirmation of impartiality, together with Magistrate Judge Gold's evaluation of her, was sufficient to establish that she was not biased. United States v. Garcia, 936 F.2d 648, 653 (2d Cir. 1991).

III.    Remaining Claims

The Court has considered the remaining arguments and finds that they are without merit.

---

[2] For example, the Court inquired: "Any other questions you'd like me to ask?" Defense Counsel answered "No." (Voir Dire at 89.)

Case 1:13-cr-00409-DLI Document 38 Filed 04/24/14 Page 153 of 192 PageID #: 1387

<u>CONCLUSION</u>

For the foregoing reasons, Defendant's Rule 33 Motion for a New Trial or, in the Alternative, an Evidentiary Hearing is DENIED.

SO ORDERED.

Dated: April 24, 2014                          _____/s/_____
            Brooklyn, New York                    Sterling Johnson, Jr., U.S.D.J.

11

Case 1:11-cr-00449-SJ   Document 191-1   Filed 07/05/15   Page 1 of 52 PageID #: 1002

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
UNITED STATES OF AMERICA,

v.

CASSANDRA CEAN,

No Cr. 11- 449(S-1)(SJ)

Defendant.
-----------------------------------------------------------------x

**DEFENDANT CASSANDRA CEAN'S MEMORANDUM IN SUPPORT OF**

**MOTION FOR RECONSIDERATION**

Case 1:11-cr-00442-SJ Document 191 Filed 05/05/15 Page 3 of 58 PageID #: 1008

Defendant Cassandra Cean submits this memorandum of law in support of her request that the Court reconsider and reverse its decision filed April 24, 2014 denying her motion pursuant to Fed. R. Crim. Pro. 33 for a new trial.

Reconsideration is appropriate where, as in the instant case, "the moving party can point to controlling decisions or [factual] data that the court overlooked -- matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Hamptons Locations, Inc. v. Rubens*, 01-CV-5477 (DRH)(WDW), 2006 U.S. Dist. LEXIS 33450 at *3-*4 (E.D.N.Y. May 25, 2006) (quoting *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995). S*ee also Arum v. Miller*, 304 F. Supp. 2d 344, 347 (E.D.N.Y. 2003) ("To grant such a motion the Court must find that it overlooked matters or controlling decisions which, if considered by the Court, would have mandated a different result."). As the following paragraphs will show, there are five reasons that warrant reconsideration and reversal of the Court's decision denying Ms. Cean's motion for a new trial. This motion provides the court with the opportunity to correct clear error and to prevent manifest injustice. A failure to grant the hearing is tantamount to an abuse of discretion.

First, the Court's decision is premised upon the erroneous assumption that the Kiel A. James whose real estate sales license was submitted as evidence in support of the motion for a new trial might not be the same Kiel A. James who served as a juror at Ms. Cean's trial. Second, the Court's decision misapprehends the nature of the prejudice inherent in Kiel James's and Geoffrey James's involvement in apparently unsuccessful and perhaps dubious real estate ventures. Third, the Court's decision also misconstrues the Second Circuit's holding in *United States v. Langford*, 990 F.2d 65 (2d Cir. 1993). Fourth, the Court has overlooked and or failed to address, Juror Number 10, Wanda Alston-Stallings's, failure to disclose that she was studying

2

for a real estate license while she was serving on the jury.   Fifth, the Court's decision fails to heed the Second Circuit's admonitions regarding the need for an evidentiary hearing on post-verdict motions where, as here, the movant has established reasonable grounds for conducting a hearing on the issue of juror bias.

> A.      *Photographic evidence conclusively establishes that the Kiel A. James who served as Juror Number 6  is the same Kiel A. James who has a real estate sales license, was involved in a short sale, and has a close relative who like many of the government's witnesses was in danger of losing his property in foreclosure proceedings.*

Apparently, this Court is laboring under the misapprehension that the Kiel A. James who served as a juror at Ms. Cean's trial may not be the same Kiel A. James who holds New York state real estate salesperson license number 10401248117.   According to the Court:

> The information that the Defendant provided only establishes that an individual with the same name as Juror Number 6 has a real estate license, acquired property which was later sold in a short sale, or had a close family member in multiple foreclosure proceedings. Defendant's attempts at connecting such information to Juror Number 6 can be deemed nothing more than conjecture.

D.E. 188, filed on 4/24/2014, at 7.

In fact, the documentary evidence submitted in support of Ms. Cean's motion for a new trial establishes conclusively that Juror Number 6 is the same Kiel A. James who has a real estate license, acquired property which was later sold in a short sale, and has a close family member who had multiple foreclosure proceedings.

For example, Mr. James's internet profile with the Century 21 Milestone real estate office with which he is affiliated has a picture of Mr. James, and it is evident from that photograph that the Kiel James affiliated with this real estate office is the very same person who

Case 1:11-cr-00442-PGG Document 191 Filed 05/25/15 Page 4 of 57 PageID #: 1395

served as Juror Number 6.[1]    Indeed, the government does not contest the "legitimacy of this document" or deny that the Kiel A. James in the Century 21 profile provided to the Court and the government, is the same Kiel A. James who served as Juror Number 6.

Nor has the government actually denied that Kiel James was affiliated with a real estate agency while he was working for JetBlue and serving as a juror.  The best response the government can muster is the febrile assertion that it is "plausible"[2] that  James was  not "actively" working as a real estate agent while serving as a juror.  Government's Memorandum of Law in Opposition to Defendants Motion for New Trial, D.E. 180 at 13-14.    Even this assertion is still a concession that James was – and apparently still is  -- working as a real estate agent.  Furthermore, while the government's answer insinuates that perhaps Mr. James kept his license tucked away in a desk drawer for use at some future time, the fact that he had a profile on a Century 21 website establishes beyond cavil that he was, and is, <u>actively</u> soliciting real estate business.

Equally specious is the notion that because he was employed by JetBlue, Mr. James could not have also been actively involved in the real estate business.  In today's economy, many people have more than one job, and it is not uncommon for a real estate salesperson to have other employment.

Furthermore, Ms. Cean has never alleged that Mr. James falsely claimed employment with JetBlue, and for that reason the truthfulness of  his statement claiming employment with JetBlue is not a basis for denying her motion for a new trial.  The gravamen of

---

[1]Undersigned counsel states as an officer of the court that the person whose picture appears on the internet profile with Century 21 Milestone real estate office and the Kiel James that sat as Juror Number 6 is one and the same, Counsel so swears under the penalty of perjury.

[2] The very word "plausible" connotes the <u>mere appearance </u>of validity.

Ms. Cean's motion for a new trial is that Mr. James deliberately and dishonestly failed to disclose his real estate salesperson license, his involvement in a short sale, and the fact that a close relative on multiple occasions was in danger of losing real property against which foreclosure proceedings had been instituted. [3]

---

[3] The court appears to be laboring under another misapprehension: that counsel for Ms. Cean did not respond when asked if he had further questions for any jurors. See Doc 188 at 9.

Any additional questions the prosecution would have me request of anybody?
MS. CRUZ MELENDEZ: No, Your Honor.

THE COURT: What about the defense?

MR. FREEMAN: I would like you to delve into the following subject matter of those people that have mortgages: Have they had any problems with the mortgage? Have they had problems --

THE COURT: What do you mean by "problems"? Making payments?

MR. FREEMAN: Well, either making payments or have the mortgage companies contacted them. Have any of them refinanced? Maybe the question are they having trouble making payments is not a good one, but have they had any experience with the mortgage companies that have given them a bad feeling.

THE COURT: Okay. That last question I can ask.

MR. FREEMAN: By the mortgage crisis. Have they been affected.

THE COURT: I don't know that it's appropriate to probe into people's financial challenges and stresses.

MR. FREEMAN: But we ask if they have been convicted of a crime.

THE COURT: Because that bears directly on their ability to be fair and impartial.

MR. FREEMAN: Well, if they weren't treated fairly by their mortgage companies.

THE COURT: I'll ask that question.
(End sidebar conference.)

> B. *The Court has misperceived the significance of Mr. James's involvement in apparently unsuccessful real estate ventures with respect to bias, and the actual significance of the Second Circuit's opinion in United States v. Langford, 990 F.2d 65, (2d Cir. 1993), for the instant case.*

Ms. Cean does not, as the Court's opinion suggests [see D.E. 188 at 8], maintain that Mr. James's mere possession of a real estate license suffices to establish bias or unfitness to serve a juror. To the contrary, the key to her complaint regarding Kiel A. James is that his involvement and a close relative's involvement in apparently unsuccessful real estate ventures was obviously relevant to the issue of whether Kiel James could fairly and impartially sit in judgment of Ms. Cean. Mr. James's failure to disclose his real estate license obviously reinforces the likelihood that he took a personal interest in the outcome of Ms. Cean's trial and concealed his real estate license, and short sale, and the Geoffrey James foreclosure problems, to maximize his chances of being chosen as a juror.

Mr. James himself sold a property at a short sale, an event that usually happens when someone is incapable of making mortgage payments and the economic disaster of

---

THE COURT: Has anybody here who has a mortgage had a negative experience with their mortgage lender or anyone else involved in servicing the mortgage? Anybody? Sometimes these mortgages change hands from one entity to another. Has anybody had difficulties with knowing who they owed their mortgage payment to that weren't readily resolved? No hands for either question.
(Sidebar conference.)

THE COURT: Any other questions you'd like me to ask?

MR. FREEMAN: No. (VD at 87-89 Numbers preceded by "VD" refer to pages in the transcript of the voir dire.)

Case 1:11-cr-00442-1 Document 131-1 Filed 05/05/15 Page 33 of 62 PageID #: 1208

foreclosure is looming on the horizon. Geoffrey James had multiple foreclosure proceedings. Such events evoke strong emotions. Some might even consider them traumatic.

As we noted in our opening memorandum of law in support of Ms. Cean's motion for a new trial, to the extent that Kiel James saw himself and/or Geoffrey James as victims of the lenders who provided them with the mortgages that led to their financial woes, Kiel James would naturally have empathized with those government witnesses, e.g., the straw buyers and others, who according to the government participated in a mortgage fraud scheme because they were "down on their luck" (Trial Tr. 1029) "in desperate financial situations" (Trial Tr. 1182) had barely any money and were "about to lose their home" (Trial Tr. 1029).

Assuming that Kiel James and Geoffrey James were "in the same boat" as some of the government's witnesses, Kiel James would have had an "axe to grind" against anyone who had allegedly caused the government's witnesses the same economic difficulties he and Geoffrey James had experienced. Thus, Kiel James was in no position to impartially and dispassionately pass judgment upon Ms. Cean. To the contrary, to the extent Mr. James blamed others for his own and Geoffrey James's problems, Kiel James would have had an incentive to serve as a juror, if only jury to "even the score." *Sampson v. United States*, 724 F.3d 150, 167 (1st Cir. Mass. 2013)(When a juror has life experiences that correspond with evidence presented during the trial, that congruence raises obvious concerns about the juror's possible bias because the juror may have enormous difficulty separating her own life experiences from evidence in the case).

Apparently, the Court believes that the overwhelming likelihood of bias in such circumstances is not sufficient proof to warrant a new trial or at the very least an evidentiary hearing. In addition, the Court fails to perceive how Mr. James's failure to disclose his real estate license is related to and an indicator of such bias.

7

Case 1:1C-cr-00442-GBD  Document 119-1 Filed 05/05/15 Page 162 Page ID #: 1609

However, as the Second Circuit observed in *United States v. Colombo*, 869 F.2d 149, 151- 1520 (2d Cir. 1989), a prospective juror who lies during *voir dire* exhibits a powerful personal interest in a case. "Such an interest not only suggests a view on the merits and/or knowledge of evidentiary facts but is also quite inconsistent with an expectation that a prospective juror will give truthful answers concerning her or his ability to weigh the evidence fairly and obey the instructions of the court." *Colombo*, 869 F.2d at 151-152.

We agree with the notion that the Second Circuit's opinion in *United States v. Langford*, 990 F.2d 65 (2d Cir. 1993), cautions that *Colombo* does not create a *per se* rule to the effect that intentional dishonesty equals bias. *Langford* does not, however, hold that dishonesty is not probative evidence or an insufficient basis for ordering an evidentiary hearing.

*Langford* was a case in which a doctor was charged with dispensing controlled substances illegally. *See Langford*, 990 F.2d at 66. A female juror – who by an odd coincidence shares the same last name of as Juror Number 6 in Ms. Cean's case -- failed to disclose a welfare-related misdemeanor larceny conviction and a misdemeanor prostitution conviction during voir dire. At a hearing, she later admitted that she concealed these matters because such disclosures would have caused her substantial embarrassment, especially since at the time of voir dire she had a six-year-old daughter, taught Sunday School, and had just taken the board examinations to become a nurse. *Langford*, 990 F.2d at 67. In addition, she thought her repayment of the money involved in the larceny case had resulted in the dismissal of the larceny charge. *Id.*

Thus, a new trial was denied in *Langford*, only after and <u>because</u>, the district court conducted an evidentiary hearing where the juror who was less than candid during voir dire candidly and credibly explained why she had failed to disclose her prior convictions, and her

Case 1:11-cr-00442-DLI   Document 131-14   Filed 05/05/15   Page 3 of 62 PageID #: 1400

explanations completely negated the possibility that she lied to insure that she would be chosen as a juror.  Moreover, the events that the juror failed to disclose in *Langford* "were very different from the matters presented by the evidence in the case she was called upon to decide." *United States v. Sampson*, 820 F. Supp. 2d 151, 196 (D. Mass. 2011)(distinguishing  and explaining *Langford*).

Indeed, the very text of the Second Circuit's decision in *Langford* makes it clear that the Court of Appeals upheld the district court's denial of a new trial in *Langford* because the testimony at an evidentiary hearing established that "the only reason Ms. James withheld this information was to save herself embarrassment." *Langford,* 990 F.2d at 69.  "She was not trying to get on the jury, and she had no animosity or "axe to grind" against Langford. *Langford,* 990 F.2d at 67 (quoting the district court's decision).  Thus, a careful reading of *Langford* shows that it provides no authority for the Court's  denial of Ms. Cean's new trial motion without an evidentiary hearing.

In stark contrast to *Langford*, the Court has no evidentiary basis for concluding that Mr. James had an innocent reason for concealing his real estate license.   More importantly, in contrast to the juror in *Langford*,  Kiel A. James's  and Geoffrey James's unsuccessful real estate transactions, make it exceedingly likely that  Mr. James  had "an axe to grind" against Ms. Cean or her alleged co-conspirators or that his own personal experiences would make it impossible to be impartial.   Yet unlike the juror in *Langford*, Mr. James has not come forward with an explanation for his lack of candor that would dispel or refute the likelihood that he lied in order to get on the jury and exact a measure of retribution for his and his family's unsuccessful real estate transactions.

C.     The Court overlooked additional evidence that casts
       doubt on the truthfulness of Wanda Alston-Stallings and
       her ability to serve as a fair and impartial juror

After Ms. Cean filed her motion for a new trial, Wanda Alston-Stallings's updated

her LinkedIn profile to include the fact that she obtained a real estate license in December 2013.[5]

To obtain that license, she must have satisfactorily completed a 75-hour salesperson qualifying

education course in real estate approved by the Secretary of State, and have passed a qualifying

examination administered by the Department of State.  Thus, in all likelihood, she was studying

to obtain a real estate license when she served as a juror.  Yet unlike other prospective jurors

who disclosed during voir far more remote connections with the real estate industry, Ms. Alston-

Stallings failed to disclose that she was in the process of  obtaining a real estate license.

The Court's decision omits any mention of this newly discovered evidence, even

though it is obviously relevant to the issue of whether she provided full and candid information

in the course of the voir dire.   This newly discovered evidence surely warrants further

investigation, including a hearing at which Ms. Alston-Stallings will have the opportunity to

explain, under oath, her lack of candor.  *United States v. Vitale*, 459 F.3d 190 (2d Cir. 2006).

D.     The Court's decision overlooks Second Circuit precedent
       mandating an evidentiary hearing on Ms. Cean's motion
       for a new trial.

Although the Second Circuit has cautioned against "haul[ing] jurors in after they

have reached a verdict in order to probe for potential instances of bias, misconduct or extraneous

---

[5] The Court's decision expresses some wariness regarding information obtained from internet
sources.  Although we understand that third-party postings on the internet may contain inaccurate
or misleading information about the person who is the subject of the posting, Wanda Alston-
Stallings is obviously the source of the information that appears on her LinkedIn webpage. One
only has to compare her answers during *voir dire* to her LinkedIn webpage to be sure.

influences," [*United States v. Sun Myung Moon*, 718 F.2d 1210, 1234 (2d Cir. 1983)], the Court of Appeals has also emphasized that "a trial court is required to hold a post-trial jury hearing when reasonable grounds for investigation exist." *United States v. Vitale*, 459 F.3d 190, 197 (2d Cir. 2006), *quoting Moon*, 718 F.2d at 1234.

"Reasonable grounds are present when there is clear, strong, substantial and incontrovertible evidence, that a specific, nonspeculative impropriety has occurred which could have prejudiced the trial of a defendant." *Vitale*, 459 F.3d at 197. Notwithstanding the apparent strictness of this standard, the Second Circuit emphasized that:

> Although prior cases are instructive in guiding our determination of what constitutes "clear, strong, substantial and incontrovertible evidence . . . each situation in this area is sui generis," *Moon*, 718 F.2d at 1234, and the allegations <u>need not be conclusive,</u>

*Vitale*, 459 F.3d at 197 (emphasis supplied).

Because, the evidence presented in support of Ms. Cean's motion for a new trial meets or exceeds the standard set forth in *Vitale*, we respectfully request that the Court reconsider its decision in light of the guidance provided by the Court of Appeals in *Vitale*, and hold an evidentiary hearing.

E. Conclusion

For the reasons stated, herein the Court should reconsider its decision of April 24, 2014 and grant Ms. Cean a new trial or in the alternative order an evidentiary hearing on her motion for a new trial, and grant her permission to directly interview Kiel A. James and Wanda Alston-Stallings.

Respectfully submitted,

/s/ Louis M. Freeman

_____

Louis M. Freeman
*Attorney for Defendant Cean*
Freeman, Nooter & Ginsberg
75 Maiden Lane
New York, New York 10038
212-608-0808(p)

```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
 2
       - - - - - - - - - - - - - X
 3
         UNITED STATES OF AMERICA,    :   11-CR-449(SJ)
 4                                    :
                                      :   U.S. Courthouse
 5                                    :   Brooklyn, New York
             -against-               :
 6                                    :   TRANSCRIPT OF
                                      :   SENTENCING
 7                                    :
                                      :
 8       CASSANDRA CEAN,              :   May 9, 2014
                                      :   10:10 a.m.
 9            Defendant.              :
                                      :
10       - - - - - - - - - - - - - X

11     BEFORE:
                     HONORABLE STERLING JOHNSON, JR., U.S.D.J.
12
       APPEARANCES:
13
       For the Government:        LORETTA E. LYNCH, ESQ.
14                                United States Attorney
                                  271 Cadman Plaza East
15                                Brooklyn, New York 11201
                                  BY:  MARIA CRUZ MELENDEZ, ESQ.
16                                     MARGARET GANDY, ESQ.
                                       WILLIAM GULLOTTA, ESQ.
17                                     Assistant U.S. Attorneys

18
       For the Defendant:        LOUIS FREEMAN, ESQ.
19                                NADJIA LIMANI, ESQ.

20

21
       Court Reporter:       Holly Driscoll, CSR
22                           Official Court Reporter
                             225 Cadman Plaza East
23                           Brooklyn, New York 11201
                             (718) 613-2274
24
       Proceedings recorded by mechanical stenography, transcript
25     produced by Computer-Assisted Transcript.
```

Case 1:14-cr-00292-JO Document 265-6 Filed 02/10/2017 10:17:03 Page 167 of 192

2

1          THE CLERK:  USA versus Cassandra Cean.

2          THE COURT:  Note your appearances.

3          MS. CRUZ MELENDEZ:  Good morning, Your Honor, Maria

4   Cruz Melendez, Margaret Gandy and Bill Gullotta for the United

5   States.

6          PROBATION OFFICER:  And Erin Stewart from Probation.

7   Good morning, Your Honor.

8          MR. FREEMAN:  Good morning again, Louis Freeman and

9   Nadjia Limani for Cassandra Cean.

10         THE COURT:  Ms. Cean, have you read and discussed

11  the presentence report with your lawyer?

12         THE DEFENDANT:  Yes, Your Honor.

13         THE COURT:  Are you ready for sentencing?

14         THE DEFENDANT:  Yes, Your Honor.

15         THE COURT:  Do you wish to say something?

16         THE DEFENDANT:  I just want to tell all those that

17  support me from the church, from my family, my friends, thank

18  you so much and, of course, I want to thank God for giving me

19  the strength to endure this, and I also want to thank you,

20  Your Honor.

21         THE COURT:  Counsel.

22         MR. FREEMAN:  Your Honor, there are members of the

23  family, three of them, that would like to make brief

24  statements.  I'm not sure what your practice is --

25         THE COURT:  No.

Case 1:08-cr-00292-JD Document 92 Filed 01/13/2017 Page 168 of 192

1          MR. FREEMAN:  -- but I would make that request.

2          THE COURT:  No.

3          MR. FREEMAN:  All right.  Well, each of them has

4   written a letter which I'm sure you've read.

5          THE COURT:  I have that.

6          You wish to say something?

7          MR. FREEMAN:  I do, Your Honor.  First of all, as

8   per the teachings of our Supreme Court, we have to go through

9   the guidelines and we do have objections.

10          THE COURT:  You have some objections to the

11   guidelines.

12          MR. FREEMAN:  Pardon me?

13          THE COURT:  You have some objections to the

14   guidelines.

15          MR. FREEMAN:  I do and, if the Court pleases, I'd

16   like to go through them now.

17          THE COURT:  Go ahead.

18          MR. FREEMAN:  The first one is an objection to loss

19   amount and the loss amount that we calculate is $504,000, and

20   would you like me to go into the reasons?

21          THE COURT:  No, I've got it on paper but if you want

22   to make a record.

23          MR. FREEMAN:  Well, Judge, just briefly on that

24   score, the Stillwell property, which the closing took place in

25   September of '05 and there was another closing that took place

Case 1:13-cr-00392-JEI Document 98 Filed 03/13/2018 1:17-03 Page 169 of 192

1    in May of '06, and in those instances the closing date is more

2    than five years before the indictment and it is not our

3    argument, as the government thinks it might be, that those

4    properties cannot be counted because they're part of a

5    conspiracy, it's more than that.  The fact is that the

6    statute, both the bank fraud statute and we argue the wire

7    fraud statute does not prohibit financial transactions unless

8    they're from a bank or a financial institution.

9           Now, the statute was changed in 2009 to bring in

10   financial institutions other than banks and these are

11   financial institutions other than banks and they should not be

12   allowed to count for sentencing purposes because they predate

13   the statute and they predate five years prior to the filing of

14   the indictment.

15          THE COURT:  What institution is other than the bank?

16          MR. FREEMAN:  In this case they were lending

17   institutions that weren't banks.

18          THE COURT:  Okay.

19          MR. FREEMAN:  Now, the statute that went into effect

20   in 2009 said the statute of limitations for banks and

21   financial institutions is now expanded from five years to ten

22   years but that didn't occur until 2009 and that occurred more

23   than five years prior to the indictment and, as a result, we

24   believe that the Stillwell properties, if you look at our

25   chart on page four or Probation's chart on page ten, you'll

Case 1:12-cr-00763-JG Document 86-6 Filed 06/14/17 Page 170 of 192

5

1   see that these closings took place outside what we argue is

2   the appropriate statute of limitations and also prior to the

3   change in the law.

4           MS. CRUZ MELENDEZ:  Your Honor, if I may be heard on

5   that?

6           THE COURT:  Yes.

7           MS. CRUZ MELENDEZ:  The government maintains that

8   the defense counsel's invocation of bank fraud statutes is

9   irrelevant here.  The government doesn't dispute the fact that

10  the statute of limitations in this case is five years.  The

11  defendant was charged and convicted of wire fraud conspiracy

12  and substantive wire fraud counts.  We do not dispute that the

13  statute of limitations is five years.  I think the issue here

14  is that she was convicted of wire fraud conspiracy.  Given

15  that fact, if the conspiracy continued beyond the limitations

16  period and there were overt acts that occurred within the

17  limitations period, then the defendant can be held accountable

18  both criminally and for purposes of loss for actions that

19  occurred prior to the statute of limitations period which

20  includes the 55 Stillwell Place transactions which occurred on

21  9/22/2005 and 5/11/2006.

22          The 9/22/2005 transaction did not amount to a loss,

23  as Probation has stated, and I don't think defense counsel

24  disputes that, and the May 11th, 2006 had a loss of $514,250.

25          THE COURT:  Now, what was the statute she was

Case 1:18-cr-00292 Document 36 Filed 03/14/2019 Page 171 of 192

1  convicted of, wire fraud or was it wire fraud through a

2  banking institution?

3            MS. CRUZ MELENDEZ:  Plain wire fraud, Your Honor.

4            MR. FREEMAN:  Not through a banking institution.

5            MS. CRUZ MELENDEZ:  Yes, and the government doesn't

6  dispute the fact that the lender wasn't a financial

7  institution which is why I believe that the defense counsel's

8  use of the banking statute is completely irrelevant here.  No

9  one is disputing the fact that it is a five year statute of

10 limitations, and the larger issue is that there was a

11 conspiracy conviction here and if there was a conspiracy

12 conviction here, then the defendant is responsible for those

13 items that occurred within the conspiracy even if it is before

14 the statute of limitations as long as the conspiracy continued

15 past the period of limitations and there were overt acts that

16 occurred which the government believes they proved beyond a

17 reasonable doubt at trial.

18           MR. FREEMAN:  The government says past the statute

19 of limitations period and also past the conspiracy.  This

20 happens to be before and we're arguing that it wasn't a crime

21 that is permitted to be considered for sentence because it is

22 beyond the five year statute of limitations, it is earlier

23 than the five year statute of limitations go back.

24           MS. CRUZ MELENDEZ:  And Your Honor --

25           THE COURT:  No, no, that's it.

Case 1:13-cr-... Document 98... Filed 03/13/201... Page 172 of 192

1      Let's hear your second point.

2      MR. FREEMAN:  That's the point.

3      THE COURT:  No, you have three.

4      MR. FREEMAN:  I'm sorry, thank you, Judge.  I

5  apologize, I misunderstood.

6      The second point is that the probation report does

7  not properly calculate the loss amounts for Stillwell Place,

8  New Jersey Avenue and East 87th Street because they use a tax

9  assessment.  Now, as the Court knows from its own experience,

10  both as a citizen and as a jurist, a tax assessment may not be

11  up to date, it may not be accurate, it may be much lower than

12  the actual fair market value of the property is and by using a

13  tax assessment, my client is prejudiced.

14      Now, the Probation Department sought an affidavit of

15  loss from the financial institutions and they got no answer.

16  I subpoenaed the loss amounts from each and every transaction

17  in each and every financial institution that loaned money in

18  this case and I couldn't get an answer, not a single one.

19  Some of the financial institutions, for example, ABC, I think

20  it's called, came back as undeliverable because the company

21  doesn't exist anymore.  But, in any event, we don't have the

22  actual fair market value, we're just going by assessments and

23  that is an unfair way to deal with this important point.

24      So, that is point number two and I ask the Court to

25  consider getting this information before we move further.

1    Now, one of the ways to do this and the only way I could

2    think of doing this would be to have the government get

3    appraisals for these properties and then we would know what

4    the true fair market value is and then the sentence would

5    reflect, as Rule 32 of the Criminal Procedure Law requires,

6    reliable information and we don't have that at this time.

7            THE COURT:  You want to address that?

8            MS. CRUZ MELENDEZ:  Yes, Your Honor.  Your Honor,

9    the guidelines specifically state that there's a rebuttable

10    presumption that the most recent tax assessment is a fair

11    representation of the fair market value.  So, defense

12    counsel's argument that the fair market value has not been

13    determined here I believe runs completely contrary to what the

14    guidelines call for.  Probation has determined what the most

15    recent tax assessment is, has provided that to the Court.  The

16    guidelines have stated that that can be used as a proxy for

17    fair market value and so the government maintains that there's

18    no need to have appraisals done without the defendant showing

19    that the tax assessment values are incorrect in this case.

20            MR. FREEMAN:  Well, how are we supposed to do that?

21            THE COURT:  No, you've got your record.

22            Let me hear your third point.

23            MR. FREEMAN:  All right.  Your Honor, our third --

24    and if I didn't use the term Fatico hearing when I said that

25    we would have an appraisal, I meant that by way of a Fatico

Case 1:14-cr-00292 Document 96 Filed 11/13/2017 Page 174 of 192

9

1    hearing.

2          The third point is that the East 87th Street

3    property has not been shown to be part of the conspiracy.

4    Now, what the probation report said is that my client was

5    involved in every transaction which comprises the instant

6    offense with the exception of the two 641 East 87th Street

7    transactions and, Your Honor, that's clear, that's clear, she

8    was not involved.  The government didn't put up any proof at

9    trial that she was involved.  This was a Mr. Shane Browne

10   operation that didn't involve her.  She was not the closing

11   attorney.  She was not involved whatsoever.  Her name does not

12   appear on the chart that the Probation Department put

13   together.  In fact, there was another closing attorney named

14   Gerald Karlen who was involved.

15         So, it is our position that since Cassandra Cean

16   played no role in the transactions, we can't use the loss

17   amount associated for that property.

18         MS. CRUZ MELENDEZ:  Your Honor, with regard to that,

19   the government presented evidence at trial that multiple

20   closing agents were used during the course of the conspiracy,

21   that Cassandra Cean had involvement with other closing agents

22   and, frankly, the case law on this issue states that a

23   participant in a conspiracy need not know every act that other

24   participants in the conspiracy are committing during the

25   course of the conspiracy.  So, the mere fact that she wasn't

1    the closing agent doesn't take away her accountability for the

2    actions of her other co-conspirators.

3          We go into more detail with regard to this in our

4    submission but also I'd like to note that in the event we were

5    to take away the loss with regard to 87th Street, it doesn't

6    reduce the loss amount because the threshold is above a

7    million dollars and so if you remove $187,000, we're still

8    above a million dollars and so, either way it would not affect

9    the loss calculation and there would still be an enhancement

10   of 16 points.

11          THE COURT:  Next point.

12          MR. FREEMAN:  Well, before I leave that point,

13   Judge, if you don't mind, this is a situation where the

14   government is saying even though she didn't attend the

15   closing, that what happened at that closing was reasonably

16   foreseeable to her and I don't think that that's an accurate

17   factual statement and I don't think it supports the conclusion

18   that it is reasonably foreseeable to her.

19          Mr. Shane Browne was involved in a lot of nefarious

20   activities and my client didn't know about all of his

21   activities and she wasn't present at the closing and there's

22   no direct proof or even credible indirect proof that she was

23   knowledgeable or that the closings were reasonably -- what was

24   generated by the closings was reasonably foreseeable to her.

25          The next point, Judge, is obstruction of justice and

Case 1:18-cr-... Document... Filed... Page 176 of 192

1   the probation report gives my client an extra two points for

2   essentially testifying during trial during which she denied

3   involvement and denied knowledge of the fraudulent activities

4   which comprised the instant offense.  And I think what we have

5   here is a situation where, first of all, the probation report

6   did not provide enough information, enough facts for you to go

7   on in assessing these two points.

8           THE COURT:  I tried this case.

9           MR. FREEMAN:  I understand.  But more importantly, I

10   don't believe that the guidelines stand for the proposition

11   that if a client testifies and a jury finds her guilty, that

12   that's sufficient to find the enhancement.  There has to be

13   more.

14           THE COURT:  Okay.

15           You want to address it?

16           MS. CRUZ MELENDEZ:  Your Honor, the government's

17   position here and I believe Probation's position here is not

18   merely the fact that the defendant testified and stated that

19   she was not guilty of the crime, there were specific instances

20   in which the defendant claimed that she did not commit certain

21   acts or that she was not aware of certain things taking place

22   but we had witnesses and documents that completely contrasted

23   that and I think the jury's verdict reflected the fact that

24   they did not believe her testimony and that her testimony was

25   false.

Case 1:12-cr... Document 96... Filed 07/31/2013... Page 177 of 192

12

1     For example, there was discussion with regard to the

2   signing of a power of attorney and whether certain individuals

3   were present.  With regard to Ms. Joanne Legair and Ms. Debra

4   Robinson, they both testified contrary to the defendant's

5   testimony that Ms. Joanne --

6          THE COURT:  I recall that.

7          MS. CRUZ MELENDEZ:  -- was not present --

8          THE COURT:  The power of attorney was signed

9   and they testified the power of attorney was signed in

10   Ms. Legair's house and that Ms. Cean was not present.

11          MS. CRUZ MELENDEZ:  That's correct, and when asked

12   on cross-examination whether or not Ms. Legair was present,

13   Ms. Cean testified that she was.  That's directly contrary to

14   testimony that was presented.  I believe if the jury were to

15   have believed her testimony, then it would have affected the

16   manner in which the actual verdict came out.

17          I think there are other examples of that, Your

18   Honor, we've mentioned them in our sentencing submission and

19   so I don't think we have a situation here where the defendant

20   merely got up and said, I did not have the intent and I'm not

21   guilty of this crime.  We went through specific instances in

22   which the defendant denied performing certain acts that were

23   the actual offense conduct that she was convicted for.

24          THE COURT:  All right.

25          Next point.

Case 1:12-cr-... Document ... Filed ... Page 178 of 192

1    MR. FREEMAN:  Your Honor, with respect to minor role

2    adjustment, we ask that a minor role adjustment be granted.

3    In this case, I'll take the example of Shane Browne, he walked

4    away with $667,000, there will be an argument about the

5    calculation later, but we have calculated that my client had

6    received $18,000 in legal fees and that is almost 36 times --

7    well, it would be 1/36th of what Mr. Shane Browne received,

8    and also the total amount of fraud as assessed by the

9    Probation Department is over a million dollars and that is

10   approximately 1/50th, 18,000 is approximately 1/50th of a

11   million dollars.

12        So, we're asking the Court to put my client's role

13   in context and to declare her a minor participant given the

14   fact that Shane Browne was the mastermind, Shane Browne did a

15   number of closings, he did closings in other cases that didn't

16   come before the Court, and in relation to him and in relation

17   to the other participants in this case, she is in fact a minor

18   participant.  The fact that she's a lawyer doesn't change

19   that.  She was a functionary to Shane Browne.  She was doing

20   closings for him, she was the closing attorney.  In our

21   opinion, it is a simple equation.

22        The fact that she is an attorney makes the

23   calculation a little unusual because attorneys aren't usually

24   considered minor participants because of their status but if

25   you look at this case in terms of what she did, how she did

Case 1:14-cr-20332-JIC Document 88 Entered on FLSD Docket 12/17/2015 Page 179 of 192

1  it, when she did it, the limited number of times she did it,

2  the limited number of -- the money that she received, she is

3  in fact a minor participant.

4          THE COURT:  You want to address that?

5          MS. CRUZ MELENDEZ:  Yes, Your Honor.  No one

6  disputes that Shane Browne was a manager and a leader, he

7  received an enhancement based on his role.  The government is

8  not seeking an enhancement for Ms. Cean in this case.

9  However, given her role as the closing attorney in the large

10 majority of these transactions, the fact that she was the

11 liaison with the lending institutions, the fact that she

12 distributed the funds to herself and her co-conspirators, I

13 think it is very difficult to state that she should be given a

14 minor role adjustment.  But for her conduct, this fraud may

15 not have been able to take place.  If the lawyer says, I don't

16 believe that these straw buyers are able to make these

17 payments, this information seems strange to me, I think it's

18 fraudulent, there's no fraud here.

19         So, I think the statement that she had a minor role

20 and that her role was merely functionary is incorrect and the

21 government strongly objects to a minor role adjustment.

22         MR. FREEMAN:  Your Honor, Shane Browne used other

23 closing attorneys, he used Gerald Karlen, we mentioned his

24 name today.  He recruited straws, he was good at it.  It's not

25 surprising that most of the straws are woman and it is not

Case 1:14-cr-00322 Document 96 03/13/2017 1:17:03 Page 180 of 192

15

1  surprising that Bibi Omar is a woman, it is not surprising

2  that Kim Ramlochan is a woman, it's not surprising that my

3  client is a woman.  He was good at recruiting people and he

4  recruited my client as well as the straws.

5          THE COURT:  All righty.  Do you want to address now

6  the mitigation circumstances?

7          MR. FREEMAN:  Yes, Your Honor.

8          Your Honor, this is a difficult case for me.  A

9  fellow lawyer stands before the Court about to be sentenced.

10 She's soon to be disbarred.  Under New York State law, upon

11 sentence, she has to notify the Disciplinary Committee and it

12 is automatic disbarment for a felony.  My client also has a

13 license as a nurse.  A felony conviction will also cause her

14 to lose that license.  Her name is going to be in the Law

15 Journal for all the legal world to see as a disbarred

16 attorney.

17         I recently made reference here today to the fact

18 that she was recruited by Shane Browne.  She was in fact

19 recruited by Shane Browne.  He's good, he's good at

20 recruiting, he's good at manipulating.  I already referred to

21 the fact that it is no accident that the people he surrounds

22 himself with are females, one he even convinced her to refer

23 to him as her son.

24         It is no accident that Shane walked away with

25 $667,000 but Cassandra Cean walked away with legal fees of

Case 1:13-cr-00292-JG Document 35 Filed 10/15/2013 Page 181 of 192

1    $18,637.  Of course he took advantage of her.

2         Now, she was a solo practitioner when this occurred

3    just starting out and as a solo practitioner, there was no

4    training, there was no sharing, there was no one to bounce

5    ideas around.  It is not like the D.A.'s Office or the U.S.

6    Attorney's Office or the Legal Aid Society or Federal

7    Defenders or a big legal department at a company like GE,

8    you're on your own and you try to build a practice and you

9    don't necessarily do it just right.

10        I believe you now know that my client is pregnant

11   and I wish to inform the Court in no uncertain terms, and I

12   think that's one of the points that her husband was going to

13   address, was that she and her husband have been trying to

14   conceive a child for almost ten years and they were told in no

15   uncertain terms that she couldn't get pregnant and this was

16   not an intentional pregnancy because she had no idea that she

17   could become pregnant and became pregnant by accident.  And it

18   doesn't help her situation, it makes her situation that much

19   sadder and that much more difficult.  And I think you know

20   from our submission that she is a high risk patient and I

21   think you know from the government's submission that they have

22   graciously agreed to join me in a request to have her

23   surrender after she gives birth and I hope that you will

24   consider that.

25        Your Honor, in court today are my client's husband

Case 1:13-cr-00392-JG Document 36 Filed 12/03/2013 Page 182 of 192

1  on the far right, her brother next to him, her pastor,

2  Mr. Ronald Cooley, and that's Peggy Harris, a dear friend

3  and a client.

4       It is important for her to have these people here

5  today and in her life because, as she told you when she spoke,

6  she doesn't know how she could go through this without their

7  support.

8       Your Honor, my client is going to not have any

9  profession, whether it be legal or nursing.  She's seriously

10 in debt.  She's in debt to the tune of about $649,000.  Her

11 house is being foreclosed on after being destroyed by Sandy.

12 Everything in her life, except her marriage, her pregnancy,

13 her church and her friends, is as bad as it could get and

14 she's suffering.  Even if she doesn't suffer on the outside,

15 she suffers on the inside.

16      And Your Honor, Your Honor should consider all this

17 suffering in coming up with a correct sentence for Cassandra

18 Cean.  As you know from our submission, her parents are ill.

19 Now she has a high risk pregnancy.  This is not a woman who

20 needs incarceration.  This is a woman who can give back to the

21 community in ways that she's already given to the community.

22      I'm sure Your Honor noticed the chart that we

23 supplied at the end of our sentencing submission recounting

24 the work that she does for the community already.  It is

25 amazing that she takes care of her parents, that she had a

Case 1:14-cr-00392-JG Document 96 Filed 12/03/14 Page 183 of 192

1  full-time practice and that she gave so much time and effort

2  to community causes and to her church and that she was so good

3  to her clients and that she took out time to help Ronald

4  Cooley study for the bar exam, her pastor praises her for the

5  work that he's done, the fact that she was working as a nurse

6  in a nursing home when she started working as an attorney to

7  make ends meet, it's truly remarkable what she's done.

8          And as I said in my sentencing submission and as the

9  letters in support make clear, that what you see from this

10  case and the person that you see standing before you today is

11  not the whole Cassandra Cean, there's more to her than what

12  you see.

13          Now, I said in my sentencing submission that we

14  don't believe that a sentence of -- let me phrase it the other

15  way.  We believe that a sentence of less than 36 months is

16  appropriate because that's the sentence that Kim Ramlochan

17  received and we believe that the sentence that Cassandra Cean

18  receives should be comparable because they are in fact

19  comparable and that to do otherwise would be to do a

20  disservice to the 3553(a) factors which includes the factor

21  not to make sentences disparate.

22          My client, if she receives a sentence of probation,

23  for example, which I know would be a huge departure in the

24  guidelines, I should say a huge variance in the guidelines,

25  but if she does and the Court imposed 2,500 hours of community

1   service over a five-year period, she would do more for the

2   community than incarceration would do for society.

3           I can only ask that Your Honor be as lenient as

4   possible when you sentence Cassandra Cean. You sat through

5   the trial, you know what the facts of the case are, you

6   observed her demeanor, you've read the sentencing submissions.

7   A sentence anywhere near the guidelines of 70 to 87 months is

8   way more than what's necessary to effectuate the goals of

9   3553(a) and I would ask you, Your Honor, to consider the

10  following rulings and recommendations; first, that if you do

11  sentence Cassandra Cean to a jail term, that she be allowed to

12  surrender 90 days after giving birth and that if you do

13  sentence her to jail time, that you recommend that she be as

14  close to the New York metropolitan area as possible so that

15  she could maintain contact with what's hopefully going to be

16  her first child as an infant.

17          That concludes my remarks on her behalf.

18          THE COURT:  Counsel.

19          MS. CRUZ MELENDEZ:  Your Honor, before responding

20  substantively, just for the sake of the record, I wanted to

21  note, and I'm sure Your Honor has reviewed this, the

22  government filed its own objections on April 30th, 2014.

23  They're largely factual in nature but Probation has not yet

24  submitted an addendum to the PSR so we'd ask that it be

25  adopted.  I can go through them in turn, Your Honor.

1        THE COURT:  I thought I did receive an addendum.

2        MS. CRUZ MELENDEZ:  There was an addendum with

3 regard to other issues and subsequent information that

4 Probation received but there was no addendum.

5        THE COURT:  I have an addendum dated April 16th.

6        MS. CRUZ MELENDEZ:  I believe that's correct, Your

7 Honor.  We submitted an objection letter April 30th and there

8 was no subsequent addendum with regard to the government's

9 objections.

10        THE COURT:  You wanted to address that?

11        MS. CRUZ MELENDEZ:  Yes, just very quickly.  The

12 first objection dealt with the actual sentence received by

13 both Shane Browne and Kim Ramlochan.  The PSR did not have

14 that information listed in there.  Shane Browne received a

15 sentence of 51 months imprisonment and was ordered to pay

16 restitution of $1,205,355 and to pay a forfeiture amount of

17 $667,480.65.  Kim Ramlochan was sentenced to 36 months and

18 ordered to pay restitution of $1,196,355 and a forfeiture

19 amount of $80,760.

20        We also noted that there was a typo I believe

21 with regard to the indictment's charge and so we would note

22 that paragraph five needs to be corrected as noted in our

23 April 30th letter, as does paragraph six.  Paragraph 30, we

24 also noted that Shane Browne did in fact receive an

25 aggravating role adjustment of two points which was not

Case 1:16-cr-00292-JO Document 85 Filed 03/18/2019 1:17-03 Page 186 of 192

1  listed in the PSR.

2      We also noted that paragraphs 93, 101 and page three

3  needed to be corrected to note that the applicable maximum

4  term of imprisonment is actually 20 years and not 30 years and

5  that the maximum fine is actually $250,000, not $1,000,000

6  because financial institutions were not involved.

7      And finally, Your Honor, we noted that we believed

8  the amount listed by Probation as the gain for Ms. Cean, which

9  was in excess of I believe $54,000, was incorrect.  The

10  government maintains and believes we proved at trial that the

11  defendant earned $41,700.57 plus an additional $2,000 to

12  $3,000 in cash from cash she received from Ms. Comacho at a

13  meeting that occurred at her office during the course of the

14  conspiracy.

15      With regard to defense counsel's statements, Your

16  Honor, and the government's position as to sentencing, as I

17  previously stated, the defendant had a pervasive role in this

18  fraud.  The fraud was extremely serious.  It involved multiple

19  transactions over several years and they were able to obtain

20  in excess of $4,000,000 in funds as a general matter, gross,

21  Your Honor.

22      I believe the defense's request for a

23  non-incarceratory sentence here is just simply inappropriate.

24  As we've discussed, Kim Ramlochan received 36 months

25  imprisonment; her co-defendant, Shane Browne, received 51

Case 1:14-cr-... Document ... Filed ... Page 187 of 192

1  months imprisonment.  While no one is disputing that Shane

2  Browne had a huge role in the conspiracy by recruiting straw

3  buyers, Ms. Cean's role was different but no less crucial than

4  Mr. Shane Browne in that she finalized the transactions and

5  distributed the funds amongst the co-conspirators.

6          I think two things, Your Honor, that are important

7  to take into account is the fact that she is an attorney, she

8  has ethical obligations to her clients and to her community

9  and she completely went contrary to those when she used the

10 vulnerability of straw buyers who came in, individuals who

11 were looking to sell their homes, had them sign powers of

12 attorney to individuals where they could essentially steal

13 property out from under them without providing the money that

14 was due to them at the end of the transaction.

15         And I think it is important, Your Honor, to note

16 that the defendant has yet to take responsibility for her

17 actions.  Even here today, Your Honor, the defendant is

18 stating that she was duped by Shane Browne and I think there's

19 a disparity between the sophistication that the defendant has

20 tried to state to Your Honor with regard to her ability to

21 work hard and become an attorney and the statement that she

22 was somehow duped because she's a female by Mr. Shane Browne.

23 I think there's just no reconciling that.  And given the use

24 of her law degree to effectuate the fraud, we believe that a

25 significant incarceratory sentence is necessary in this case.

Case 1:16-cr-...-J... Document 8... Filed 01/13/2017 ... 17-003 Page 188 of 192

23

1    THE COURT:  Let me address the objections to the

2    guidelines.  Number one, the government proved that there was

3    a conspiracy and that it occurred within five years of the

4    indictment and under conspiracy laws, the defendant is liable

5    for acts prior to those five years if overt acts are proven

6    and it was in this case, and I tried the particular case, so I

7    think the Stillwell Avenue is a property that can be counted.

8         There's a dispute over whether the amount of money

9    involved was 500 some thousand dollars or over a million

10   dollars.  2B1.1 addresses that issue.  2B1.1 says that in

11   instances such as this, the amount to be determined will be

12   the actual amount or the intended amount, whichever is

13   greater.  I find specifically that the government has proven

14   that the intended amount is over one million dollars, so I

15   think 16 points is proper in this case.

16        With respect to obstruction, this is not a case

17   where the defendant said, I am not guilty, I did not do it.

18   Defendant testified to material statements that were false.

19   The jury found that the defendant did not tell the truth under

20   oath.  Specifically, I recall the instance in which one of the

21   witnesses, Ms. Dickerson, said that she gave a power of

22   attorney to Ms. Robinson and that it was signed in her

23   apartment and that Ms. Cean was not there.  That testimony

24   was false and the jury credited the testimony of the

25   witnesses.

# ADDENDUM F - SENTENCING TRANCRIPT

Case 1:16-cr-... Document ... Filed ... Page 189 of 192

1      With respect to minor role, I disagree with the

2  assertions of defense counsel that Ms. Cean's role was minor,

3  that she was a closing attorney, that she disbursed the funds.

4  She knew or should have known that what she was doing was

5  wrong.  So, I reject that argument.  I adopt the findings of

6  the presentence report.

7      I have examined the submissions, listened to the

8  arguments of counsel and I think a sentence that is sufficient

9  but not greater than necessary in this particular instance,

10  particularly given the background of this defendant, she was a

11  Horatio Alger story, she had it all, she was to be admired

12  having worked, gone to school, a nurse, then becoming a

13  lawyer, but she threw it all away just for the sake of a quick

14  dollar; so, I think that a sentence that is sufficient but not

15  greater than necessary is the one I'm going to pronounce:  I'm

16  going to sentence the defendant to the custody of the Attorney

17  General or his duly authorized representative for a period of

18  87 months.  I sentence the defendant to three years supervised

19  release and I sentence a $100 special assessment on each count

20  for a total of, what is it, four counts or five counts?

21      MS. CRUZ MELENDEZ:  Five counts, Your Honor.

22      THE COURT:  I am also ordering forfeiture, I'm

23  signing the forfeiture order, $43,700.57.  I order restitution

24  in the amount of $1,205,355 jointly and severally to be paid

25  at the rate of $25 per quarter while in custody and a rate of

Case 1:14-cr-00292-JM Document 86-1 Filed 09/18/17 Page 190 of 192

1  ten percent of her gross income per month while she's out on

2  supervised release.  I waive the interest.

3          Defendant shall make full financial disclosure to

4  Probation and she shall participate in a credit counseling

5  program.  She shall refrain from any employment which involves

6  real estate transactions and mortgages.  And she shall not

7  possess a firearm, ammunition or destructive device.

8          I'm going to allow the defendant to surrender in

9  September of this year.  The defendant can make an application

10  if she's still bearing her child in September to extend that

11  but September is the date.

12          Give them a date, Ana.

13          I advise the defendant you have a right to appeal

14  this sentence and also appeal this conviction.

15          THE CLERK:  September 19th.

16          THE COURT:  Do you want to surrender to the

17  institution or to the Marshals?

18          MR. FREEMAN:  Your Honor, you're aware that her due

19  date is November?

20          THE COURT:  I said that you can make an application

21  in September.

22          MR. FREEMAN:  Well, when she surrenders, we would

23  ask that she be surrendering to the institution.

24          THE COURT:  Okay.

25          MR. FREEMAN:  And we would ask that you recommend an

Case 1:18-cr-... Document ... Filed ... Page 191 of 192

26

1  institution in the New York metropolitan area as close to New

2  York City as possible.

3           THE COURT:  For whatever it is worth, I will make

4  that recommendation.

5           Is there anything else?

6           MS. CRUZ MELENDEZ:  Your Honor, there was an

7  underlying indictment, because she was convicted on a

8  superseding indictment, and so the government would move to

9  discharge the underlying indictment.

10          THE COURT:  It will be dismissed.

11          MS. CRUZ MELENDEZ:  Thank you, Your Honor.

12          (Time noted:  10:50 a.m.)

13          (End of proceedings.)

14

15

16

17

18

19

20

21

22

23

24

25

**Rule 32(a) Statement**

**Certificate of Type-Volume Limitation, Typeface
Requirements and Type Style Requirements**

A Motion for Permission to File an Oversized Brief was filed on
January 6, 2015, seeking permission to file a brief of no more than
26,100 words.

By Order dated January 14, 2015 (DOC 80) the Court denied
permission for a brief of 25,247 words. However it granted
permission to file a revised brief of no more than 20,000 words.

This brief contains 19,405 words, excluding the parts of the brief
exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief therefore complies with the Court order.

This brief has been prepared in a proportionally spaced typeface using
Microsoft Word in 14 point Times New Roman.